**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **VIVOS ACQUISITIONS, LLC,** | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-01606-RDA-TCB |
| **HEALTH CARE RESOURCE NETWORK, LLC**, EL AL. | |
| Defendants. | |

## FIRST AMDNED COMPLAINT

Plaintiff, Vivos Acquisitions, LLC ("Vivos and/or Plaintiff"), by and through undersigned counsel, pursuant to Fed. R. Civ. Pro 15(A) submits the following Amended Complaint against Health Care Resource Network, LLC ("HCRN"), Laura Bankeroff, ("Bankeroff") and Joann Koutsioukis ("Koutsioukis"), and states as follows:

### PARTIES

1.     Plaintiff Vivos Acquisitions, LLC is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business 10529 Crestwood Drive, Suite 201, Manassas, Prince William County, Virginia.   Vivos is a citizen of the Commonwealth of Virginia, as its members are citizens of the Commonwealth of Virginia.

2.     HCRN is a Nevada limited liability company HCRN, with its principal place of business located in Montgomery County, Maryland.

3.     HCRN's current members are Defendants Bankeroff and Koutsioukis who are also residents of Montgomery County, Maryland.  As such, HCRN is deemed a citizen of the State of Maryland.

4.     Defendant Bankeroff is a natural person over the age of eighteen who, upon information and belief, resides in Montgomery County, the State of Maryland and is *sui juris*.

5.     Defendant Koutsioukis is a natural person over the age of eighteen who, upon information and belief, resides in Montgomery County the State of Maryland and is *sui juris*.

### JURISDICTION AND VENUE

6.     Pursuant to the jurisdictional provisions of contracts between the parties and consent of the Defendants, the parties have stipulated to the jurisdiction of the Circuit Court for Fairfax County, Virginia for purposes of this litigation.

7.     Jurisdiction is vested in this Court and proper pursuant to 28 U.S.C. § 1332 which provides that "[t]he district courts shall have jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different states." As set forth below, this action satisfies each of the requirements of 28 U.S.C. § 1332(a).

8.     The Complaint seeks damages of more than $10 million. Accordingly, the amount in controversy exceeds $75,000.

9.     The required diversity of citizenship is satisfied because there is complete diversity among the parties.

10.     Venue is proper in this district because the Membership Interest Purchase Agreement attached hereto and incorporated herein as **Exhibit 1** between the parties specifies that the Agreement shall be governed by Virginia law and "any court of competent jurisdiction located in Fairfax County, Virginia," which includes this Court for matters involving federal subject matter jurisdiction, shall have jurisdiction over proceedings to enforce the agreement.

11.     Fairfax County, Virginia, is located within this judicial district. *See* 28 U.S.C. §

127(a).

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2)(the contracts were executed in Virginia), and 1391(b)(3)(by agreement of the parties) and by Agreement of the parties to this action.

**FACTS COMMON TO ALL COUNTS**

13.     HCRN is a company engaged in the business of providing staffing solutions to businesses, specializing in medical professional and support staff for government and military treatment facilities.

14.     Many of HCRN's services are provided to government agencies and military treatment facilities.

15.     Prior to February 10, 2017, HCRN was owned and managed by Laura Bankeroff, who owned 51% membership interest in the company, and Joann Koutsioukis, who owned 49% membership interest in the company.

16.     On or about February 10, 2017, Plaintiff and Defendants entered into a Membership Interest and Purchase Agreement.

17.     Attached hereto and incorporated herein as **Exhibit 1** is a true and accurate copy of the Membership Interest and Purchase Agreement, dated February 10, 2017 ("Membership Interest Agreement").

18.     Pursuant to the Membership Interest Agreement, Vivos acquired from Bankeroff and Koutsioukis all membership interests in HCRN for a purchase price of Eight million Five Hundred Eighty Thousand and 00/100 Dollars $8,580,000.00 with the sum of Four Million, Eighty Thousand and 00/100 Dollars ($4,080,000.00), to be deferred and paid pursuant to various Promissory Notes to Defendants Bankeroff and Koutsioukis.

19.     Specifically, the parties to the Membership Interest Agreement between Vivos,

as buyer, and Bankeroff and Koutsioukis, agreed, *inter alia*:

> **Purchase Price.** The purchase price for the Membership Interests shall be $8,580,000.00 (the "***Purchase Price***"), and Buyer will deliver the Purchase Price to the Sellers in the following manner:
>
> (a) On the Funding Date, Buyer will deliver to Sellers, by wire transfer, the total amount of $4,300,000.00, payable as follows:
>
>> Laura Bankeroff $2,193,000.00
>> Joann Koutsioukis $2,107,000.00
>
> (b) At Closing, Buyer will also execute and deliver to Sellers promissory notes in substantially the form of Exhibit A, with one note payable to Bankeroff in the principal amount of $2,182,800.00 (the "***Bankeroff Note***") and the other note payable to Koutsioukis in the principal amount of $2,097,200.00 (the "***Koutsioukis Note***" collectively with the Bankeroff Note, the "***Seller Notes***"). The Seller Notes shall provide for, among other things, a term and amortization period of fifty-seven (57) months, payment commencing three (3) months after the Closing Date, the accrual of interest at a fixed rate of 4.50% per annum, prepayment without any penalty, and Buyer's right of setoff as set forth herein at Section 7.3. The Seller Notes shall be secured by a pledge by Buyer of the Membership Interests, all in accordance with the terms and conditions of a Membership Interest Pledge and Security Agreement in substantially the form of Exhibit B hereto (the "***Pledge Agreement***").

20.     Immediately prior to February 10, 2017, the membership interests of HCRN

were as follows:

> Laura Bankeroff 51%
> Joann Koutsioukis 49%

21.     Defendants Bankeroff and Koutsioukis were the sole and beneficial owners of

any interest in HCRN until the time of the closing on February 10, 2017.

22. In paragraph 5.4 of Membership Interest and Purchase Agreement the parties agreed as follows:

**5.4 Customer and Other Business Relationships.**

After the Closing, each Seller shall cooperate with Buyer and the Company in their efforts to continue and maintain for the benefit of Buyer and the Company those business relationships of the Company and of such Seller relating to the business of any Company, including relationships with any suppliers, vendors, licensors, licensees, lessors, employees, regulatory authorities, and others. Each Seller shall refer to Buyer and the Company all inquiries and communications received by such Seller relating to the Company after the Closing. After the Closing, no Seller shall take any action, either directly or indirectly, that could diminish the value of Company or interfere with the business of Company.

23. Section 8.01 of the Membership Interest Agreement the parties agreed, in pertinent part, as follows:

**8.1 Notices.** All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or mailed first-class postage prepaid, or by overnight delivery by a nationally recognized overnight delivery service. **<u>Notices that are sent by first-class mail shall be deemed delivered on the date that is three business days after being postmarked and deposited in the U.S. mail, or one business day after delivery to such nationally recognized overnight delivery service for overnight delivery.</u>** Notice shall be sent to the addresses set forth herein or to such other address or to such other person as the parties shall have last designated by notice to the other parties in accordance with the terms of this Section 8.1 … (Emphasis added).

24. In paragraph 8.5 of the Membership Interest Agreement the parties agreed as follows:

**8.5 Governing Law, Jurisdiction and Venue.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Virginia without giving effect to its conflicts of law's provisions; and the Parties hereto agree that the any court of

competent jurisdiction located in Fairfax County, Virginia shall have exclusive jurisdiction in any proceeding instituted to enforce this Agreement and the transactions contemplated hereby, and any objections to venue are hereby waived.

25.     The closing was February 10, 2017 and the Funding Date by agreement was February 16, 2017.

26.     However, on February 16, 2017 the parties entered into a Closing Certificate and Notice of Funding agreeing to the following:

2.      The parties expressly acknowledge and agree that the payment of the purchase price, as provided in the [Membership Purchase Agreement], has changed by decreasing the amount paid at closing from $4,500,000 to $4,300,000, by increasing the Bankeroff Note from $2,080,800.00 to $2,182,800.00, and by increasing the Koutsioukis Note from $1,999,200.00 to $2,097,200.00.

The parties further acknowledge and agree that these changes were made to the respective documents with the signature pages already executed, therefore the changed pages were replaced keeping the same previously executed signature pages. The effected pages are page 2 of the [Membership Purchase Agreement], page 1 of the Bankeroff Note, and page 1 of the Koutsioukis Note.

3.      The parties acknowledge the payment of an additional amount, being the payoff balance of the SunTrust line of credit ($582,942.71) paid at closing, to be paid by Buyer to Sellers in the form of Supplemental Seller Notes, as reviewed and agreed by the parties, with the Bankeroff Supplemental Note in the amount of $297,300.78 and the Koutsioukis Supplemental Note in the amount of $285,641.92.

See **Exhibit 2**.

27.     Plaintiff executed and delivered to Defendants Bankeroff and Koutsioukis the following Promissory Notes dated February 16, 2017:

A.      Promissory note dated February 16, 2017 payable to Bankeroff in the principal

amount of $2,182,800.00 (the "***Bankeroff Note***").  A true and accurate copy of the Bankeroff Note is attached hereto as **<u>Exhibit 3</u>**.

B.  Promissory note dated February 16, 2017 payable to Koutsioukis in the principal amount of $2,097,200.00 (the "***Koutsioukis Note***" collectively with the Bankeroff Note, the "***Seller Notes***").  A true and accurate copy of the Koutsioukis Note is attached hereto as **<u>Exhibit 4</u>**.

28.  The Bankeroff Note provided in pertinent part as follows:

> … [Vivos] ("Maker") promises to pay to the order of Laura Bankeroff, … ("Holder"), the principal sum of Two Million One Hundred Eighty Two Thousand Eight Hundred and 00/100 Dollars ($2,182,800.00), together with interest from the date hereof on the unpaid balance at the rate of 4.5% per annum ("Interest Rate").  [Vivos] shall pay principal and interest in fifty seven (57) monthly installments as follows: Fifty six (56) monthly installments in the amount of Forty Two Thousand, Five Hundred Sixty Three and 48/100 Dollars ($42,563.48) each, commencing on the first day of the third calendar month following the Closing Date (May 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of January 1, 2022, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as Exhibit A, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note.
>
> All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.
>
> This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the [Vivos], Holder, Joann Koutsioukis and Health Care Resource Network, LLC (the "Purchase Agreement"). Terms used in this Note not otherwise defined

7

herein shall have the meaning given to them in the Purchase Agreement.

[Vivos], without notice or demand of any kind, shall be in default (each, an "***Event of Default***") hereunder if any of the following events occurs:

*    *    *

(c) [Vivos] fails **to make payments** when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder. (Emphasis Added)

(d) [Vivos] shall be in default or breach of any of the terms and provisions of the Purchase Agreement between [Vivos] and Holder of even date herewith.

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. [Vivos] covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

[Vivos] may, at its election, prepay without penalty all unpaid principal hereof. Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to [Vivos]'s right of setoff as provided under the Purchase Agreement.

*    *    *

[Vivos] expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and [Vivos], whether suit is brought by Holder and [Vivos], shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

29. The Koutsioukis Note provided in pertinent part as follows:

… [Vivos] promises to pay to the order of Joann Koutsioukis, … ("Holder"), the principal sum of Two Million One Hundred Eighty Two Thousand Eight Hundred and 00/100 Dollars ($2,182,800.00), together with interest from the date hereof on the unpaid balance at the rate of 4.5% per annum ("Interest Rate"). [Vivos] shall pay principal and interest in fifty seven (57) monthly installments as follows: Fifty six (56) monthly installments in the amount of Forty Two Thousand, Five Hundred Sixty Three and 48/100 Dollars ($42,563.48) each, commencing on the first day of the third calendar month following the Closing Date (May 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of January 1, 2022, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as Exhibit A, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note.

All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the [Vivos], Holder, Joann Koutsioukis and Health Care Resource Network, LLC (the "Purchase Agreement"). Terms used in this Note not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

[Vivos], without notice or demand of any kind, shall be in default (each, an "***Event of Default***") hereunder if any of the following events occurs:

* * *

 (c)     [Vivos] fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

(d)     [Vivos] shall be in default or breach of any of the terms and provisions of the Purchase Agreement between [Vivos] and Holder of even date herewith.

9

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. [Vivos] covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

[Vivos] may, at its election, prepay without penalty all unpaid principal hereof. Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to [Vivos]'s right of setoff as provided under the Purchase Agreement.

\* \* \*

[Vivos] expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and [Vivos], whether suit is brought by Holder and [Vivos], shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

30.    The parties agreed that Vivos obligation to pay the above identified Seller Notes (Bankeroff Note and Koutsioukis Note) to be secured by a pledge by Plaintiff of its acquired membership interests in HCRN, all in accordance with certain terms and conditions outlined in a Membership Interest Pledge and Security Agreement attached hereto and incorporated herein as **Exhibit 5** (the "*Pledge Agreement*").

31.    In paragraph 5 of the Pledge Agreement the parties agreed as follows:

5.    **Remedies Upon Occurrence of Event of Default**. Upon the occurrence of a default under the Note or on any of the Collateral Documents which is not cured within any applicable cure period or if the Pledgor defaults hereunder which is not cured within five (5) days of delivery of notice of such default

10

to the Pledgor ("Event of Default"), then in addition to the rights and remedies of Pledgees under the Seller Notes, Pledgees may, without demand of performance or notice of any kind to the Pledgor, either (i), sell or dispose of and deliver Pledged Interests or interest therein in a public or private sale, for cash or for credit, without assumption of credit risk or (ii) retain and become the full owner of the Pledged Interests with all rights and privileges thereto and without the requirement of any notice to the Pledgor.

The Pledgor irrevocably appoints Pledgees its attorney-in-fact to execute any instrument necessary to transfer title to the Membership Interests to Pledgees upon the occurrence of an Event of Default. The Pledgor further provides that the Pledgees may utilize any Assignment or Bill of Sale that the Pledgees may have been provided to transfer title to the Pledged Interests to Pledgees or Pledgees' successors or assigns. The Pledgees or any purchaser has the right to retain all or part of the Pledged Interests, free of any rights of redemption in the Pledgor.

32.     In paragraph 14 of the Pledge Agreement, the parties agreed as follows:

**Notice.**          Any notice required or permitted by this Pledge Agreement shall be effective if given in accordance with the notice provision set forth in the [Membership Interest Agreement].

33.     Plaintiff also executed and delivered to Defendants Bankeroff and Koutsioukis two Supplemental Promissory Notes also dated February 16, 2017 as follows:

A.     Supplemental promissory note payable to Defendant Bankeroff in the principal amount of $297,300.78 (the "***Bankeroff Supplemental Note***").  A true and accurate copy of the Bankeroff Note #2 is attached hereto as **Exhibit 6**.

B.     Supplemental promissory note payable to Defendant Koutsioukis in the principal amount of $285,641.92 the "***Koutsioukis Supplemental Note***" collectively with the Bankeroff Supplemental Note, the "***Seller Supplemental Notes***"). A true and accurate copy of the Koutsioukis Supplemental Note is attached hereto as **Exhibit 7**.

11

34.     The Seller Supplemental Notes provided for, among other things, as follows:

[Vivos] shall pay principal and interest in fifty seven (57) monthly installments as follows: Fifty six (56) monthly installments in the amount of $5,797.22 each, commencing on the first day of the second calendar month following the Closing Date (April 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of December 1, 2021, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as Exhibit A, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note. All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

* * *

[Vivos], without notice or demand of any kind, shall be in default (each, an "***Event of Default***") hereunder if any of the following events occurs:

…

(e)  [Vivos] fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

(f)  [Vivos] shall be in default or breach of any of the terms and provisions of the Purchase Agreement between [Vivos] and Holder of even date herewith.

Upon an Event of Default, … Maker covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

29.     The first payment due on the Supplemental Promissory Notes was April 1, 2017.

35.     On February 10, 2017, as further inducement to Plaintiff to buy HCRN, Bankeroff entered into an employment agreement with HCRN for a term of three (3) years

pursuant to the terms and conditions outlined in the Employment Agreement attached hereto and incorporated herein as **Exhibit 8** (the "***Employment Agreement***").

36.     Ms. Bankeroff was employed as HCRN's "Chief Executive Officer (CEO)/President" and was charged with the responsibility, among other things, "to handle business development and sales, client project management, account management, employee management and growth, executive-level decision making for employer success, and marketing." *See* **Exhibit 8**.

37.     On April 26, 2017, Ms. Bankeroff executed an Amended Employment Agreement with HCRN where Ms. Bankeroff was hired as an "Administrator" who was charged with the responsibility to "undertake a variety of management and client responsibilities including without limitation: business development and sales, client project management, account management, employee management and growth, executive-level decision making for Employer success, and marketing." *See* the First Amended and Restated Employment Agreement attached hereto and incorporated herein as **Exhibit 8A**.

38.     In Paragraph 8 of the First Amended and Restated Employment Agreement, the Parties agreed as follows:

> Governing Law; Jurisdiction. This Agreement shall be governed by, interpreted, construed, and enforced in accordance with the laws of the **State of Maryland**. (Emphasis Added)

39.     At all times relevant to this matter, Defendants Bankeroff provided the services to HCRN out of its principal offices in the State of Maryland where Ms. Bankeroff resided and worked.

40.     At all relevant times, as a result of the employment of Ms. Bankeroff by HCRN,

a single member LLC owned at the time by Vivos its Manager, Defendant Bankeroff owed duties to HCRN and its sole managing member, Vivos, including fiduciary duties of care, obedience, information and loyalty.

41.    Defendant Bankeroff owed a duty to exercise reasonable care, competence, diligence and judgment in decision making as would be exercised by similar agents under similar circumstances.

42.    Defendant Bankeroff owed Vivos, HCRN's Manager, the duty of obedience which required her to act reasonably and to refrain from conduct likely to damage the Vivos' enterprise, and to act within the express and implied terms of any agency agreement between her and Vivos, the Manager of the HCRN.

43.    Defendant Bankeroff owed Vivos, HCRN's Manager, the duty to disclose information to Vivos about the contracts and bids that HCRN had with the U.S. Government

44.    Defendant Bankeroff, as the "Administrator" and employee of Vivos was required to promptly make payments to Creditors as ordered by Vivos, the Limited Liability Company's Manager.

45.    Defendant Bankeroff owed Vivos, HCRN's Manager, the duty of loyalty which required her to act only in Vivos' best interest.

46.    This included refraining from refusing to make timely payments on Vivos' behalf as instructed, acting on behalf of Defendant Koutsioukis, conspiring with Defendant Koutsioukis to oust Vivos from HCRN, competing with the Vivos for the ownership of HCRN, failing to disclose information to Vivos about the alleged default in time to allow Vivos to cure any alleged default.

47.     Between April 2017 and July 2018 payments due and owing under the Seller Promissory Notes and the Seller Supplemental Promissory Notes were made by or on behalf of Vivos and accepted by Defendants.

48.     When payments were due and owing to any Defendant Creditors under the Promissory Notes of Supplemental Promissory Notes, Vivos made payments by depositing funds in HCRN's accounts and instructing Bankeroff to make payments to the Defendant Creditors from HCRN's account.

49.     Many of the monthly payments due and owing on the Seller Promissory Notes and the Supplemental Promissory Notes payable to Defendants Bankeroff and Koutsioukis were made by Vivos through funds withdrawn by Defendant Bankeroff from HCRN's bank accounts as instructed by Vivos.  This was the practice for most payments in 2017 and 2018.

50.     Thus, for most payments in 2017 and 2018, Defendant Bankeroff would withdraw or cause to be withdrawn funds from HCRN's bank account (which at the time was owned by Vivos) and use such funds to make payments to herself and Defendant Koutsioukis that were due under the various Seller Promissory Notes and the Supplemental Promissory Notes.

51.     The funds in HCRN's accounts to pay Vivos monthly installments to the Creditor Defendants came from deposits made by Vivos or made on behalf of Vivos by various creditors, lenders, other financial institutions or from funds received from Vivos' debtors.

52.     The Promissory Notes and the Supplemental Promissory Notes did not contain any limitations regarding the source of the funds used by Vivos to pay the Defendant Creditors.

53.     The Promissory Notes and the Supplemental Promissory Notes did not prohibit

Vivos from using HCRN's funds to make any of its installment payments to the Defendant Creditors.

54.      As per the Membership Interest Agreement, or the Seller Promissory Notes or the Supplemental Promissory Notes, Plaintiff's installment for the month of August 2018 was due on the first day of the month, *i.e.* August 1, 2018.

55.      Pursuant to the terms of the Membership Interest Agreement, the Seller Promissory Notes and the Supplemental Promissory Notes, a Notice of Default is only proper if used in response to an actual breach of the above-mentioned agreements.

56.      A day is any continuous period of time consisting of twenty-four hours and including the solar day and night beginning at mean midnight.

57.      Under the unambiguous and terms of the Seller Promissory Notes and Supplemental Promissory Notes, Plaintiff had until August 1, 2018 11:59 PM to make the installment due on August 1, 2018.

58.      Neither the Membership Interest Agreement nor the above referenced Seller Promissory and Supplemental Promissory Notes required any payments to be made before the first day of the month in August 2018.

59.      Under the clear terms of the Membership Interest Agreement or the above referenced four Seller Promissory and Supplemental Promissory Notes, default occurred only after Vivos failed to make an installment on the **<u>first day</u>** of each consecutive month and such failure continued uncured for more than five (5) days after the requisite Written Notice from Defendants was delivered to the Plaintiff.

60.      Under the clear terms of the Membership Interest Agreement or the above

referenced four Seller Promissory and Supplemental Promissory Notes, a breach of those Agreements to trigger the issuance of a notice of default can only occur after an actual material breach of the contracts.

61. Under the clear terms the above referenced four Seller Promissory and Supplemental Promissory Notes, a breach of those Agreements as a result of nonpayment can only occur after the expiration of the payment deadline which is 11:59 PM on August 1, 2018.

62. The first day of August does not expire until Midnight on August 2, 2018.

63. Notwithstanding, on August 1, 2018, the day all of the August 2018 installments were due on the Seller Promissory Notes and the Supplemental Promissory Notes by Vivos, Plaintiff received by electronic mail ("e-mail") a written Notice from Defendants Bankeroff and Koutsioukis declaring that Plaintiff had breached the Seller Promissory and Supplemental Promissory Notes was already in default of the Seller Promissory and Supplemental Promissory Notes ("Notice of Default"). *See* **Exhibit 9.**

64. Vivos made payments to the Creditor Defendants pursuant to the terms of the above referenced four Seller Promissory and Supplemental Promissory Notes but Defendants Bankeroff and Koutsioukis refused to take the money from HCRN's accounts.

65. On August 1, 2018, Vivos instructed Defendant Bankeroff, as President of HCRN, to withdraw funds deposited by Vivos in HCRN's accounts and that was due and owing to Defendants Bankeroff and Koutsioukis from HCRN's accounts, as was the parties' practice in 2018.

66. Defendants Koutsioukis and Bankeroff refused to accept payments made by HCRN on behalf of Vivos on August 1, 2018.

17

67.     This Notice of Default was delivered by Federal Express to Vivos' attorneys on August 2, 2018 in the early afternoon.

68.     This Notice of Default was issued on August 1, 2018 even though the August 2018 payments of principal and interest as amortized in the Seller Promissory and Supplemental Promissory Notes were not due until August 1, 2018 at 11:59 PM, the time when the first day of the month on which the August 2018 installment was due and owing expired.

69.     According to the Membership Interest Agreement or the Seller Promissory and Supplemental Promissory Notes, notices that were sent by e-mail were improper.

70.     The Notice of Default issued by Defendants Koutsioukis and Bankeroff was premature as it was sent out before the breach of the contract would occur.

71.     Defendants Koutsioukis and Bankeroff declaration of the breach of the Seller Promissory and Supplemental Promissory Notes was improper and premature.

72.     The Membership Interest Agreement and the above identified Seller Promissory and Supplemental Promissory Notes required that a written notice to be delivered **after** the default had occurred and after a breach of the relevant Agreements had occurred and not before it.

73.     The Membership Interest Agreement and the above identified Seller Promissory and Supplemental Promissory Notes provided that Notices of Default that were sent by a nationally recognized overnight delivery service were deemed delivered, by agreement, one business day after **actual** delivery to such nationally recognized overnight delivery service for overnight delivery was made by the party sending the requisite Written Notice.

74.     Thus, as per the clear terms of the Seller Promissory and Supplemental Promissory Notes and the Membership Interest Agreement, upon default of nonpayment of an installment, the earliest date on which the Defendants could have issued the requisite written notice to trigger the five (5) day cure period in August 2018 was Midnight on August 2, 2018. Not anytime during the twenty-four hours and including the solar day and night beginning at mean midnight on August 1, 2018.

75.     The Written Notice of Default delivered by Defendants to Federal Express on July 31, 2018 for delivery on Vivos on August 1, 2018 was premature and improper.

76.     The August 1, 2018 Written Notice of Default was in breach of the Seller Promissory and Supplemental Promissory Notes and the Membership Interest Agreement.

77.     No Written Notice as required by the Membership Interest Agreement or the above referenced Seller Promissory and Supplemental Promissory Notes was sent to Vivos after its alleged default after 11:59 PM on August 1, 2018.

78.     No Written Notice were delivered by Defendants as required by the Membership Interest Agreement or the above referenced four Seller Promissory and Supplemental Promissory Notes after any alleged Default that occurred at midnight on August 2, 2018 to a nationally recognized overnight delivery service for delivery to the Plaintiff.

79.     Without the delivery of the Written Notice of Default, Vivos did not have a deadline to cure the alleged Default.

80.     In the letter dated delivered by Federal Express and by e-mail on August 1, 2018, Vivos was wrongfully told that unless it cured its defect within five days from August 1, 2018, pursuant to the terms of the Seller Promissory Notes and the Supplemental Promissory

Notes, the entire unpaid balances under the four referenced promissory notes would be accelerated and immediately due and payable, together with accrued interest.

81.    Bankeroff, as President and HCRN's duly authorized representative, pursuant to the terms of the Employment Agreement owed fiduciary duties to HCRN and its sole member and was obligated to comply with Vivos' instructions to deliver the loan payments due and owing to Defendants Bankeroff and Koutsioukis from HCRN's account.

82.    Defendant Bankeroff, however, refused to accept payment by Vivos.

83.    Upon information and belief, Bankeroff did not want to accept the payment because she wanted Vivos to default so that she can oust Vivos from HCRN and take the company along with Defendant Koutsioukis.

84.    Upon information and belief, on or about August 2018 Defendants know that HCRN's bid for a multimillion-dollar project with the U.S. Government was approved.

85.    Defendants developed their scheme to out Vivos from HCRN before Vivos was told about the contract from the U.S. Government.

86.    Defendants Bankeroff and Koutsioukis' unilateral refusal to accept the payments from HCRN on behalf of Vivos was improper.

87.    While the 5 days to cure any defect would have expired at the earliest on close of the day August 7, 2018 at 11:59, P.M., Defendants Bankeroff and Koutsioukis prematurely removed Vivos as the sole member of HCRN, cancelled the certification to the Vivos members and reissued the membership certificates in the names of Defendants Bankeroff and Koutsioukis pursuant to the Pledge  Agreement before the expiration of the 5 day cure period.

88.    By doing so, Defendants shut out Vivos from the management or operation of

HCRN and made it impossible for Vivos to withdraw the funds from HCRN's accounts to make the payment to Defendants.

89. After ousting Vivos, Defendants Bankeroff and Koutsioukis appointed Defendant Bankeroff as the Manager of HCRN and voted that all actions of Bankeroff on behalf of the HCRN were ratified, confirmed and approved in all respects.

90. This scheme to oust Vivos was done notwithstanding the fact that Vivos was not in default on August 1, 2018 or August 7, 2018 because its obligations to pay the promissory note did not expire until Midnight on August 2, 2018 and the deadline for curing the default did not expire at all since no proper Notice of Default was mailed to the Plaintiff.

91. According to the terms of the Membership Interest Agreement and the Seller Promissory Notes and the Supplemental Promissory notes, the written Notice was a condition precedent to any cure obligation by Vivos.

92. This scheme to oust Vivos was done notwithstanding the fact that Vivos was not sent the agreed upon Written Notice of default on August 2, 2018.

93. The Written Notice of Default delivered by Federal Express on August 1, 2018 was improper as there was no default at the time it was issued on July 31, 2018 or August 1, 2018 and delivered to Federal Express.

94. Given that the Federal Express had to be sent prior to August 1, 2018, Defendants Bankeroff and Koutsioukis agreed and planned to manipulate a putative default, orchestrate Bankeroff's failure to heed Vivos' instructions to make the requisite payments and cure the putative defaults, and orchestrate the takeover of HCRN under the pledge agreements to exclude Vivos from the Company, so they could capture the benefit of the Government

contract that they HCRN had been recently awarded.

95.     Defendants Bankeroff and Koutsioukis were acting in concert with each other at all times relevant to the causes of action alleged herein.

96.     Defendants Bankeroff and Koutsioukis acted in concert with each other to declare that Vivos was in Default of the Seller Promissory Notes and Supplemental Promissory Notes with the intend to oust Vivos from HCR and for them to keep the proceeds of the sale, to take over HCRN, to keep all the payments made by Vivos over the past months and to convert the company assets, including the multimillion dollar government contract, to their sole benefit.

102.    Plaintiff has been injured as a result of Defendants various acts and omissions, including the loss of income from its membership in HCRN in an amount to be determined at trial, but no less than $10 Million Dollars.

103.    Defendants' acts and omissions are malice and driven by ill will.

## COUNT I
## DECLARATORY JUDGMENT

104.    Plaintiff re-alleges and adopts paragraphs 1 through 103 above, as though fully set forth herein.

105.    Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000.

106.    Plaintiff executed four promissory notes dated February 16, 2017 (*i.e.*, Seller Promissory Notes and Supplemental Promissory Notes) to be paid according to clear terms, conditions and instructions set forth in the Membership Interest Agreement and the above

refenced Promissory Notes.

107.    The Seller Promissory Notes provided for, among other things, a term and amortization period of fifty-seven (57) months, and that payment was to commence on the first day of the third month following the agreed upon closing date.

108.    The Seller Promissory Notes further provided that Plaintiff, as the maker of the notes, would be in default if it "fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from [Defendants]."

109.    The Supplemental Promissory Note provided for, among other things, a term and amortization period of fifty-seven (57) months, and that payment was to commence on the first day of the second month following the agreed upon closing date.

110.    The Supplemental Promissory Note further provided that Plaintiff, as the maker of the notes, would be in default if it "fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from [Defendants]."

111.    From February 2017 through August 2018, Plaintiff performed all conditions precedent to Defendants' performance of their obligations under the Membership Interest Agreement and the Notes.

112.    The August payments on the Notes were due on August 1, 2018.

113.    Plaintiff had until 11:59 PM on August 1, 2018 to make any required payments under the Membership Interest Agreement or the above referenced Seller Promissory and Supplemental Promissory Notes.

114.    Vivos made payments to Defendants Koutsioukis and Bankeroff even if the

funds came from HCRN's bank account.

115.     Neither the Seller Promissory Notes or the Supplemental Promissory Notes have any terms requiring that the funds to pay any of the installments due to Koutsioukis or Bankeroff had to from accounts solely held or owned by Vivos or that third parties cannot making payments on behalf of Vivos.

116.     The Seller Promissory Notes or the Supplemental Promissory Notes did not require Vivos to make payments to Koutsioukis and Bankeroff from a specific source to the exclusion of other funding sources available for use by Vivos or by third parties on its behalf.

117.     On the afternoon of August 1, 2018, Defendants prematurely declared a default by the Plaintiff and delivered by Federal Express and electronic mail, a written notice declaring that Plaintiff was in default for failing to make the August payment, and that unless the defect was cured within five days, then pursuant to the terms of the promissory notes, the entre unpaid balances under the promissory notes would be accelerated and immediately due and payable, together with accrued interest.

118.     The August 1, 2018 was improper as the Membership Interest Agreement or the above referenced Seller Promissory and Supplemental Promissory Notes did not allow a notice by e-mail.

119.     The August 1, 2018 was improper as the Membership Interest Agreement or the above referenced Seller Promissory and Supplemental Promissory Notes did not allow a notice of default to be issued before an actual breach of the agreements has occurred.

120.     The August 1, 2018 was improper as the Membership Interest Agreement or the above referenced Seller Promissory and Supplemental Promissory Notes did not allow a notice

of default of be issued on August 1, 2018 as the breach by nonpayment could not occur before 12:00 AM on August 2, 2018.

121.     According to the Membership Interest Agreement or the above referenced Seller Promissory and Supplemental Promissory Notes, the breach of the aforementioned agreements was a condition precedent for any default notices to be delivered by Defendants.

122.     The Seller Promissory and Supplemental Promissory Notes, which required an installment payment on the first day of every month, and the Membership Interest Agreement make clear that the first day Defendants could send a notice to cure for failure to timely pay would be after the expiration of the deadline for making the payment at Midnight on August 2, 2018. *See* Section 8.01 of the Membership Interest Agreement (stating "Notices that are sent by first-class mail shall be deemed delivered on the date that is three business days after being postmarked and deposited in the U.S. mail, <u>or one business day after delivery to such nationally recognized overnight delivery service for overnight delivery.</u>"). Accordingly, <u>the August 1, 2018 notice letter from Defendants was premature and improper</u>.

123.     On August 1, 2018 Plaintiff instructed Defendant Bankeroff to withdraw the funds due and owing for the August payments from HCRN's accounts, as was the parties' practice in 2018, because Plaintiff deposited those funds in HCRN's accounts for that express purpose.

124.     Defendants had the ability to receive full payment of all amounts due, the means to accomplish the payment, the duty to make the payment, but they unilaterally refused, without excuse or justification, to accept payments for the Notes as made by the Plaintiff through funds deposited in HCRN's bank account.

25

125.     The refusal by Defendants to accept payments for the Notes from Plaintiff was improper and a material breach of the Membership Interest Agreement.

126.     The refusal by Defendant Bankeroff to accept payments for the Notes from Plaintiff was a material breach of the Seller and Supplemental Promissory Notes and the Membership Interest Agreement and her Employment Agreement with HCRN.

127.     On August 7, 2018, Defendants Bankeroff and Koutsioukis removed Plaintiff as the sole member of HCRN, cancelled the certification to Plaintiff's members and reissued the membership certificates in the names of Defendants Bankeroff and Koutsioukis.

128.     Defendants' actions on August 7, 2018 were improper and constituted a material breach of the Membership Interest Agreement.

129.     Defendants' unlawful actions on August 7, 2018 shut out Plaintiff from the management and operation of HCRN.

130.     Plaintiff maintains that Defendants' actions, beginning with the untimely and premature declaration of the breach of the aforementioned Promissory Notes, the premature notice of default, the premature demand letter to cure a breach hours before the actual breach could have occurred, the refusal to accept the August payment from Plaintiff through HCRN, the removal of Plaintiff from HCRN and reissuance of the membership interests in Defendants' names, were wrongful, improper and in material breach of the Membership Interest Agreement.

131.     Defendants' declaration on August 7, 2018, that Plaintiff's "failure" to make the August 2018 payment and failure to cure five days after the August 1, 2018 letter, signified that Plaintiff defaulted on the Notes, which allowed them to remove Plaintiff and all of its

membership interests from HCRN, and to take control and full interest in HCRN back from Plaintiff was wrong, improper and mature.

132.     The Notice of Default dated August 1, 2018 was untimely.

133.     Thus, there exists an actual controversy of a practicable issue between Plaintiff and Defendants within the jurisdiction of this Court involving the rights and liabilities of the parties under a contract, which controversy may be determined by a judgment of this Court.

134.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million.

WHEREFORE, Plaintiff demands:

A.  That this Court determine and adjudicate the rights and liabilities of the parties with respect to the Membership Interest Contract.

B.  That this Court find and declare that Plaintiff did not default on payment of the promissory notes (Seller Notes #1 and Seller Notes #2) in August 2018 because Plaintiff timely attempted and offered the funds to pay the notes.

C.  Plaintiff made payments to Koutsioukis and Bankeroff as per the terms of the Seller Promissory Notes and the Supplemental Promissory notes.

D.  The Payments made on behalf of Vivos were not disallowed by the terms of the Membership Interest Agreement and the Seller Promissory and Supplemental Promissory Notes. allowed

E.  That this Court find and declare that Defendants' written notice to Plaintiff on August 1, 2018 was untimely, premature and improper.

F.  That this Court find and declare the Plaintiff's obligation to pay the August 1, 2018

installment did not expire until 11:59 PM on that same date.

G. That Defendant's declaration of breach of the Membership Interest Agreement, the Seller Promissory, or the Supplemental Promissory Notes by letter dated August 1, 2018 is premature and improper.

H. Defendants wrongfully terminated the Membership Interest Agreement and the Seller Promissory and Supplemental Promissory Notes.

I. Termination for cause under the Membership Interest Agreement was proper until after Vivos actually breached the Seller Promissory and Supplemental Promissory Notes.

J. The Default Notice was proper only if issued in response to the actual breach by Vivos of the Membership Interest Agreement, the Seller Promissory or the Supplemental Promissory Notes.

K. Breach of the Seller Promissory and Supplemental Promissory Notes can occur under the facts of this case only if payments by Vivos were not made after 12:59 PM on August 1, 2018.

L. Vivos made payment on August 1, 2018 pursuant to the terms of the Seller Promissory and Supplemental Promissory Notes.

M. Defendant Koutsioukis' and Bankeroff's refusal to accepts the payments made by Vivos were wrong and improper.

N. That this Court find and declare that Defendants' refusal to accept the monies for the Notes in August 2018 constituted a material breach of the Membership Interest Agreement and the Seller Promissory and Supplemental Promissory Notes.

O. That this Court find and declare that Defendants' removal of all of Plaintiff's

membership interests in HCRN and reissuance of same in Defendants' name was premature, improper and constituted a material breach of the Membership Interest Agreement.

P. Defendants' unlawful actions on August 7, 2018 shut out Plaintiff from the management and operation of HCRN.

Q. That Vivos remains the Sole Member of HCRN.

R. That Defendants oust of Vivos from HCRN was improper.

S. That this Court award to Plaintiff the costs of these proceedings.

T. That this Court award to Plaintiff such other and further relief as it deems proper.

## COUNT II
## BREACH OF CONTRACT
## AS AGAINST DEFENDANTS HCRN, BANKEROFF AND KOUTSIOUKIS

135.    Plaintiff restates and incorporates by reference all allegations contained in all preceding paragraphs as if fully set forth herein.

136.    Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000 (the Membership Interest Agreement).

137.    From February 2017 through August 2018, Plaintiff performed all conditions precedent to Defendants' performance of their obligations under the Membership Interest Agreement, the Seller Promissory Notes and the Supplemental Promissory Notes (collectively, "Notes").

138.    The common practice during that time for monthly payment of the Notes was for Defendant Bankeroff to withdraw the funds from HCRN's bank accounts, because Plaintiff

had deposited funds into HCRN's accounts specifically to pay the Notes. Most payments were transferred in that manner.

139.     The Operating Agreement required that Defendant Bankeroff, as the agent of HCRN, to follow the instructions if its manager and to ensure all payments due and payable to Koutsioukis and Bankeroff be delivered as instructed by Vivos.

140.     The employment agreement signed by Defendant Bankeroff obligated her to comply with Plaintiff's instructions to deliver the loan payments due and owing under the Notes.

141.     However, in August 2018, Defendants unilaterally refused to accept payments for the Notes from Vivos when those installment payments were made through HCRN.

142.     The refusal by Defendants to accept payments for the Notes from Plaintiff was improper and a material breach of the Membership Interest Agreement and the Seller Promissory and Supplemental Promissory Notes.

143.     The refusal by Defendant Bankeroff to accept the payments as instructed by Vivos, HCRN's sole member and manager, was a material breach of the Operating Agreement and her employment agreement with HCRN.

144.     On August 7, 2018, Defendants Bankeroff and Koutsioukis improperly removed Plaintiff as the sole member of HCRN, cancelled the certification to Plaintiff's members and reissued the membership certificates in the names of Defendants Bankeroff and Koutsioukis.

145.     Defendants' actions on August 7, 2018 were improper and constituted a material breach of the Membership Interest Agreement.

146.     Defendants' unlawful actions on August 7, 2018 shut out Plaintiff from the management and operation of HCRN.

147.     As a direct and result of Defendants' breach of the Management Interest Agreement and the Seller Promissory and Supplemental Promissory Notes for refusal to accept payments when payment was tendered to them, in addition to Defendant Bankeroff' s breach of the Operating Agreement and her Employment Contract, Plaintiff has incurred has incurred and will continue to incur lost profits and other consequential damages.

148.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million.

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; nominal damages, actual damages in excess of $8.5M; lost profits as identified from the Accounting requested in Count III; pre- and post-judgment interest; reasonable attorney's fees; costs incurred in bring this action, and any such further any additional relief as this Court deems appropriate and just.

## COUNT III
## AN ACCOUNTING OF HCRN

149.     Plaintiff re-alleges and adopts paragraphs 1 through 148 above, as though fully set forth herein.

150.     Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000 (the Membership Interest Agreement).

151.     From February 2017 through August 2018, Plaintiff performed all conditions precedent to Defendants' performance of their obligations under the Membership Interest

Agreement and the Notes.

152.     Defendants materially breached the 2017 Membership Interest Agreement when they refused to accept payments for the Notes from HCRN on behalf of Plaintiff.

153.     On August 7, 2018, Defendants materially breached the 2017 Membership Interest Agreement with Plaintiff when they removed Plaintiff from HCRN and reissued the membership interests in their own names. By doing so, Defendants shut out Plaintiff from the management or operation of HCRN.

154.     Defendants Bankeroff and Koutsioukis then appointed Defendant Bankeroff as the Manager of HCRN and voted that all actions of Bankeroff on behalf of the HCRN were ratified, confirmed and approved in all respects.

155.     By doing so, Defendants Bankeroff and Koutsioukis ousted Vivos from control and began to exercise whatever purported rights they claimed to exist in order to control HCRN's affairs and day-to-day operations.

156.     As Manager of HCRN, Bankeroff owed a duty to account for all transactions and all monies of HCRN, starting in August 2018.

157.     Because Defendants' removal of Plaintiff's control of its company, HCRN and usurpation of Plaintiff's membership interest in HCRN was unlawful, Plaintiff is entitled to profits from HCRN since August 2018, as the prior lone shareholder.

158.     As a result of Defendants' unlawful removal of Plaintiff's control of its company, HCRN and usurpation of Plaintiff's membership interest in HCRN, Plaintiff does not have possession or access to the accounting books and records of HCRN, to determine the profits to which it has been entitled since August 2018, but which it has not received.

159.    Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million.

WHEREFORE Vivos Acquisitions, LLC demands that:

a.   Defendants be ordered by decree of this Court to fully and completely account for all profits, losses, and other relevant transactions from August 7, 2018 to present;

b.   Vivos Acquisitions, LLC have judgment against Defendants in the sum found to be due to Vivos Acquisitions, LLC on such accounting, with interest together with the costs and disbursements of this action;

c.   That Defendants convey to Vivos its share of the profits from HCRN from August 1, 2018 until the present.

d.   Vivos Acquisitions, LLC have such other and further relief as may be just and equitable.

## COUNT IV
## RESTITUTION

160.    Plaintiff re-alleges and adopts paragraphs 1 through 159 above, as though fully set forth herein.

161.    Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000 (the Membership Interest Agreement).

162.    From February 2017 through August 2018, Plaintiff performed all conditions precedent to Defendants' performance of their obligations under the Membership Interest Agreement and the Notes.

163.    Plaintiff's purchase of Defendants' membership rights conferred a benefit of

$8,580,000 upon Defendants Bankeroff and Koutsioukis

164.     Defendants Bankeroff and Koutsioukis were aware of and appreciated the benefit Plaintiff conferred when they accepted the purchase price of more than $10M and accepted the monthly payments on the promissory notes through July 2018.

165.     Because Defendants refused to accept the payments for the promissory notes in August 2018 and unlawfully removed Plaintiff from HCRN, taking back all of the membership interests they had sold to Plaintiff, it would be unjust and inequitable under the circumstances to allow Defendants to retain the money Plaintiff had paid for the membership interests.

166.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million.

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants and restitution for the value of the benefit it conferred to Defendants in an amount in excess of $5 Million.

## COUNT V
## CONVERSION

167.     Plaintiff re-alleges and adopts paragraphs 1 through 166 above, as though fully set forth herein.

168.     Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000.

169.     On August 7, 2018, Defendants removed Plaintiff's membership interests in HCRN and Plaintiff's control of HCRN.

170.     Defendant's removal of Plaintiff's membership interests in HCRN and ousting

of Plaintiff from HCRN was not previously agreed upon, was intentional, without permission or justification, and constituted a conversion of Plaintiff's property.

171.    The value of Plaintiff's membership interests exceeded 10 Million U.S. Dollars at the time of the conversion.

172.    Because of Defendants' malicious acts and omissions and ill will Plaintiff is entitled to punitive damages and prays this Court for an award of $350,000.00.

173.    Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million.

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; actual damages in excess of $10 Million; lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just,

## COUNT VI
## BREACH OF FIDCUAIRY DUTY
## AGAINST DEFENDANT BANKEROFF

174.    Plaintiff re-alleges and adopts paragraphs 1 through 168 above, as through fully set forth herein.

175.    Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000.

176.    Ms. Bankeroff was hired as the Chief Executive Officer (CEO)/President of HCRN and was charged with the responsibility, among other things, to handle business development and sales, client project management, account management, employee

35

management and growth, executive-level decision making for employer success, and marketing.

177.     As CEO/President of HCRN, Defendant Bankeroff owed Plaintiff a fiduciary duty to act in good faith and in its best interests, as the sole shareholder in HCRN.

178.     Defendant Bankeroff breached her fiduciary duty when, in August 2018 and directly contrary to the interests of Plaintiff, she refused to accept funds from HCRN as payment for the promissory notes.

179.     Defendant Bankeroff breached her fiduciary duties as CEO/President of HCRN when she conspired with Defendant Koutsioukis to unlawfully remove control of HCRN from Plaintiff and reissue Plaintiff's interests in her and Defendant Koutsioukis' names.

180.     As a direct and proximate result of Defendant Bankeroff' s breach of her fiduciary duties as CEO/President of HCRN, Plaintiff suffered substantial economic losses.

181.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendant Bankeroff; actual damages in excess of $10 Million ; lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just,

## COUNT VII
## TRESPASS TO CHATTEL

182.     Plaintiff re-alleges and adopts paragraphs 1 through 181 above, as through fully set forth herein.

183.     Plaintiff entered into a valid and enforceable contract with Defendants

Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000.

184.     Without Plaintiff's consent, Defendants unlawfully and intentionally took ownership of Plaintiff's membership interests and control of HCRN from Plaintiff.

185.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million

186.     Because of Defendants' malicious acts and omissions and ill will Plaintiff is entitled to punitive damages and prays this Court for an award of $350,000.00.

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; actual damages in excess of $10 Million; lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just,

## COUNT VIII
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE BUSINESS OR ECONOMIC ADVANTAGE

187.     Plaintiff re-alleges and adopts paragraphs 1 through 186 above, as through fully set forth herein.

188.     Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000 (the Membership Interest Agreement).

189.     From February 2017 through August 2018, Plaintiff performed all conditions precedent to Defendants' performance of their obligations under the Membership Interest Agreement and the Notes.

190.	Before the improper takeover in August 2018, there was a business relationship or expectancy between Vivos as the sole member of HCRN and the U.S. government and various other third parties with reasonable probability of future economic benefit to Vivos.

191.	Given Defendants' history of ownership of HCRN, Defendants were aware of existing government contracts, as well as prospective clients and contracts HCRN could be awarded at all times relevant to this lawsuit.

192.	In August 2018, Defendants intentionally and improperly interfered with the business relationship and expectancy of Plaintiff and HCRN's actual and prospective clients refusing to accept payments for the Notes from HCRN on behalf of Vivos.

193.	On August 7, 2018, Defendants intentionally and improperly interfered with the business relationship and expectancy of Plaintiff and HCRN's actual and prospective clients when Defendants ousted Plaintiff from HCRN and reissued the membership interests in their own names.

194.	Absent Defendants' improper and tortious conduct, Plaintiff would have realized the expectancy of future business with various clients as the owner of HCRN, including government contracts. Indeed, since August 2018, HCRN has continued its good standing and business enterprise, from which Plaintiff cannot receive benefits and profits.

195.	As a direct and proximate result of Defendants' conduct, Plaintiff has incurred and will continue to incur lost profits and other consequential damages, including damages associated with the lost government contracts and prospective clients, as well as additional compensatory damages, all to be further determined at trial.

196.	Vivos has been damaged and continues to be damaged by the Defendants

actions in an amount to exceed $10 Million

197.     Because of Defendants' malicious acts and omissions and ill will Plaintiff is entitled to punitive damages and prays this Court for an award of $350,000.00.

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; actual damages in excess of $10 Million; lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just.

## COUNT IX.
## VIOLATION OF VIRGINIA CODE SECTIONS 18.2-499 and 18.2-500

198.     Plaintiff re-alleges and adopts paragraphs 1 through 192 above, as through fully set forth herein.

199.     Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000 (the Membership Interest Agreement).

200.     From February 2017 through August 2018, Plaintiff performed all conditions precedent to Defendants' performance of their obligations under the Membership Interest Agreement and the Notes.

201.     Without the consent or approval of Plaintiff, Defendants Bankeroff and Koutsioukis agreed in concert together to unlawfully remove Plaintiff from HCRN and take back the membership interests they had sold to Plaintiff.

202.     Defendants Bankeroff and Koutsioukis willfully and maliciously combined and conspired to injure Defendant Vivos by ousting it from HCRN and taking its shares in the company without consideration, all the while keeping all the monies paid to date by Vivos as

payment for the purchase of the business and as payment on the four promissory notes for their sole benefit and profit.

203.    These unlawful and intentional actions were conducted willfully and with malice, with the intent to prevent Plaintiff from exercising control of its company, HCRN, enjoying the benefit of its bargain and conducting its lawful, gainful business as the owner of HCRN.

204.    Plaintiff has been injured as a result of this combination, including the loss of income from the Membership Interest Purchase Agreement in an amount to be determined at trial, but no less than $10 Million Dollars.

205.    Because of Defendants' malicious acts and omissions and ill will Plaintiff is entitled to punitive damages and prays this Court for an award of $350,000.00.

206.    Plaintiff prays this Court for treble damages in accordance with Virginia Code §18.2-500.

207.    Plaintiff prays this court for reasonable attorney fees in accordance with Virginia Code §18.2-500.

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; three times the actual damages in excess of $10 Million; lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just.

## COUNT X
## COMMON LAW CONSPIRACY

208.    Plaintiff re-alleges and adopts paragraphs 1 through 207 above, as through fully

set forth herein.

209.     Plaintiff entered into a valid and enforceable contract with Defendants Bankeroff and Koutsioukis for the purchase of Defendants' membership interests in HCRN for $8,5801,000 (the Membership Interest Agreement).

210.     From February 2017 through August 2018, Plaintiff performed all conditions precedent to Defendants' performance of their obligations under the Membership Interest Agreement and the Notes.

211.     Without the consent or approval of Plaintiff, Defendants Bankeroff and Koutsioukis agreed to unlawfully remove Plaintiff from HCRN and take back the membership interests they had sold to Plaintiff.

212.     In April 2018, Defendants intentionally refused to accept payments for the Notes from HCRN on behalf of Plaintiff.

213.     On August 7, 2018, Defendants intentionally and affirmatively ousted Plaintiff from HCRN and reissued the membership interests in their own names.

214.     Defendants' willful and unlawful actions were committed in furtherance of the conspiracy to remove Plaintiff from HCRN and to take back the membership interests they had sold to Plaintiff.

215.     As a direct and proximate result of Defendants' conduct, Plaintiff has incurred and will continue to incur lost profits and other consequential damages.

216.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; actual

damages in excess of $10 Million; lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just,

**COUNT XI**
**TORTIOUS INTERFERENCE WITH BUSINESS OR CONTRACT**
**EXPECTANCY AS AGAINST DEFENDANTS BANKEROFF AND KOUTSIOUKIS**

217.     Plaintiff re-alleges and adopts paragraphs 1 through 216 above, as through fully set forth herein.

218.     In the event the Management Interest Agreement is found to be unenforceable or subject to rescission, Plaintiff alleges that it conferred a benefit upon Defendants Bankeroff and Koutsioukis when it purchased their membership interests in HCRN for $8,580,000.

219.     Plaintiff's purchase created a contract expectancy, of which Defendants were aware.

220.     In April 2018, Defendants intentionally and improperly interfered with that contract expectancy when they refused to accept payments for the Notes from HCRN on behalf of Vivos.

221.     In violation of the Membership Interest Agreement, on August 7, 2018, Defendants intentionally, improperly and unlawfully ousted Plaintiff from HCRN and reissued the membership interests in their own names.

222.     As a direct and proximate result of Defendants' conduct, Plaintiff has incurred and will continue to incur lost profits and other consequential damages.

223.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; actual damages in excess of $10M; lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just.

## COUNT XII
## UNJUST ENRICHMENT AS AGAINST
## DEFENDANTS BANKEROFF AND KOUTSIOUKIS

224.     Plaintiff re-alleges and adopts paragraphs 1 through 223 above, as through fully set forth herein.

225.     In the event the Management Interest Agreement is found to be unenforceable or subject to rescission, Plaintiff alleges that it conferred a benefit upon Defendants Bankeroff and Koutsioukis when it purchased their membership interests in HCRN for $8,580,000.

226.     Defendants Bankeroff and Koutsioukis were aware of and appreciated the benefit Plaintiff conferred when they accepted the purchase price of more than $8.5M and accepted the monthly payments on the promissory notes between April 2017 and July 2018.

227.     Because Defendants refused to accept the payments for the promissory notes in August 2018 and unlawfully removed Plaintiff from HCRN, taking back all of the membership interests they had sold to Plaintiff, it would be unjust and inequitable under the circumstances to allow Defendants to retain the money Plaintiff had paid for the membership interests.

228.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million

WHEREFORE Vivos Acquisitions, LLC requests judgment against Defendants; actual damages in excess of $10 M; lost profits as identified from the Accounting requested in Count II-

III; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just.

**COUNT XIII**
**QUANTUM MERUIT**

229.     Plaintiff re-alleges and adopts paragraphs 1 through 228 above, as through fully set forth herein.

230.     In the event the Management Interest Agreement is found to be unenforceable or subject to rescission, Plaintiff alleges that it conferred a benefit upon Defendants Bankeroff and Koutsioukis when it acquired their membership interests in HCRN for $8,580,000.

231.     Defendants Bankeroff and Koutsioukis were aware of the benefit Plaintiff conferred when they accepted the purchase price of more than $10M and accepted the monthly payments on the promissory notes between April 2017 and July 2018.

232.     The benefit conferred by Plaintiff was rendered under such circumstances that Defendants knew Plaintiff expected consideration. Because Defendants unlawfully removed Plaintiff from HCRN and took back all of the membership interests they had sold to Plaintiff, it would be unjust under the circumstances to allow Defendants to retain the money received from Plaintiff for those membership interests.

233.     Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million

**WHEREFORE**, Plaintiff prays for judgment against all Defendants as follows:

a.     For an award of damages in excess of $10 Million, or an exact amount to be proven at trial for the value *quantum meruit*, of the benefit it conferred to Defendants;

b.     For an award of attorney's fees and costs of suit;

c.      For an award of statutory damages;

d.      For an award of punitive damages; and

e.      For such other and further relief as the Court deems just and appropriate.

### COUNT XIV.      CONSTRUCTIVE TRUST AND RECEIVERSHIP

234.      Plaintiff re-alleges and adopts paragraphs 1 through 233 above, as through fully set forth herein.

235.      Defendants Bankeroff and Koutsioukis unlawfully took over Plaintiff's interest in HCRN without payment to Vivos.

236.      These unlawful and intentional actions were conducted willfully and with malice, with the intent to prevent Plaintiff from exercising control of its company, HCRN, and conducting its lawful, gainful business.

237.      Defendants have wrongfully profited and will continue to wrongfully profit from their control of HCRN and conversion of Vivos interest in HCRN.

238.      It would be unjust to allow Defendants to take over HCRN and to keep all the monies paid by the Plaintiff through August 2018 by wrongfully ousting Vivos from HCRN, taking over Vivos' interest in HCRN and to keep all the profits made by the company from August 1, 2018 until the present.

239.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered substantial economic damages and continues to suffer damages in excess of $10 Million Dollars.

240.      Vivos has been damaged and continues to be damaged by the Defendants actions in an amount to exceed $10 Million

WHEREFORE Vivos Acquisitions, LLC requests that the Court hold Defendants liable for the actual damages in excess of $10 Million in constructive trust and to impose such a trust upon all of the Defendants' assets and property; appointing an appropriate person as Trustee of the Constructive Trust and authorizing and directing the Trustee to liquidate the trust assets and pay over any proceeds of the liquidation of the trust assets after costs of sale incurred in liquidating the trust assets toward satisfaction of damages suffered by the Plaintiff, with any excess to be returned to Defendants or such other party as this Court may direct; appointing a Special Commissioner and authorizing the Special Commissioner to conduct an accounting and to sell HCRN and pay over any proceeds of the sale of the Property after costs of sale incurred in the sale of HCRN toward satisfaction of the damages suffered by HCRN and to account for lost profits as identified from the Accounting requested in Count II; pre- and post-judgment interest; reasonable attorney's fees; and costs incurred in bring this action, and for such further any additional relief as this Court deems appropriate and just.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

**VIVOS ACQUISITIONS, LLC,**

By counsel

/s/ *Elias G. Saboura-Polkovotsy, Esq.*

Elias G. Saboura-Polkovotsy, Esq.
VSB No. 72256
**SABOURA, GOLDMAN & COLOMBO, P.C.**
11200 Rockville Pike
Suite 405
N. Bethesda, Maryland 20852
*esaboura@sabouralaw.com*
Main: (301) 245 3230
Direct: (301) 245-3234
Facsimile: (301) 881-8885
*Counsel for Plaintiff*

**CERTIFICATES OF SERVICE FOR DOCUMENTS FILED USING CM/ECF**

I hereby certify that on January 21, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will then send notification of such filing (NEF) to the following:

> Stuart A. Schwager (VSB #36204)
> Stuart A. Berman (*pro hac vice*)
> **LERCH, EARLY & BREWER, CHTD.**
> 7600 Wisconsin Avenue, Suite 700
> Bethesda, MD 20814
> (301) 347-1271 (p)
> (301) 347-1521 (f)
> *saschwager@lerchearly.com*
> *saberman@lerchearly.com*
>
> Counsel for Defendants Health Care Resource Network, LLC, Laura Bankeroff, and Joann Koutsioukis

> /s/ *Elias G. Saboura-Polkovotsy, Esq.*
> Elias G. Saboura-Polkovotsy, Esq.
> VSB No. 72256
> **SABOURA, GOLDMAN & COLOMBO, P.C.**
> 11200 Rockville Pike
> Suite 405
> N. Bethesda, Maryland 20852
> *esaboura@sabouralaw.com*
> Main: (301) 245 3230
> Direct: (301) 245-3234
> Facsimile: (301) 881-8885
> *Counsel for Plaintiff*

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This is a **MEMBERSHIP INTEREST PURCHASE AGREEMENT**, dated February 10, 2017 (the "*Agreement*") by and among **VIVOS ACQUISITIONS, LLC**, a Virginia limited liability company ("*Buyer*"); and **LAURA BANKEROFF** ("*Bankeroff*") and **JOANN KOUTSIOUKIS** ("*Koutsioukis*", and collectively with Bankeroff referred to as the "*Sellers*"); and **HEALTH CARE RESOURCE NETWORK, LLC**, a Nevada limited liability company (the "*Company*").  Buyer, Sellers and Company are collectively referred to herein as the "*Parties*".

## WITNESSETH:

WHEREAS, the Company is in the business of providing staffing solutions to businesses, specializing in medical professional and support staff for government and military treatment facilities (the "*Business*");

WHEREAS, Sellers are the owners of all of the membership interest in the Company as set forth below (the "*Membership Interests*"):

| | |
|---|---|
| Laura Bankeroff | 51% |
| Joann Koutsioukis | 49% |

WHEREAS, Buyer desires to acquire and Sellers desires to sell to Buyer all of the Membership Interests in the Company on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the promises and of the respective representations and warranties set forth in this Agreement, and of the covenants and agreements contained herein, and intending to be legally bound, Buyer, Sellers and the Company hereby agree as follows:

## ARTICLE 1

### Sale of Membership Interests, Tax Matters

**1.1** **Sale of Membership Interests.**  Subject to the terms and conditions set forth in this Agreement, Sellers hereby agree, at the Closing (as defined herein), to sell and transfer the Membership Interests to Buyer and Buyer agrees, at such Closing, to acquire such Membership Interests.  Sellers shall make such sale, transfer, assignment, and delivery of the Membership Interests free and clear of all liens, encumbrances, or claims of others whatsoever, with the exception of the security interest in such membership interests granted by Buyer to Sellers in accordance with the terms of this Agreement.

**EXHIBIT 1**

**1.2**    **Purchase Price.**    The purchase price for the Membership Interests shall be $8,580,000.00 (the "***Purchase Price***"), and Buyer will deliver the Purchase Price to the Sellers in the following manner:

(a)    On the Funding Date, Buyer will deliver to Sellers, by wire transfer, the total amount of $4,300,000.00, payable as follows:

| | |
|---|---|
| Laura Bankeroff | $2,193,000.00 |
| Joann Koutsioukis | $2,107,000.00 |

(b)    At Closing, Buyer will also execute and deliver to Sellers promissory notes in substantially the form of <u>Exhibit A</u>, with one note payable to Bankeroff in the principal amount of $2,182,800.00 (the "***Bankeroff Note***") and the other note payable to Koutsioukis in the principal amount of $2,097,200.00 (the "***Koutsioukis Note***" collectively with the Bankeroff Note, the "***Seller Notes***").   The Seller Notes shall provide for, among other things, a term and amortization period of fifty-seven (57) months, payment commencing three (3) months after the Closing Date, the accrual of interest at a fixed rate of 4.50% per annum, prepayment without any penalty, and Buyer's right of setoff as set forth herein at <u>Section 7.3</u>.   The Seller Notes shall be secured by a pledge by Buyer of the Membership Interests, all in accordance with the terms and conditions of a Membership Interest Pledge and Security Agreement in substantially the form of <u>Exhibit B</u> hereto (the "***Pledge Agreement***").

**1.3**    **Employment Agreement.**    As further inducement to Buyer, Bankeroff shall enter into an employment agreement with the Company for a term of three (3) years in substantially the form of <u>Exhibit C</u> hereto (the "***Employment Agreement***").

**1.4**    **Earnout Agreement.**    As further inducement to Buyer, Bankeroff shall enter into an earnout agreement with the Company, whereby Bankeroff will be eligible for payments in the amount of forty percent (40%) the Company's increase in EBITDA from the prior year, payable annually for a term of five (5) years after the Closing Date, and in substantially the form of <u>Exhibit D</u> hereto (the "***Earnout Agreement***").

**1.5**    **S Corporation Status.**    Company and Sellers shall not revoke Company's election to be taxed as an S corporation with the meaning of Section 1361 and 1362 of the Code. Company and Sellers shall not take or allow any action other than the sale of the Membership Interests pursuant to this Agreement that would result in the termination of Company's status as a validly electing S corporation within the meaning of Section 1361 and 1362 of the Code.

**1.6**    **Section 338(h)(10) Election.**    At Buyer's election, the Company and each Seller shall join with Buyer in making an election under Section 338(h)(10) of the Internal Revenue Code of 1986, as amended (the "***Code***") (and any corresponding election under state, local and foreign tax law) with respect to the purchase and sale of the Membership Interests (collectively, a "***Section 338(h)(10) Election***").   In the event Buyer elects to make the Section 338(h)(10) Election, then Buyer, Corporation and Sellers agree that the Purchase Price and the liabilities of Company and its qualified subchapter S subsidiaries (plus other relevant items) will be allocated to the assets of Company and its qualified subchapter S subsidiaries for all purposes (including tax and financial accounting) in a manner consistent with Section 338 of the Code and Section

1060 of the Code and the regulations thereunder. Buyer, Company, Subsidiaries and Sellers shall file all tax returns (included amended returns and claims for refund) and information reports in a manner consistent with such values. Buyer shall pay the accounting costs incurred to make the Section 338(h)(10) Election and shall further adjust the Purchase Price by the difference between the Sellers' tax liability with making the Section 338(h)(10) Election and Sellers' tax liability had the Section 338(h)(10) Election not been made by the Parties (the "*Tax Gross-Up Amount*"). The Tax Gross-Up Amount shall be paid in cash, by wire transfer of immediately available funds to the accounts designated by the Sellers promptly upon determination of the Tax Gross-Up Amount.

**1.7** **Cooperation on Tax Matters.**

(a) Buyer, Company and its Subsidiaries and Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of tax returns and any audit, litigation or other proceeding with respect to taxes. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information of any material provided hereunder. Company and its Subsidiaries, Sellers and Buyer agree (A) to retain all books and records with respect to tax matters pertinent to Company and its Subsidiaries relating to any taxable period beginning before the Closing Date until expiration of the statute of limitations (and, to the extent notified by Buyer or Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, Company and its Subsidiaries or Sellers as the case may be, shall allow the other Party to take possession of such books and records.

(b) Sellers further agree, upon request, to use commercially reasonable efforts to obtain, or cooperate with Buyer or Company to obtain, at no cost to Sellers, any certificate or other document from any governmental authority or any other person as may be necessary to mitigate, reduce or eliminate any tax that could be imposed (including with respect to the transactions contemplated hereby).

**ARTICLE 2**

**Closing**

**2.1** **Closing.** The closing under this Agreement shall take place by electronic delivery of signatures to Buyer's counsel, at amiller@mpl-law.com, and Sellers' counsel, at ggavett@gavettdatt.com on or before December 15, 2016 (the "*Closing*" or "*Closing Date*"). The Buyer shall execute and deliver original, hard copy, fully executed Sellers Notes to Sellers' counsel at or before Closing.

**2.2** **Interim Business Operations.** From the date of execution of this Agreement to the Closing Date, Sellers shall operate the Business in the ordinary course of business until Closing, will use its best efforts to preserve the Business, pay all liabilities and obligations

arising in the ordinary course of business, and preserve the goodwill of Customers and suppliers. The Parties expressly agree to the following payments: the Company shall pay the Sun Trust line of credit in the ordinary course of business through accounts receivable; Bankeroff may pay from the Company funds her Fourth (4th) Quarter taxes in December of 2016 pursuant to past practices; and the Company may pay staff year-end bonuses in December of 2016 in amounts substantially the same as past practices.

## ARTICLE 3

### Representations and Warranties of Sellers

Sellers hereby jointly and severally make the following representations and warranties, each of which is true and correct on the date hereof and will be true and correct on the Closing Date, and each of which shall survive the Closing Date and the transactions contemplated hereby to the extent set forth in <u>Section 7.1</u> below.

**3.1** <u>**Limited Liability Company Existence and Qualification**</u>. As of the date hereof and on the Closing Date the Company is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Nevada and is duly qualified to conduct its business in Maryland and in each jurisdiction where the nature of its business or its properties require it be so qualified. <u>Schedule 3.1</u> identifies each state or foreign jurisdiction where the Company does business or is qualified to do business, or each state or foreign jurisdiction which, due to the nature of the Company's business, the Company is required to be qualified to do business. The Company has the limited liability company power and authority to own and use its properties and to transact the business in which it is engaged, and to enter into this Agreement and to consummate the transaction contemplated hereby.

**3.2** <u>**Capitalization.**</u> The Membership Interests in the Company are as follows:

| | |
|---|---|
| Laura Bankeroff | 51% |
| Joann Koutsioukis | 49% |

There are no outstanding warrants, options, contracts, calls, or other rights of any kind with regard to any authorized and unissued, or issued but not outstanding, membership interests or units, or any other ownership interest of Company of any kind.

**3.3** <u>**Officers and Managers.**</u> As of the date of execution hereof and the Closing date, the officers and managers, if applicable, of the Company are as set forth on <u>Schedule 3.3</u>. The officers and managers set forth on <u>Schedule 3.3</u> constitute all officers and managers of the Company.

**3.4** <u>**Title to Membership Interests.**</u> Sellers are the sole record and beneficial owner of the Membership Interests in the percentages set forth in Section 3.2 above, and Sellers have full right and title to such Membership Interests and full and unrestricted right, power, and authority to exchange, assign, transfer, and deliver such Membership Interests, free and clear of claims, charges, equities, restrictions, pledges, liens, or encumbrances of any kind other than restrictions under applicable federal and state securities laws. Sellers acquired such Membership Interests legally and without knowledge or notice of any infirmity with respect to such

Membership Interests.  The Parties agree that the Membership Interests shall be certificated so that such interests may be pledged as collateral for the performance of this Agreement by Buyer pursuant to the Pledge and Security Agreement of even date.

**3.5** **Subsidiaries.**  Each subsidiary of the Company is set forth on <u>Schedule 3.5</u>.  For each Subsidiary, the following information is provided on <u>Schedule 3.</u>5: (i) its name and jurisdiction of organization/incorporation, (ii) the number of authorized shares for each class of its capital stock, (iii) the number of issued and outstanding shares of each class of its capital stock, the names of the holders thereof, and the number of shares held by each such holder, and (iv) the number of shares of its capital stock held in treasury. All of the issued and outstanding shares of capital stock of each Subsidiary have been duly authorized and are validly issued, fully paid, and non-assessable. The Company or one or more of its Subsidiaries hold of record and own beneficially all of the outstanding shares of each Subsidiary, free and clear of any restrictions on transfer (other than restrictions under any applicable federal and state securities laws), taxes, liens, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require any of Company and its Subsidiaries to sell, transfer, or otherwise dispose of any capital stock of any of its Subsidiaries or that could require any Subsidiary to issue, sell, or otherwise cause to become outstanding any of its own capital stock. There are no outstanding stock appreciation, phantom stock, profit participation, or similar rights with respect to any Subsidiary. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of any capital stock of any Subsidiary. Neither the Company nor any Subsidiary controls directly or indirectly or has any direct or indirect equity participation in any Company, partnership, trust, or other business association that is not a Subsidiary.  Except for the Subsidiaries set forth in <u>Schedule 3.5</u>, neither the Company nor any Subsidiary owns or has any right to acquire, directly or indirectly, any outstanding capital stock of, or other equity interests in, any other entity.

**3.6** **Agreement Legal and Authorized.**  The execution and delivery of this Agreement does not, and the consummation by Sellers of the transactions contemplated herein and fulfillment by Sellers of the terms, conditions, and provisions hereof, will not:

(a) conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under the Articles of Organization or Operating Agreement or any agreement or other instrument to which the Company or Sellers are a party or by which any of the Company's properties or assets are bound, or grant any other party the right to terminate an agreement with the Company;

(b) conflict with, violate, or result in a breach of any law, administrative regulation, or court decree applicable to the Company or the Sellers;

(c) result in the creation or imposition of any lien, charge, or encumbrance of any nature upon any of the properties or assets of the Company.

**3.7** **Valid and Binding Obligation.**  The Company has the right, power, legal capacity, and authority to enter into and perform its obligations under this Agreement. The

execution, delivery, and performance of this Agreement has been duly authorized by all necessary limited liability company actions on the part of the Company. This Agreement constitutes a valid, binding, and enforceable obligation of the Company and the Sellers, except as such enforceability may be limited by bankruptcy, insolvency and similar laws and for the availability of injunctive relief and other equitable remedies.

**3.8     Undisclosed Liabilities.**     The Company does not have any liabilities or obligations whatsoever, whether due or to become due, accrued, absolute, contingent, or otherwise, including liabilities for or in respect of claims, charges, debts, judgments taxes (including, without limitation, any interest or penalties relating thereto), and Sellers, to their knowledge and belief, know of no basis for any claim against the Company for any liability, except (a) to the extent specifically set forth in this Agreement or on any of the Schedules delivered pursuant hereto, or (b) liabilities or obligations incurred in the normal and ordinary course of business of the Company.   Neither the Company nor Sellers know or have any reasonable ground to know of any basis for the assertion against the Company of any liability of any nature not incurred in the ordinary course of business.

**3.9     Accounts Payable.**  Schedule 3.9 sets forth all accounts payable of the Company as of the Closing Date.   The Company has no outstanding accounts payable, liabilities or obligations to any trade creditors, either accrued prior to Closing, contingent or otherwise, except for those set forth on the schedule attached hereto as Schedule 3.9 (and in amounts no greater than as set forth on such schedule).

**3.10    Taxes.**

(a)      Each of Company and its Subsidiaries have filed all tax returns that they were required to file under applicable laws and regulations. All such tax returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations. All taxes due and owing by Company or any its Subsidiaries (whether or not shown on any tax return) have been paid. Neither Company nor any Subsidiary currently is the beneficiary of any extension of time within which to file any tax return. No claim has ever been made by an authority in a jurisdiction where Company or any Subsidiary does not file tax returns that Company or any Subsidiary is or may be subject to taxation by that jurisdiction. There are no liens for taxes (other than taxes not yet due and payable) upon any of the assets of Company or any Subsidiary.

(b)      No audit of any foreign, federal, state, or local income tax returns or other tax returns by Company or any Subsidiary is in progress, or threatened.  Each of Company and its Subsidiaries have withheld and paid all taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.  There exists no past due unpaid foreign, federal, state, or local taxes for employment withholding (including any taxes that are reported on IRS Form 941 or state equivalents), unemployment (including any taxes that are reported on IRS Form 940 or state equivalents), sales, use, income or other tax or any tax deficiency by a governmental agency or authority having jurisdiction assessed against Company or any Subsidiary that will not be paid off and discharged on or before the Closing Date.

(c)     Copies of all foreign, federal, state and local income tax returns, tax examination reports and statements of deficiencies assessed against, or agreed to by, Company with respect to the last three (3) years will be made available to Buyer, upon request.  Such tax returns, and all records pertinent to their preparation, shall remain the property of Company after the Closing and shall be delivered into possession of Buyer at or before that time.  No waiver of any statute of limitations has been given and is in effect against Company.

(d)     Neither Company nor any qualified subchapter S subsidiary of Company has, in the past 10 years (A) acquired assets from another Company in a transaction in which Company's tax basis for the acquired assets was determined, in whole or in part, by reference to the tax basis of the acquired assets (or any other property) in the hands of the transferor or (B) acquired the stock of any Company that is qualified subchapter S subsidiary.

(e)     Neither Company nor any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)     change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)     use of an improper method of accounting for a taxable period ending on or prior to the Closing Date;

(iii)     ''closing agreement'' as described in Section 7121 of the Code (or any corresponding or similar provision of state, local, or foreign income tax law) executed on or prior to the Closing Date;

(iv)     intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local, or foreign income tax law);

(v)     installment sale or open transaction disposition made on or prior to the Closing Date;

(vi)     prepaid amount received on or prior to the Closing Date; or

(vii)     election under Section 108(i) of the Code.

(f)     There is no tax sharing agreement, tax allocation agreement, tax indemnity obligation, or similar agreement, arrangement, understanding, or practice, oral or written, with respect to taxes that will require any payment by the Company or any Subsidiary.

(g)     No Seller is a foreign person within the meaning of Section 1445(f)(3) of the Code.  Neither the Company nor any Subsidiary has been a United States real property holding Company within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii).

**3.11    Necessary Property; Title to Assets.**  Schedule 3.11 sets forth all tangible property owned or leased by Company now used in, and necessary for the conduct of, the business of Company in the manner and to the extent presently conducted or planned by it.  The equipment and other tangible personal property of Company, owned or leased by Company, are in good operating condition and repair and adequate for the uses to which they are being put, and are not in need of maintenance or repairs other than ordinary, routine maintenance that is not material in nature or cost.  There exists no restriction or reservation affecting Company's title to or the utility of its assets that would prevent it from using such assets, or any part thereof after this purchase is consummated, to the same full extent that they might continue to do so if the transaction contemplated hereby did not take place.

**3.12    Powers of Attorney.**  The Company does not have outstanding any revocable or irrevocable power of attorney to any person, firm, or corporation for any purpose whatsoever.

**3.13    Names.**  Company has registered the internet domain names, social media domain names, trade names, assumed names and fictitious names set forth on Schedule 3.13, all of which are available to Company and used by it currently without interference.  The use of all names shall belong exclusively to Company and are not, and will not, be used by Sellers individually or through any other entity that Sellers own or control or is associated with or employed by them.  All customer lists, marketing information, and all rights to and absolute use of all advertising and promotional materials are owned by Company, are proprietary property of Company, and shall remain with the Company (which has good and clear title to same) at and after Closing.

**3.14    Contracts and Commitments.**  Schedule 3.14 lists the following contracts and other agreements to which Company or any Subsidiary is a party:

(a)     any agreement (or group of related agreements) for the lease of personal property to or from any person providing for lease payments in excess of $10,000 per annum;

(b)     any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services, the performance of which will extend over a period of more than one year, result in a material loss to Company or any Subsidiary, or involve consideration in excess of $10,000;

(c)     any agreement concerning a partnership or joint venture;

(d)     any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation, in excess of $10,000 or under which it has imposed a lien on any of its assets, tangible or intangible;

(e)     any agreement concerning confidentiality or non-competition;

(f)     any agreement with any of Sellers and their affiliates (other than Company and its Subsidiaries);

(g)        any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other plan or arrangement for the benefit of its current or former directors, officers, and employees;

(h)        any collective bargaining agreement;

(i)        any agreement for the employment of any individual on a full-time, part-time, consulting, or other basis providing annual compensation in excess of $10,000 or providing severance benefits;

(j)        any agreement for the performance of independent contractor services to Company or any Subsidiary where the term of such agreement is greater than six months or the compensation can reasonably be expected to be in excess of $10,000;

(k)        any agreement under which it has advanced or loaned any amount to any of its directors, officers, and employees outside the ordinary course of business;

(l)        any agreement under which the consequences of a default or termination could have a material adverse effect on the Business or Company or any Subsidiary;

(m)        any agreement under which it has granted any person any registration rights (including, without limitation, demand and piggyback registration rights);

(n)        any settlement, conciliation or similar agreement with any governmental entity or which will require satisfaction of any obligations after the execution date of this Agreement;

(o)        any agreement under which the Company or any Subsidiary has advanced or loaned any other person amounts in the aggregate exceeding $10,000;

(p)        any other agreement (or group of related agreements) the performance of which involves consideration in excess of $10,000; or

(q)        any buy-sell or similar agreement between or among the members of the Company or any Subsidiary.

Sellers have delivered to Buyer a correct and complete copy of each written agreement (as amended to date) listed in <u>Schedule 3.14</u> and a written summary setting forth the terms and conditions of each oral agreement referred to in <u>Schedule 3.14</u>. With respect to each such agreement: (A) the agreement is legal, valid, binding, enforceable, and in full force and effect (except as such enforceability may be limited by bankruptcy, insolvency and similar laws and for the availability of injunctive relief and other equitable remedies); (B) the agreement will continue to be legal, valid, binding, enforceable (except as such enforceability may be limited by bankruptcy, insolvency and similar laws and for the availability of injunctive relief and other equitable remedies), and in full force and effect on identical terms following the consummation of the transactions contemplated hereby; (C) no party is in breach or default, and no event has occurred that with notice or lapse of time would constitute a breach or default by the Company, or permit termination, modification, or acceleration by the counterparty,

under the agreement; (D) to Sellers' knowledge no counterparty to any such agreement is in breach or default thereof; and (E) no party has repudiated any provision of the agreement.

3.15   **Inventories.**   All inventories of the Company consist of quality and quantity usable and, with respect to finished goods, saleable, in the ordinary course of business.  The quantities of each item of inventory are not excessive, but are reasonable for the continued operation of the Company in the ordinary course of business.

3.16   **Litigation.**   There is no suit, claim, action, or proceeding now pending or threatened before any court, administrative or regulatory body, or any governmental agency, nor are Sellers or Company aware of any grounds therefor, to which Company is a party or that may result in any judgment, order, decree, liability, or other determination that will, or could have any material adverse effect upon the business or conditions, financial or otherwise, of Company.  No such judgment, order, or decree has been entered against Company nor any such liability incurred that has, or could have, such effect.  There is no claim action or proceeding now pending or threatened before any court, administrative or regulatory body, or any governmental agency, nor are Sellers or Company aware of any grounds therefor, that will, or could, prevent or hamper the consummation of the transactions contemplated by this Agreement.

3.17   **Environmental Matters.**   The Company has duly complied in all material respects with, and its business, operations, assets, equipment, property, leaseholds or other facilities are in compliance with, the provisions of all federal, state and local environmental, health, and safety laws, codes and ordinances, and all rules and regulations promulgated thereunder.

3.18   **Indebtedness to and from Officers, Managers, and Others.**   The Company is not indebted to any member, manager, officer, employee, or agent of the Company except for amounts due as normal salaries, wages, bonuses, and reimbursements of ordinary expenses on a current basis.  Except as set forth on Schedule 3.18, all loans or other forms of indebtedness of the Company to any of its members, managers, officers, employees or agents of the Company will be repaid in full as of the Closing Date.  The Company is not indebted to or a creditor of any other person, company or Company owned in whole or part by any Seller.

3.19   **Insurance Policies.**   Set forth on Schedule 3.19 hereto is a list of all insurance policies and bonds in force of which the Company or any Subsidiary is the owner, insured, or beneficiary, or covering Company and any of its properties, operations, or personnel.  There is no default with respect to any provision contained in any such policy, nor has there been any failure to give any notice or present any claim under any such policy in a timely fashion or in the manner or detail required by such policy. No notice of cancellation or non-renewal with respect to, or disallowance of any claim under, any such policy has been received by Company.  To the Sellers' Knowledge, neither the Company's or any subsidiary's incident or claim experience that, its workers' compensation insurance premiums or expenses will increase in the next 12 months, or, if self-insured, that it will not be permitted to continue to self-insure without increase in any related bonds, letters of credit, or other form of financial security.

**3.20    Guarantees.**  Company is not a guarantor, indemnitor, or otherwise liable for any indebtedness of any other person, firm, or Company except as disclosed on Schedule 3.20, all of which guarantees will be satisfied or released as of the Closing Date.

**3.21    Broker's Fees.**  The Parties agree that any broker fees related to this Agreement and the transaction contemplated hereunder shall be paid by the respective Parties, and that Company proceeds shall not be used to pay said broker fees.

**3.22    Bank Accounts and Safe Deposit Boxes.**  Set forth on Schedule 3.22 hereto are (a) the name, branch, account number, and purpose of all bank accounts maintained by Company together with the names of authorized signatories on each such account, (b) the amounts and terms of each compensating balance and the reasons therefor, (c) the available balance in the account as of the Closing Date, and (d) the location of all safe deposit boxes maintained by Company together with the names of the persons with authorized access thereto.  Each of the Sellers and Company's employees, except as shall be designated at Closing, shall be removed as signatories of such accounts and deposit boxes.

**3.23    Books and Records.**  The books of account, stock record books, and minute books and other corporate records of Company are in all material respects complete and correct and have been maintained in accordance with generally accepted accounting practices (GAAP). The articles of organization and operating agreement and all amendments thereto of Company, and the minute books and records of Company have been made available to Buyer and are correct and complete to the date hereof.  All of such records shall remain the property of Company after Closing and shall be delivered into the possession of Buyer on or before that date.

**3.24    Employees and Independent Contractors.**  Schedule 3.24 lists the following with respect to the employees and independent contractors of Company or any Subsidiary:

(a)        for each employee of the Company or any Subsidiary, including each employee on leave of absence or layoff status:  name, job title, date of hiring, date of commencement of employment, details of leave of absence or layoff, rate of compensation, bonus arrangement, vacation, sick time, and personal leave accrued as of the Closing Date, and service credited for purposes of vesting and eligibility to participate under any benefit plan.

(b)        for every independent contractor, consultant, or sales agent of Company or any Subsidiary:  name, responsibilities, date of engagement, and compensation.  Each such independent contractor, consultant, or sales agent qualifies as an independent contractor in relation to Company for purposes of all applicable legal requirements, including those relating to taxes, insurance, and employee benefits.

(c)        To the best of Sellers' knowledge, information and belief, (A) no director, officer, or other key employee of Company or any Subsidiary intends to terminate employment with the Company or Subsidiary, and (B) no independent contractor, consultant, or sales agent intends to terminate such person's arrangement with Company or any Subsidiary.  To the best of Sellers' knowledge, information and belief, no executive or manager of Company or any Subsidiary is a party to any confidentiality, non-competition, proprietary rights or other such agreement between such employee and any person besides such entity that would be material to

the performance of such employee's employment duties, or the ability of such entity or Buyer to conduct the business of such entity

(d)     for each employee of the Company or any Subsidiary who has been terminated or laid off, or whose hours of work have been reduced by more than 50% by the Company or any Subsidiary, in the six months prior to the date of this Agreement: (i) name the date of such termination, layoff, or reduction in hours; and the reason for such termination, layoff, or reduction in hours.

(e)     There is no collective bargaining agreement or collective bargaining relationship with any labor organization.  No labor organization or group of employees has filed any representation petition or made any written or oral demand for recognition.  To the knowledge of any of Sellers, (A) no union organizing or decertification efforts are underway or threatened and no other question concerning representation exists, and (B) no labor strike, work stoppage, slowdown, or other material labor dispute has occurred, and none is underway or threatened.

(f)     There is no workmans compensation liability, experience or matter outside the ordinary course of business;

(g)     There is no employment-related charge, complaint, grievance, investigation, inquiry or obligation of any kind, pending or to Sellers' knowledge threatened in any forum, relating to an alleged violation or breach by Company or any Subsidiary (or its or their officers or directors) of any law, regulation or contract.

(h)     To Sellers' knowledge, neither Company nor any Subsidiary has any other current labor or employment problems that have resulted in, or which the Sellers reasonably believe could be expected to result in a lawsuit or have a material adverse effect on the Business or prospects of the Company or any Subsidiary.  The Company and each Subsidiary is in compliance in all material respects with all applicable laws respecting employment, employment practices, workers' compensation, wages and hours, payment for vacation and overtime, and immigration matters.  All persons that have been classified or treated by the Company or any Subsidiary as independent contractors have been correctly treated as independent contractors under all tax, employment and other laws.

### 3.25    **Employee Benefits.**

(a)     Schedule 3.25(a) lists each "employee benefit plan" as defined by Section 3(3) of ERISA, all specified fringe benefit plans as defined in Section 6039D of the Code, and all other bonus, incentive-compensation, deferred-compensation, profit-sharing, stock-option, stock-appreciation-right, stock-bonus, stock-purchase, employee-stock-ownership, savings, severance, change-in-control, supplemental-unemployment, layoff, salary-continuation, retirement, pension, health, life-insurance, disability, accident, group-insurance, vacation, holiday, sick-leave, fringe-benefit, or welfare plan, and any other employee compensation or benefit plan, policy, practice, or contract (whether qualified or nonqualified, effective or terminated, written or unwritten) and any trust, escrow, or other contract related thereto that (A) is maintained or contributed to by the Company or any Subsidiary and (B) provides benefits to,

or describes policies or procedures applicable to, any current or former director, officer, employee, or service provider of the Company or any Subsidiary, or the dependents of any thereof, regardless of how (or whether) liabilities for the provision of benefits are accrued or assets are acquired or dedicated with respect to the funding thereof (each, an "***Employee Plan***").

(b)     Sellers have delivered to Buyer copies of (i) the documents comprising each Employee Plan (or, with respect to an Employee Plan which is unwritten, a detailed written description of eligibility, participation, benefits, funding arrangements, assets, and any other matters that relate to the obligations of the Company thereunder); (ii) all trust agreements, insurance contracts, or any other funding instruments related to each Employee Plan; (iii) all rulings, determination letters, no-action letters, or advisory opinions from the IRS, the United States Department of Labor, or any other governmental body that pertain to each Employee Plan and any open requests therefor; (iv) the most recent actuarial and financial reports (audited and/or unaudited) and the annual reports filed with any governmental body with respect to each Employee Plan during the current year and each of the three preceding years; (v) all contracts with third-party administrators, actuaries, investment managers, consultants, or other independent contractors that relate to each Employee Plan; and (vi) all summary plan descriptions, summaries of material modifications and memoranda, employee handbooks, and other written communications regarding each Employee Plan.

(c)     All amounts owed by the Company or any Subsidiary under the terms of any Employee Plan have been timely paid in full. Each Employee Plan that provides health or welfare benefits is fully insured, and any incurred but not reported claims under each such Employee Plan that is not fully insured have been properly accrued. The Company and each Subsidiary has paid in full all required insurance premiums, subject only to normal retrospective adjustments in the ordinary course of business, with regard to each Employee Plan.

(d)     The Company and each Subsidiary has complied with the applicable continuation requirements for each Employee Plan, including (A) Section 4980B of the Code (as well as its predecessor provision, Section 162(k) of the Code) and Sections 601 through 608, inclusive, of ERISA ("***COBRA***") and (Bi) any applicable state legal requirements mandating welfare benefit continuation coverage for employees.

(e)     The form of each Employee Plan is in compliance with the applicable terms of ERISA, the Code, and any other applicable legal requirement, including the Americans with Disabilities Act of 1990, the Family Medical Leave Act of 1993, and the Health Insurance Portability and Accountability Act of 1996, and each Employee Plan has been operated in compliance with such legal requirements and the written Employee Plan documents. Neither the Company nor any fiduciary of an Employee Plan has violated the requirements of Section 404 of ERISA. Each required report and description of an Employee Plan (including IRS Form 5500 Annual Reports, Summary Annual Reports and Summary Plan Descriptions, and Summaries of Material Modifications) have been (to the extent required) timely filed with the IRS, the United States Department of Labor, or other Governmental Body and distributed as required, and all notices required by ERISA or the Code or any other legal requirement with respect to each Employee Plan have been appropriately given. The Company nor any Subsidiary has any unfunded liability with respect to any deferred compensation, retirement, or other Employee Plan.

(f)        There has never been any administrative proceeding or litigation relating to any Employee Plan and, to the knowledge of Sellers, no such administrative proceeding or litigation is threatened. Neither the execution and delivery of this Agreement nor the consummation or performance of any transactions contemplated in this Agreement will, directly or indirectly (with or without notice or lapse of time), result in the assessment of a tax or penalty under Section 4975 of the Code or Section 502(l) of ERISA or result in a violation of Section 406 of ERISA.

(g)        Neither the execution and delivery of this Agreement nor the consummation or performance of any transaction contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time), obligate the Company or any Subsidiary to pay any separation, severance, termination, or similar benefit to, or accelerate the time of vesting for, change the time of payment to, or increase the amount of compensation due to, any director, employee, officer, former employee, or former officer of the Company or any Subsidiary. There is no contract providing for payments that could subject any person to liability under Section 4999 of the Code.

(h)        Other than the continuation coverage requirements of COBRA, neither the Company nor any Subsidiary has any obligation or potential liability for benefits to employees, former employees, or their dependents following termination of employment or retirement under any Employee Plan.

(i)        Neither the execution and delivery of this Agreement nor the consummation or performance of any transaction contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time), result in an amendment, modification, or termination of any Employee Plan. No written or oral representation has been made to any employee or former employee of the Company or any Subsidiary promising or guaranteeing any employer payment or funding for the continuation of medical, dental, life, or disability coverage for any period of time beyond the end of the current plan year (except to the extent of coverage required under COBRA). No written or oral representation has been made to any employee or former employee of the Company concerning the employee benefits of Buyer.

(j)        Neither the Company or any Subsidiary contributes to, nor has any obligation to contribute to, nor has any liability with respect to, any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA that is a "defined benefit plan" within the meaning of Section 3(35) of ERISA.

(k)        The Company does not contribute to, nor has any obligation to contribute to, nor has any liability with respect to, a "multiemployer plan" within the meaning of Section 3(37) of ERISA or Section 414(f) of the Code or a plan that has two or more contributing sponsors, at least two of whom are not under common control within the meaning of Section 413(c) of the Code.

(l)        No Employee Plan is a "nonqualified deferred compensation plan" as defined in Section 409A of the Code.

**3.26** **Immigration.** The Company and each Subsidiary is and at all times has been in compliance in all material respects with the terms and provisions of the Immigration Reform and Control Act of 1986, as amended (the "***Immigration Act***"). With respect to each Employee (as defined in 8 C.F.R. § 274a.1(f)) of the Seller for whom compliance with the Immigration Act is required, the Company or Subsidiary, as applicable, has on file a true, accurate and complete copy of (i) each Employee's Form I-9 (Employment Eligibility Verification Form) and (ii) all other records, documents or other papers prepared, procured and/or retained pursuant to the Immigration Act. Neither the Company nor any Subsidiary has been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order, nor has any action or administrative proceeding been initiated or threatened against the Company or any Subsidiary by the Immigration and Naturalization Service by reason of any actual or alleged failure to comply with the Immigration Act. None of the employees of Company or any Subsidiary are subject to any temporary or permanent work visas.

**3.27** **Governmental Authorizations; Licenses; Certifications.** Prior to the execution of this Agreement, Sellers have delivered to Buyer true and complete copies of all existing governmental authorizations, licenses and certifications held by the Company or any Subsidiary or their directors, officers and employees which are necessary to the operation of the Business. Schedule 3.27 sets forth each such governmental authorization, license and certification and each such governmental authorization, license and certification remains in full force and effect. The Company has not received any notice or other communication (whether oral or written) from any governmental body or any other organization of person regarding (i) any actual, alleged, or potential violation of, or failure to comply with, any governmental authorization, license or certification, or (ii) any actual, proposed, or potential revocation, suspension, cancellation, termination, or modification of any governmental authorization, license or certification. The consummation of the transaction contemplated herein and the transfer of ownership to occur thereby will not (i) require any notice, consent, authorization, waiver or other form of permission from any governmental body or other organization, or (ii) subject Company or any Subsidiary or Buyer to any regulatory requirements that Sellers or Company or Subsidiary are not currently subject to or are currently exempt from.

**3.28** **Intellectual Property.** Schedule 3.28 is an accurate and complete list of all patents, trademarks, trade names, trademark registrations, service names, service marks, copyrights, licenses, formulas and applications therefor owned by the Company or any Subsidiary or used or required by the Company or any Subsidiary in the operation of its business, title to each of which is held by the Company or any Subsidiary free and clear of all adverse claims, liens, security agreements, restrictions or other encumbrances. The Company owns and each Subsidiary, as applicable, owns or possesses adequate licenses or other rights to use all patents, trademarks, trade names, service marks, trade secrets or other intangible property rights and know-how necessary to entitle it to conduct its business as presently being conducted. There is no infringement action, lawsuit, claim or complaint which asserts that the Company's or any Subsidiary's operations violate or infringe the rights or the trade names, trademarks, trademark registrations, service names, service marks or copyrights of others with respect to any apparatus or method of the Company or any Subsidiary or any adversely held trademarks, trade names, trademark registrations, service names, service marks or copyrights, and neither the Company nor any Subsidiary is in any way making use of any confidential information or trade secrets of any person, except with the consent of such person.

**3.29    Financial Statements.**  Sellers have delivered to Buyer: (a) local, state, federal and foreign tax returns of the Company and each Subsidiary (unless filed on a consolidated basis with such Subsidiary, if applicable, which shall be expressly noted) for year(s) ended December 31, 2015 and December 31, 2014 (the "***Corporate Tax Returns***"), (b) an unaudited, internally-prepared interim balance sheet of the Company and each Subsidiary (unless filed on a consolidated basis with such Subsidiary which shall be expressly noted) as at October 31, 2016 (the "***Interim Balance Sheet***"), (c) reviewed balance sheets of the Company and each Subsidiary (unless filed on a consolidated basis with such Subsidiary) as at December 31, 2015 (the "***Balance Sheets***"), and (d) the related reviewed consolidated statements of income, changes in shareholders' equity, and cash flows for each of the two fiscal years ended on such dates, including the notes thereto, together with the report thereon of the Company's independent public accountants (collectively, the "***Financial Statements***").   The Corporate Tax Returns, Interim Balance Sheet, Balance Sheets and Financial Statements (i) fairly present the financial condition and the taxable income and loss, assets and liabilities results of operations, changes in shareholders' equity, and cash flows of the Company and each Subsidiary as at the respective dates of, and for the periods referred to in, each of the respective documents, and (ii) were prepared in accordance with GAAP, except that the Interim Balance Sheet does not include footnote disclosures or changes of the type that are normal and recurring resulting from year-end adjustments.  The Financial Statements reflect the consistent application of GAAP throughout the periods involved, except as disclosed in the notes to the Financial Statements.  No financial statements of any person or entity other than the Company are required by GAAP to be included or reflected in the Financial Statements.  The Corporate Tax Returns, Interim Balance Sheet, Balance Sheets and Financial Statements were prepared from, and are consistent with, the accounting records of the Company.

**3.30    Notes and Accounts Receivable.**  Schedule 3.30 sets forth the notes and accounts receivable owed to Company or any Subsidiary as of the Closing Date.  All notes and accounts receivable, including without limitation those set forth on Schedule 3.30, represent valid obligations arising from loans advanced, sales actually made or services actually performed in the ordinary course of business.  The notes and accounts receivable of the Company and its Subsidiaries are current and collectible net of the reserve shown on the Interim Balance Sheet or the Company's books of account with respect to accounts receivable after the date of the Interim Balance Sheet (which reserve is adequate and calculated consistent with past practice in the preparation of the Financial Statements).  Sellers reasonably believe that, subject to such reserve, each of the notes and accounts receivable is collectible in full, without any setoff, expense, or other reduction, within 60 days after the day on which it first becomes due and payable.

**3.31    Financial Solvency.**    The Company and Sellers are not entering into the arrangements contemplated by this Agreement with actual intent to hinder, delay or defraud its present or future creditors.  Neither the Company or Sellers have filed or intend to file any bankruptcy petition or application for receivership.

**3.32    Real Estate.**

(a)       Schedule 3.34(a) sets forth all real estate owned by Company. The building and structures owned by Company are structurally sound, in good operating condition and repair and adequate for the uses to which they are being put and none of such buildings or

structures is in need of maintenance or repairs other than ordinary, routine maintenance that is not material in nature or cost. Neither the Company nor any Subsidiary is a guarantor of any mortgage, deed of trust or underlying notes or other forms of debt of any Seller or other person.

(b)     Schedule 3.34(b) sets forth all real estate leased by Company. As of the Closing Date, such leases are binding and in full effect. To the best of Sellers' knowledge, information and belief, the building and structures leased by Company are structurally sound, in good operating condition and repair and adequate for the uses to which they are being put and none of such buildings or structures is in need of maintenance or repairs other than ordinary, routine maintenance.

### 3.33     Product Liabilities and Warranties.

(a)     Except set forth on Schedule 3.35(a), the Company nor any Subsidiary has incurred any loss as a result of any defect or other deficiency (whether of design, materials, workmanship, labeling, instructions, or otherwise) with respect to any product designed, manufactured, sold, leased, licensed, or delivered, or any service provided by the Company, whether such loss is incurred by reason of any express or implied warranty (including warranty of merchantability or fitness), any doctrine of common law (tort, contract, or other), or otherwise. No government body has alleged that any product designed, manufactured, sold, leased, licensed, or delivered by Company or any Subsidiary is defective or unsafe or fails to meet any product warranty or any standards promulgated by any such governmental body. No product designed, manufactured, sold, leased, licensed, or delivered by the Company or any Subsidiary has been recalled, and neither the Company nor any Subsidiary has received any notice of recall (written or oral) of any such product from any governmental body.

(b)     Except set forth on Schedule 3.35(b), neither the Company nor any Subsidiary has given to any person or business entity any product or service guaranty or warranty, right of return, or other indemnity relating to the products manufactured, sold, leased, licensed, or delivered, or services performed, by the Company, except those arising in the ordinary course of business.

### 3.34     Compliance with the Foreign Corrupt Practices Act and Export Control and Antiboycott Laws.  Neither the Company nor any Subsidiary, to the knowledge of Sellers, any representative of the Company or any Subsidiary in its capacity as such has at any time violated the Foreign Corrupt Practices Act or the anticorruption laws of any jurisdiction where the Company or any Subsidiary does business.  The Company and each Subsidiary has at all times complied with all legal requirements relating to export control and trade sanctions or embargoes. Neither the Company nor any subsidiary has violated the antiboycott prohibitions contained in 50 U.S.C. Sections 2401 *et seq*. or taken any action that can be penalized under Section 999 of the Code.

### 3.35     HIPAA/Privacy.  To the knowledge of Sellers, Company is, and at all times has been in compliance with the applicable requirements of HIPAA, as amended, and the implementing regulations thereunder governing the privacy of individually identifiable information and the security of such information maintained in electronic form, laws governing

the privacy and security of health-related medical information and personal information, and any "business associate" agreement entered into at the request of a HIPAA-covered entity.

**3.36** **Controlled Substances.** To the knowledge of Sellers, none of Company's employees, or persons who provide professional services under agreements with Company on behalf of the Business, has engaged in any activities which are prohibited under the Federal Controlled Substances Act, 21 U.S.C. § 801 *et seq*., as amended, or the regulations promulgated pursuant to such statute, or any related state or local statutes, or regulations concerning the acquisition, storage, disposal, dispensing and sale of controlled substances.

**3.37** **Anti-Kick Back Absence of Certain Commercial Practices.** Neither Company nor any Seller nor any member, officer, employee, agent or other person acting on behalf of any of them has, to the knowledge of Sellers, in violation of applicable law:

      (a)    received or solicited, offered or paid any renumeration, directly or indirectly, in exchange for referring, or as inducement to refer, an individual for the furnishing of services, or purchase or lease of items, services or facilities paid for by Medicare or Medicaid.

      (b)    given or agreed to give any gift or similar benefit of more than nominal value to any customer, supplier, governmental employee or official, or any other person who is or may be in a position to help or hinder the Business, or assist in any connection with any proposed transaction, which gift or similar benefit, if not given in the past, might have adversely affected the Business, or which, if not continued in the future, might adversely affect the Business;

      (c)    used any funds for unlawful contributions, payments, gifts, or entertainment, or made any unlawful expenditures relating to political activity to governmental officials or others, or establish or maintain any unlawful or unrecorded records; or

      (d)    made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to, or received any such unlawful payments from, any customers, vendors, suppliers, employees, foreign or domestic government officials, or other persons contracting with Company or any Subsidiary. Neither Company nor any Subsidiary has proposed or offered to make or receive any such illegal payments.

**3.38** **Malpractice; Negligence Claims.** Sellers are not aware of any claims or threatened claims against Company or any of its officers, members, employees, agents, or other persons acting on behalf of Company, for any malpractice or negligence in the treatment of patients, delivery of services or provision of care for patients provided by the Business.

**3.39** **Computer and Technology Security.** Company have taken all commercially reasonable steps to safeguard the information technology systems utilized in the operation of the business of Company, including the implementation of procedures to ensure that such information technology systems are free from any disabling codes or instructions, timer, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," or other software routines or hardware components that in each case permit unauthorized access or the unauthorized disablement or unauthorized erasure of data or other software by a third party, and to Sellers'

knowledge there have been no successful unauthorized intrusions or breaches of the security of the information technology systems.

**3.40** **Data Privacy.** Company's respective businesses have complied with and, as presently conducted, are in compliance in all material respects with, all laws and regulations applicable to data privacy, data security and/or information personnel. Company have complied with, and are presently in compliance with, its and their respective policies applicable to data privacy, data security, and/or personal information. Neither Company has experienced any incident in which personal information or other data was or may have been stolen or improperly accessed, and neither Company is aware of any facts suggesting the likelihood of the foregoing, including without limitation, any breach of security or receipt of any notices or complaints from any person regarding personal information or other data.

**3.41** **Full Disclosure.** Company and Sellers have provided full and unrestricted access to all financial records of Company to Buyer. No representation or warranty by Company, or the Sellers in this Agreement, or in the Disclosure Schedules furnished or to be furnished by Company, or the Sellers pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

## ARTICLE 4

### Representations and Warranties of Buyer

Buyer hereby makes the following representations and warranties, each of which is true and correct on the date hereof and will be true and correct on the Closing Date, and each of which shall survive the Closing Date and the transactions contemplated hereby to the extent set forth in Section 7.1 below:

**4.1** **Limited Liability Company Existence and Qualification.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and is duly qualified to conduct its business in each jurisdiction where the nature of its business or its properties require it be so qualified. Company has the limited liability company power and authority to own and use its properties and to transact the business in which it is engaged, and to enter into this Agreement and to consummate the transaction contemplated hereby.

**4.2** **Agreement Legal and Authorized.** The execution and delivery of this Agreement does not, and the consummation by the Parties of the transactions contemplated herein and fulfillment by Buyer of the terms, conditions, and provisions hereof, will not:

      (a)      conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under the Articles of Organization or Operating Agreement of the Buyer or any agreement or other instrument to which the Buyer is a party or by which any of Buyer's properties or assets are bound; or

      (b)      conflict with, violate, or result in a breach of any law, administrative regulation, or court decree applicable to Buyer;

(c)     Buyer has the right, power, legal capacity, and authority to enter into and perform its obligations under this Agreement. The execution, delivery, and performance of this Agreement has been duly authorized by all necessary limited liability company actions on the part of the Buyer. This Agreement constitutes a valid, binding, and enforceable obligation of Buyer, except as such enforceability may be limited by bankruptcy, insolvency and similar laws and for the availability of injunctive relief and other equitable remedies.

(d)     There is no claim action or proceeding now pending or, to the Buyer's Knowledge, threatened before any court, administrative or regulatory body, or any governmental agency, that will, or could, prevent or hamper the consummation of the transactions contemplated by this Agreement.

(e)     Neither the Buyer nor any of its officers, directors, or employees on behalf of Buyer has paid or agreed to pay any brokerage fee, or commission or any finder's fees, to any broker, agent, or finder on account of this Agreement or any matters contemplated by it.

## ARTICLE 5

## Post-Closing Covenants

### 5.1     Cooperation and Proceedings; Access to Records.

(a)     After the Closing, Sellers shall cooperate with Buyer and its counsel and make itself and its representatives reasonably available to Buyer and the Company,  at no cost or expense to Sellers, in connection with the institution or defense of any proceeding, whether existing, threatened, or anticipated, involving or relating to the transactions contemplated herein.

(b)     Sellers and Buyer will make reasonably available to the other any records in the nonrequesting party's custody or control for the purpose of preparing any financial statement or tax return or preparing for or defending any tax-related examination of the requesting party, or for defending any rights of setoff and/or indemnity.  The party requesting such records will reimburse the nonrequesting party for the reasonable out-of-pocket costs and expenses incurred by the nonrequesting party.  The nonrequesting party will afford access to such records during normal business hours, upon reasonable advance notice given by the requesting party, at mutually agreeable locations, and subject to such reasonable limitations as the nonrequesting party may impose to delete competitively sensitive or privileged information.

### 5.2     Releases.

(a)     Buyer and Company shall use commercially reasonable efforts to obtain the release of Sellers from any personal liability with respect to any debts or obligations undertaken by them in connection with the Business, including personal guaranties of the Company's debt and other contractual liabilities and obligations; provided, however, Buyer and Company shall not be obligated to substitute personal guaranties of their own shareholders, officers or directors.

### 5.3     Non-Competition, Non-Solicitation, and Non-Disparagement.

(a) For a period of two (2) years after the Closing Date:

(i) No Seller shall, directly or indirectly, engage, invest in, own, manage, operate, finance, control, advise, render services to, guarantee the obligations of, be employed by, be associated with, or in any manner be connected with any person or entity engaged in any business that Company conducts as of the Closing Date within any geographic area where the Company has done business or made sales within the two years prior to the Closing Date.

(ii) No Seller shall, directly or indirectly, (A) cause, induce, or attempt to cause or induce any employee, agent, independent contractor, customer, vendor, distributor or supplier of the Company to terminate such relationship; (B) in any way interfere with the relationship between the Company and any of its employees, agents, independent contractors, customers, vendors or suppliers; or (C) hire, retain, employ, or otherwise engage or attempt to hire, retain, employ, or otherwise engage as an employee, independent contractor, or otherwise, any employee, agent, or independent contractor of the Company.

(b) No Seller shall make any disparaging statement, either orally or in writing, regarding Buyer, the Company, the business, products, or services thereof, or any of their respective shareholders, directors, officers, employees, or agents.

(c) For a period of ten (10) years after the Closing Date, each Seller will keep in confidence and trust all Confidential Information of the Company, and will not use or disclose any such Confidential Information without the written consent of Buyer and the Company, except as may be necessary in the ordinary course of performing duties on behalf of the Company, or in connection with a valid and enforceable order or subpoena issued by any court or government agency. As used in this Agreement, "*Confidential Information*" means information belonging to the Company which is of value to the Company in the course of conducting its business and the disclosure of which could result in a competitive or other disadvantage to the Company. Confidential Information includes, without limitation, financial information, reports, and forecasts; inventions, improvements and other intellectual property, trade secrets, know-how, designs, processes or formulae; software; source code; market or sales information or plans; customer lists and contact information; and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) which have been discussed or considered by the management or employees of the Company. Confidential Information also includes the confidential information of others with which the Company has a business relationship. Notwithstanding the foregoing, Confidential Information does not include (i) information in the public domain, or information that (ii) was in the Seller's possession before receipt from the discloser. (iii) is rightfully received by Seller from a third party without a duty of confidentiality, (iv) is disclosed by the discloser to a third party without a duty of confidentiality on the third party, (v) is independently developed by Seller or another without access to such information, (vi) is disclosed under operation of law, or (vii) is disclosed by Seller with the discloser's prior written approval.

(d) Each Seller agrees that this Section 5.3, including the provisions relating to duration, geographical area, and scope, is reasonable and necessary to protect and preserve Buyer's and the Company's legitimate business interests and the value of the Company, and to

prevent an unfair advantage from being conferred on any Seller. If any provision of this <u>Section 5.3</u> would be held to be excessively broad as to duration, geographical area, scope, activity, or subject, for any reason, such provision shall be modified, by limiting and reducing it, so as to be enforceable to the extent allowed by law.

(e)     Sellers acknowledge that any breach of this <u>Section 5.3</u> would result in serious and irreparable injury to Buyer and Company, Buyer and Company could not be adequately compensated by monetary damages alone, and Buyer's and Company's remedy at law would not be adequate. Therefore, each Seller acknowledges and agrees that, in the event of a breach by any such Seller, Buyer and Company shall be entitled, in addition to any other remedy at law or in equity to which Buyer and Company may be entitled, to equitable relief against such Seller, including temporary restraining orders and preliminary and permanent injunctions to restrain such Seller from such breach and to compel compliance with the obligations of such Seller, and each Seller waives the posting of a bond or undertaking as a condition to such relief. Notwithstanding the mandatory arbitration provisions of <u>Section 8.6</u>, Buyer and Company shall be permitted to seek equitable relief in the courts of Montgomery County, Maryland or the U.S. District Court for Maryland, and Sellers hereby irrevocably consent to jurisdiction of such courts.

(f)     In the event that Buyer or the Company is in default of any payment or performance obligation, or any representation, warranty or covenant, under this Agreement, the Seller Notes, or any other document or instrument executed in connection with this transaction, the foregoing non-competition and non-solicitation provisions shall become null and void as to Sellers unless such default is cured within thirty (30) days after written notice of breach and demand for cure is served on Buyer and Company. In the event Seller(s) are in default under this <u>Section 5.3</u>, Buyer shall be permitted to suspend and setoff payments owed under such defaulting Seller'sNote during the period of the default.

5.4     <u>**Customer and Other Business Relationships.**</u>  After the Closing, each Seller shall cooperate with Buyer and the Company in their efforts to continue and maintain for the benefit of Buyer and the Company those business relationships of the Company and of such Seller relating to the business of any Company, including relationships with any suppliers, vendors, licensors, licensees, lessors, employees, regulatory authorities, and others. Each Seller shall refer to Buyer and the Company all inquiries and communications received by such Seller relating to the Company after the Closing. After the Closing, no Seller shall take any action, either directly or indirectly, that could diminish the value of Company or interfere with the business of Company.

5.5     <u>**Publicity.**</u>  Except as required pursuant to this Agreement to obtain the consent of such third party or as required by law or as necessary for the reporting and payment of taxes, Sellers shall not publicize, advertise or announce to any third party the entering into of this Agreement, the terms of this Agreement or the transactions contemplated hereby without the prior written consent of Buyer. Sellers may disclose the terms and provisions of this Agreement and the transactions contemplated hereby to its professional consultants and advisors, including but not limited to Sellers' attorneys and accountants.

**ARTICLE 6**

**Closing Deliveries**

**6.1    Delivery of Documents by Buyer.**  Buyer shall cause to be delivered to Sellers at Closing the following documents in a form satisfactory to Sellers and Sellers' counsel, and the same shall constitute a condition to Sellers' obligation to consummate this transaction:

(a)    The cash portion of the Purchase Price as described in Section 1.2;

(b)    Original Seller Notes duly executed and delivered by Buyer as Maker to each of the Sellers as payee;

(c)    A good-standing certificate of Buyer issued by its organizing jurisdiction, and of the State of Maryland where the Company is located;

(d)    Resolutions of Buyer authorizing the transactions contemplated by this Agreement;

(e)    An incumbency certificate of Buyer; Copy of the Operating Agreement of the Buyer

(f)    Resolutions of the Company appointing new managers, directors and officers of the Company on and after the Closing, and authorizing entry by the reconstituted Company into the Employment Agreement;

(g)    The Employment Agreement executed and delivered by the Company;

(h)    The Earnout Agreement executed and delivered by the Company;

(i)    The Pledge Agreement executed and delivered by Buyer; and

(j)    A closing statement showing payments and disbursements for the transactions contemplated herein.

**6.2    Delivery of Documents by Sellers.**  Sellers shall cause to be delivered to Buyer at Closing the following documents in a form satisfactory to Buyer and Buyer's counsel, and the same shall constitute a condition to Buyer's obligation to consummate this transaction:

(a)    Assignment of Certificated Membership Interest to Buyer and otherwise in proper form for transfer;

(b)    A copy of the Articles of Organization for the Company,  Operating Agreement and minutes of the Company, if any;

(c)    A good-standing certificate of the Company  issued by its organizing jurisdiction and any jurisdiction where Company is qualified to do business;

(d)    Resolutions of the Company authorizing the transactions contemplated herein;

(e)     All books and records of the Company;

(f)     Each license, certificate of occupancy, certification or other governmental approval required for the operation of the Company's business;

(g)     A resignation and release by each Seller from each manager or officer position held in Company;

(h)     The Employment Agreement executed and delivered by Bankeroff;

(i)     The Earnout Agreement executed and delivered by Bankeroff;

(j)     Other third-party consents to the transactions contemplated herein as deemed necessary by Buyer; and

(k)     A closing statement showing payments and disbursements for the transactions contemplated herein.

## ARTICLE 7

### Indemnification, Survival of Representations and Warranties.

**7.1     Survival of Warranties and Representations.**     All representations, warranties, and agreements of Buyer, and Company, and Sellers made under or pursuant to this Agreement shall survive until the fourth anniversary of the Closing Date.

**7.2     Indemnification by Sellers.**

(a)     The Sellers hereby jointly and severally covenant and agree to indemnify and hold harmless Buyer from and against any and all loss, liability, damage, or expense (including, but not limited to consultant fees and reasonable attorney fees incident thereto) arising out of, or resulting from, any material misrepresentation or the breach of any warranty, representation, or covenant made by the Company or Sellers in this Agreement, the schedules hereto, and any and all written statements, certificates, instruments, and documents delivered to Buyer pursuant to this Agreement on or before the Closing Date.

(b)     In the event that any claim is made against Buyer for any matter for which Sellers have agreed to indemnify Buyer per the terms of this Section 7.2, Sellers shall have the right to defend such claim. Buyer agrees to provide Sellers, at Sellers' expense, with all material and information in Buyer's possession reasonably necessary to the defense of any such claim by Sellers. Buyer shall promptly give Sellers' written notice of any such claim in such manner as set forth in Article 8 below. In the event of litigation, such notice shall be in writing and sent to Sellers' Representative within seven (7) business days of receipt of the claim or notice of litigation by Buyer. Sellers' Representative shall notify Buyer in writing with reasonable promptness (and in the event of litigation, within five (5) business days of receipt of the aforesaid notice of litigation) as to whether Sellers intend to contest such claim or liability. In the interim, Buyer shall take any action it deems appropriate with respect to such claim to protect against default.

**7.3** **Right of Setoff.** Upon written notice to Sellers specifying in reasonable detail the basis therefor, and failure of Seller to cure same within thirty (30) days following receipt of such written notice, Buyer may set off any amount to which it claims to be entitled from any Sellers, including any amounts that may be owed under this Article 7 or otherwise, against amounts otherwise payable under the Seller Notes or any provision of this Agreement. The exercise of such right of setoff by Buyer in good faith, whether or not ultimately determined to be justified, will not constitute a default under this Agreement or Seller Notes, regardless of whether any Seller disputes such setoff claim, or whether such setoff claim is for a contingent or an unliquidated amount. Neither the exercise of, nor the failure to exercise, such right of setoff or give notice of a claim will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it. Buyer may apportion its right of setoff against the Seller Notes in any manner Buyer deems appropriate.

# ARTICLE 8

## Miscellaneous

**8.1** **Notices.** All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or mailed first-class postage prepaid, or by overnight delivery by a nationally recognized overnight delivery service. Notices that are sent by first-class mail shall be deemed delivered on the date that is three business days after being postmarked and deposited in the U.S. mail, or one business day after delivery to such nationally recognized overnight delivery service for overnight delivery. Notice shall be sent to the addresses set forth herein or to such other address or to such other person as the parties shall have last designated by notice to the other parties in accordance with the terms of this Section 8.1:

if to Sellers':

> Laura Bankeroff
> 10817 Red Barn Lane
> Potomac, MD  20854
>
> Joann Koutsioukis
> 10817 Red Barn Lane
> Potomac, MD  20854

with a copy to:

> Geoffrey S. Gavett, Esquire
> Gavett, Datt & Barish, P.C.
> 15850 Crabbs Branch Way, Suite 330
> Rockville, MD  20855

if to Buyer:

> Vivos Acquisitions, LLC
> 10529 Crestwood Dr., Suite 201
> Manassas, VA 20109
> Attn:  Silvija Valleru

with a copy to:                              MPL Law Firm, LLP
                                                  137 East Philadelphia Street
                                                  York, PA 17401
                                                  Attn:  Andrew J. Miller

**8.2**     **Successors and Assigns; Entire Agreement; Modification.** Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their respective assigns, successors, heirs, executors, and administrators**,** including without limitation, heirs, distributees, personal or legal representatives, administrators, executors and any other person, partnership, company, Company or entity which may acquire substantially all of either party's assets or business, or with or into which either party may be liquidated, consolidated, merged or otherwise combined.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated herein and shall not be modified or amended except by an instrument in writing signed by or on behalf of the parties hereto. This Agreement shall become binding upon the parties hereto only upon its execution by <u>all</u> parties and the failure of any one or more parties hereto to execute this Agreement shall render this Agreement invalid as to all parties unless otherwise agreed.

**8.3**     **Expenses.** The parties hereto shall pay their own costs, fees and expenses incident to due diligence conducted in connection with this transaction, the negotiation, preparation and execution of this Agreement, and the consummation of the transactions contemplated hereby (including fees in the nature of finder fees, investment banking fees, lender fees and the like), and no such costs, fees or expenses shall be paid by or transferred to the Company following Closing.

**8.4**     **Assignment and Delegation.** The parties hereto acknowledge that the services and performances to be rendered hereunder are unique and personal.  Accordingly, the parties hereto may not assign nor delegate any of his or its duties or obligations under this Agreement.

**8.5**     **Governing Law, Jurisdiction and Venue.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Virginia without giving effect to its conflicts of laws provisions; and the Parties hereto agree that the any court of competent jurisdiction located in Fairfax County, Virginia shall have exclusive jurisdiction in any proceeding instituted to enforce this Agreement and the transactions contemplated hereby, and any objections to venue are hereby waived.

**8.6**     **Counterparts.** This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**8.7**     **Headings.** The paragraph headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provisions hereof.

**8.8**     **Time of the Essence.** Time shall be of the essence in the performance of all obligations and conditions contained in this Agreement.

**8.9** **Further Action**.  The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purposes of this Agreement.

**8.10** **Attorney Fees.**  In the event any suit or action is brought by any party under this Agreement to enforce any of its terms, or in any appeal therefrom, it is agreed that the prevailing party shall be entitled to reasonable attorneys' fees to be fixed by the trial court and/or appellate court.

**8.11** **Waiver Of Right To Jury Trial**.  Each party hereto expressly waives their respective right to a trial by jury on all issues of law and/or fact arising out of the interpretation or enforcement of this agreement, and any other disputes between the parties collateral to this agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

SIGNATURES APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first hereinabove written.

**BUYER:**

VIVOS ACQUISITIONS, LLC, a Virginia limited liability company

By:_____
    Silvija Valleru, Vice President


**SELLERS:**

_____
Laura Bankeroff


_____
Joann Koutsioukis


**COMPANY:**

HEALTH CARE RESOURCE NETWORK, LLC, a Nevada limited liability company


By:_____
Laura Bankeroff, President

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first hereinabove written.

**BUYER:**

VIVOS ACQUISITIONS, LLC, a Virginia limited liability company

By:_____
        Silvija Valleru, Vice President

**SELLERS:**

_____
Laura Bankeroff

_____
Joann Koutsioukis

**COMPANY:**

HEALTH CARE RESOURCE NETWORK, LLC, a Nevada limited liability company

By:_____
        Laura Bankeroff, President

# INDEX OF EXHIBITS AND SCHEDULES

Exhibit A – Seller Notes
Exhibit B – Membership Interest Pledge Agreement
Exhibit C – Employment Agreement
Exhibit D – Earnout Agreement

Schedule 3.1 – State Registrations
Schedule 3.3 – Managers and Directors
Schedule 3.5 – Subsidiaries
Schedule 3.9 – Accounts Payable
Schedule 3.11 – Tangible Property
Schedule 3.13 – Trade Names
Schedule 3.14 – Material Contracts
Schedule 3.18 – Manager and Officer Indebtedness
Schedule 3.19 – Insurance Policies
Schedule 3.20 – Guarantees
Schedule 3.22 – Bank Accounts and Safe Deposit Boxes
Schedule 3.24 – Employment and Consulting Contracts
Schedule 3.25(a) – Employee Benefit Plans
Schedule 3.27 – Governmental Authorizations
Schedule 3.28 – Intellectual Property
Schedule 3.30 – Notes and Accounts Receivable
Schedule 3.32(a) – Real Property – Owned
Schedule 3.32(b) – Real Property – Leased
Schedule 3.33(a) – Products Liability Losses/Claims
Schedule 3.33(b) – Product Warranties

**EXHIBIT A**

**<u>FORM OF SELLER NOTES</u>**

# PROMISSORY NOTE

DATE:                             February 10, 2017

PRINCIPAL AMOUNT:        $2,080,800.00

INTEREST RATE:             4.5%

MATURITY DATE:           January 1, 2022

HOLDER NAME/ADDRESS:    Laura Bankeroff
                                      10817 Red Barn Lane
                                      Potomac, MD  20854

FOR VALUE RECEIVED, and the sum of one dollar cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, **Vivos Acquisitions, LLC**, a Virginia limited liability company ("*Maker*"), promises to pay to the order of Laura Bankeroff, her heirs, executors, personal representatives, successors and assigns ("*Holder*"), the principal sum of Two Million Eighty Thousand Eight Hundred and 00/100 Dollars ($2,080,800.00), together with interest from the date hereof on the unpaid balance at the rate of 4.5%  per annum ("*Interest Rate*"). Maker shall pay principal and interest in fifty seven (57) monthly installments as follows:  Fifty six (56) monthly installments in the amount of  Forty Thousand, Five Hundred Ninety Eight and 18/100 Dollars ($40,598.18) each, commencing on the first day of the third calendar month following the Closing Date (May 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of January 1, 2022, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as <u>Exhibit A</u>, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note.  All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the Maker, Holder, Joann Koutsioukis and Health Care Resource Network, LLC (the "*Purchase Agreement*").  Terms used in this Note not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

Maker, without notice or demand of any kind, shall be in default (each, an "*Event of Default*") hereunder if any of the following events occurs:

                 (a)      The institution of bankruptcy, reorganization, insolvency or liquidation proceedings by or against Maker where such proceeding is consented to by Maker, or remains undismissed for sixty (60) days after notice thereof; or

                 (b)      Insolvency or bankruptcy of Maker, or the making by Maker of an assignment for the benefit of creditors, or the consent of Maker to the appointment of a trustee or

a receiver or other officer of the court or other tribunal on or for Maker in an insolvency or bankruptcy case or proceeding;

      (c)    Maker fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

      (d)    Maker shall be in default or breach of any of the terms and provisions of the Purchase Agreement between Maker and Holder of even date herewith.

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. Maker covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

Maker may, at its election, prepay without penalty all unpaid principal hereof. Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to Maker's right of setoff as provided under the Purchase Agreement.

Any provision of this Note which may be unenforceable or invalid under any applicable law shall be ineffective to the extent of such unenforceability or invalidity only, without affecting the enforceability or validity of any other provision hereof.

In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

Maker hereby expressly waives the benefit of any homestead exemption as to this debt and waives demand, protest, notice of presentment, notice of protest, and notice of non-payment and dishonor of this Note.

Maker agrees that this Note is provided not in payment of, but as additional security for and evidence of obligations due to the Holder under the Purchase Agreement and this note is not accepted in lieu of Holder's other legal rights. Maker expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and Maker, whether suit is brought by Holder and Maker, shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE(S) APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the Maker has caused this Note to be executed on the day and year first above mentioned.

VIVOS ACQUISITIONS, LLC, a Virginia limited liability company

By: _____
      Silvija Valleru, Vice President

STATE OF _____
COUNTY OF _____: to-wit:

The forgoing instrument was acknowledged before me this ____ day of _____, 20__, by Silvija Valleru, Vice President of Vivos Acquisitions, LLC, a Virginia limited liability company, on behalf of the limited liability company.

_____
      Notary Public

My Commission Expires: _____

## EXHIBIT A
## AMORTIZATION SCHEDULE



### Amortization schedule

**Monthly Payments: $ 40,598.18 ● Total Interests: $ 234,096.20**

| Month | Interest Paid | Interest Total | Principal Paid | Principal Total | Remaining Balance |
|---|---|---|---|---|---|
| 1 | $ 7,800.00 | $ 7,800.00 | $ 32,798.18 | $ 32,798.18 | $ 2,047,201.82 |
| 2 | $ 7,677.01 | $ 15,477.01 | $ 32,921.17 | $ 65,719.35 | $ 2,014,280.65 |
| 3 | $ 7,553.55 | $ 23,030.56 | $ 33,044.63 | $ 98,763.98 | $ 1,981,236.02 |
| 4 | $ 7,429.64 | $ 30,460.19 | $ 33,168.54 | $ 131,932.52 | $ 1,948,067.48 |
| 5 | $ 7,305.25 | $ 37,765.45 | $ 33,292.93 | $ 165,225.45 | $ 1,914,774.55 |
| 6 | $ 7,180.40 | $ 44,945.85 | $ 33,417.77 | $ 198,643.22 | $ 1,881,356.78 |
| 7 | $ 7,055.09 | $ 52,000.94 | $ 33,543.09 | $ 232,186.31 | $ 1,847,813.69 |
| 8 | $ 6,929.30 | $ 58,930.24 | $ 33,668.88 | $ 265,855.19 | $ 1,814,144.81 |
| 9 | $ 6,803.04 | $ 65,733.28 | $ 33,795.14 | $ 299,650.33 | $ 1,780,349.67 |
| 10 | $ 6,676.31 | $ 72,409.60 | $ 33,921.87 | $ 333,572.19 | $ 1,746,427.81 |
| 11 | $ 6,549.10 | $ 78,958.70 | $ 34,049.07 | $ 367,621.27 | $ 1,712,378.73 |
| 12 | $ 6,421.42 | $ 85,380.12 | $ 34,176.76 | $ 401,798.03 | $ 1,678,201.97 |
| 13 | $ 6,293.26 | $ 91,673.38 | $ 34,304.92 | $ 436,102.95 | $ 1,643,897.05 |
| 14 | $ 6,164.61 | $ 97,837.99 | $ 34,433.57 | $ 470,536.51 | $ 1,609,463.49 |
| 15 | $ 6,035.49 | $ 103,873.48 | $ 34,562.69 | $ 505,099.21 | $ 1,574,900.79 |
| 16 | $ 5,905.88 | $ 109,779.36 | $ 34,692.30 | $ 539,791.51 | $ 1,540,208.49 |
| 17 | $ 5,775.78 | $ 115,555.14 | $ 34,822.40 | $ 574,613.90 | $ 1,505,386.10 |

| | | | | | |
|---|---|---|---|---|---|
| 18 | $5,645.20 | $121,200.34 | $34,952.98 | $609,566.88 | $1,470,433.12 |
| 19 | $5,514.12 | $126,714.46 | $35,084.05 | $644,650.94 | $1,435,349.06 |
| 20 | $5,382.56 | $132,097.02 | $35,215.62 | $679,866.56 | $1,400,133.44 |
| 21 | $5,250.50 | $137,347.52 | $35,347.68 | $715,214.24 | $1,364,785.76 |
| 22 | $5,117.95 | $142,465.47 | $35,480.23 | $750,694.47 | $1,329,305.53 |
| 23 | $4,984.90 | $147,450.36 | $35,613.28 | $786,307.75 | $1,293,692.25 |
| 24 | $4,851.35 | $152,301.71 | $35,746.83 | $822,054.59 | $1,257,945.41 |
| 25 | $4,717.30 | $157,019.00 | $35,880.88 | $857,935.47 | $1,222,064.53 |
| 26 | $4,582.74 | $161,601.75 | $36,015.44 | $893,950.91 | $1,186,049.09 |
| 27 | $4,447.68 | $166,049.43 | $36,150.49 | $930,101.40 | $1,149,898.60 |
| 28 | $4,312.12 | $170,361.55 | $36,286.06 | $966,387.46 | $1,113,612.54 |
| 29 | $4,176.05 | $174,537.60 | $36,422.13 | $1,002,809.59 | $1,077,190.41 |
| 30 | $4,039.46 | $178,577.06 | $36,558.71 | $1,039,368.31 | $1,040,631.69 |
| 31 | $3,902.37 | $182,479.43 | $36,695.81 | $1,076,064.12 | $1,003,935.88 |
| 32 | $3,764.76 | $186,244.19 | $36,833.42 | $1,112,897.54 | $967,102.46 |
| 33 | $3,626.63 | $189,870.82 | $36,971.54 | $1,149,869.08 | $930,130.92 |
| 34 | $3,487.99 | $193,358.81 | $37,110.19 | $1,186,979.27 | $893,020.73 |
| 35 | $3,348.83 | $196,707.64 | $37,249.35 | $1,224,228.62 | $855,771.38 |
| 36 | $3,209.14 | $199,916.79 | $37,389.04 | $1,261,617.66 | $818,382.34 |
| 37 | $3,068.93 | $202,985.72 | $37,529.25 | $1,299,146.90 | $780,853.10 |
| 38 | $2,928.20 | $205,913.92 | $37,669.98 | $1,336,816.88 | $743,183.12 |
| 39 | $2,786.94 | $208,700.85 | $37,811.24 | $1,374,628.13 | $705,371.87 |
| 40 | $2,645.14 | $211,346.00 | $37,953.03 | $1,412,581.16 | $667,418.84 |
| 41 | $2,502.82 | $213,848.82 | $38,095.36 | $1,450,676.52 | $629,323.48 |
| 42 | $2,359.96 | $216,208.78 | $38,238.22 | $1,488,914.73 | $591,085.27 |
| 43 | | | | | $552,703.66 |

| | | | | | |
|---|---|---|---|---|---|
| | $ 2,216.57 | $ 218,425.35 | $ 38,381.61 | $ 1,527,296.34 | |
| 44 | $ 2,072.64 | $ 220,497.99 | $ 38,525.54 | $ 1,565,821.88 | $ 514,178.12 |
| 45 | $ 1,928.17 | $ 222,426.16 | $ 38,670.01 | $ 1,604,491.90 | $ 475,508.10 |
| 46 | $ 1,783.16 | $ 224,209.31 | $ 38,815.02 | $ 1,643,306.92 | $ 436,693.08 |
| 47 | $ 1,637.60 | $ 225,846.91 | $ 38,960.58 | $ 1,682,267.50 | $ 397,732.50 |
| 48 | $ 1,491.50 | $ 227,338.41 | $ 39,106.68 | $ 1,721,374.18 | $ 358,625.82 |
| 49 | $ 1,344.85 | $ 228,683.26 | $ 39,253.33 | $ 1,760,627.51 | $ 319,372.49 |
| 50 | $ 1,197.65 | $ 229,880.90 | $ 39,400.53 | $ 1,800,028.05 | $ 279,971.95 |
| 51 | $ 1,049.89 | $ 230,930.80 | $ 39,548.28 | $ 1,839,576.33 | $ 240,423.67 |
| 52 | $ 901.59 | $ 231,832.39 | $ 39,696.59 | $ 1,879,272.92 | $ 200,727.08 |
| 53 | $ 752.73 | $ 232,585.11 | $ 39,845.45 | $ 1,919,118.37 | $ 160,881.63 |
| 54 | $ 603.31 | $ 233,188.42 | $ 39,994.87 | $ 1,959,113.24 | $ 120,886.76 |
| 55 | $ 453.33 | $ 233,641.75 | $ 40,144.85 | $ 1,999,258.10 | $ 80,741.90 |
| 56 | $ 302.78 | $ 233,944.53 | $ 40,295.40 | $ 2,039,553.50 | $ 40,446.50 |
| 57 | $ 151.67 | $ 234,096.20 | $ 40,446.50 | $ 2,080,000.00 | $ 0.00 |

# PROMISSORY NOTE

DATE:                                    February 10, 2017

PRINCIPAL AMOUNT:        $1,999,200.00

INTEREST RATE:               4.5%

MATURITY DATE:              January 1, 2022

HOLDER NAME/ADDRESS:     Joann Koutsioukis
                         10817 Red Barn Lane
                         Potomac, MD  20854

FOR VALUE RECEIVED, and the sum of one dollar cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, **Vivos Acquisitions, LLC**, a Virginia limited liability company ("***Maker***"), promises to pay to the order of Joann Koutsioukis, her heirs, executors, personal representatives, successors and assigns ("***Holder***"), the principal sum of One Million Nine Hundred Ninety Nine Thousand, Two Hundred and 00/100 Dollars ($1,999,200.00) together with interest from the date hereof on the unpaid balance at the rate of 4.5% per annum ("***Interest Rate***"). Maker shall pay principal and interest in fifty seven (57) monthly installments as follows:  Fifty six (56) monthly installments in the amount of  Thirty Nine Thousand, Twenty One and 10/100 Dollars ($39,021.10) each, commencing on the first day of the third calendar month following the Closing Date (May 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of January 1, 2022, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as Exhibit A, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note.  All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the Maker, Holder, Laura Bankeroff and Health Care Resource Network, LLC (the "***Purchase Agreement***").  Terms used in this Note not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

Maker, without notice or demand of any kind, shall be in default (each, an "***Event of Default***") hereunder if any of the following events occurs:

        (a)     The institution of bankruptcy, reorganization, insolvency or liquidation proceedings by or against Maker where such proceeding is consented to by Maker, or remains undismissed for sixty (60) days after notice thereof; or

        (b)     Insolvency or bankruptcy of Maker, or the making by Maker of an assignment for the benefit of creditors, or the consent of Maker to the appointment of a trustee or

a receiver or other officer of the court or other tribunal on or for Maker in an insolvency or bankruptcy case or proceeding;

        (c)     Maker fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

        (d)     Maker shall be in default or breach of any of the terms and provisions of the Purchase Agreement between Maker and Holder of even date herewith.

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. Maker covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

Maker may, at its election, prepay without penalty all unpaid principal hereof.  Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to Maker's right of setoff as provided under the Purchase Agreement.

Any provision of this Note which may be unenforceable or invalid under any applicable law shall be ineffective to the extent of such unenforceability or invalidity only, without affecting the enforceability or validity of any other provision hereof.

In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

Maker hereby expressly waives the benefit of any homestead exemption as to this debt and waives demand, protest, notice of presentment, notice of protest, and notice of non-payment and dishonor of this Note.

Maker agrees that this Note is provided not in payment of, but as additional security for and evidence of obligations due to the Holder under the Purchase Agreement and this note is not accepted in lieu of Holder's other legal rights. Maker expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and Maker, whether suit is brought by Holder and Maker, shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE(S) APPEAR ON THE FOLLOWING PAGE(S)]**

IN WITNESS WHEREOF, the Maker has caused this Note to be executed on the day and year first above mentioned.

VIVOS ACQUISITIONS, LLC, a Virginia limited liability company

By: _____
       Silvija Valleru, Vice President

STATE OF _____

COUNTY OF _____: to-wit:

The forgoing instrument was acknowledged before me this ____ day of _____, 20__, by Silvija Valleru, Vice President of Vivos Acquisitions, LLC, a Virginia limited liability company, on behalf of the limited liability company.

_____
          Notary Public

My Commission Expires: _____

**EXHIBIT A**
**AMORTIZATION SCHEDULE**



**Monthly Loan Calculator with Amortization**

| Principal | $ 1,999,200 | Amortization | 57 | months | **Help** |
| Interest Rate | 4.5 % | | Calculate Payment | | **About** |

| Or input payment | $ 39,021.10 | and | Calculate Principal |

*For illustrative purposes only. Rates are compounded monthly.*

**CLOSE this window**

---

**Amortization schedule**

**Monthly Payments: $ 39,021.10 ● Total Interests: $ 225,002.47**

| Month | Interest Paid | Interest Total | Principal Paid | Principal Total | Remaining Balance |
|---|---|---|---|---|---|
| 1 | $ 7,497.00 | $ 7,497.00 | $ 31,524.10 | $ 31,524.10 | $ 1,967,675.90 |
| 2 | $ 7,378.78 | $ 14,875.78 | $ 31,642.31 | $ 63,166.41 | $ 1,936,033.59 |
| 3 | $ 7,260.13 | $ 22,135.91 | $ 31,760.97 | $ 94,927.38 | $ 1,904,272.62 |
| 4 | $ 7,141.02 | $ 29,276.93 | $ 31,880.07 | $ 126,807.45 | $ 1,872,392.55 |
| 5 | $ 7,021.47 | $ 36,298.41 | $ 31,999.62 | $ 158,807.07 | $ 1,840,392.93 |
| 6 | $ 6,901.47 | $ 43,199.88 | $ 32,119.62 | $ 190,926.70 | $ 1,808,273.30 |
| 7 | $ 6,781.02 | $ 49,980.90 | $ 32,240.07 | $ 223,166.77 | $ 1,776,033.23 |
| 8 | $ 6,660.12 | $ 56,641.03 | $ 32,360.97 | $ 255,527.74 | $ 1,743,672.26 |
| 9 | $ 6,538.77 | $ 63,179.80 | $ 32,482.32 | $ 288,010.06 | $ 1,711,189.94 |
| 10 | $ 6,416.96 | $ 69,596.76 | $ 32,604.13 | $ 320,614.20 | $ 1,678,585.80 |
| 11 | $ 6,294.70 | $ 75,891.46 | $ 32,726.40 | $ 353,340.60 | $ 1,645,859.40 |
| 12 | $ 6,171.97 | $ 82,063.43 | $ 32,849.12 | $ 386,189.72 | $ 1,613,010.28 |
| 13 | $ 6,048.79 | $ 88,112.22 | $ 32,972.31 | $ 419,162.03 | $ 1,580,037.97 |
| 14 | $ 5,925.14 | $ 94,037.36 | $ 33,095.95 | $ 452,257.98 | $ 1,546,942.02 |
| 15 | $ 5,801.03 | $ 99,838.39 | $ 33,220.06 | $ 485,478.04 | $ 1,513,721.96 |
| 16 | $ 5,676.46 | $ 105,514.85 | $ 33,344.64 | $ 518,822.68 | $ 1,480,377.32 |
| 17 | $ 5,551.41 | $ 111,066.27 | $ 33,469.68 | $ 552,292.36 | $ 1,446,907.64 |

| 18 | $ 5,425.90 | $ 116,492.17 | $ 33,595.19 | $ 585,887.56 | $ 1,413,312.44 |
|----|-----------|--------------|-------------|--------------|----------------|
| 19 | $ 5,299.92 | $ 121,792.09 | $ 33,721.17 | $ 619,608.73 | $ 1,379,591.27 |
| 20 | $ 5,173.47 | $ 126,965.56 | $ 33,847.63 | $ 653,456.36 | $ 1,345,743.64 |
| 21 | $ 5,046.54 | $ 132,012.10 | $ 33,974.56 | $ 687,430.92 | $ 1,311,769.08 |
| 22 | $ 4,919.13 | $ 136,931.23 | $ 34,101.96 | $ 721,532.88 | $ 1,277,667.12 |
| 23 | $ 4,791.25 | $ 141,722.48 | $ 34,229.84 | $ 755,762.72 | $ 1,243,437.28 |
| 24 | $ 4,662.89 | $ 146,385.37 | $ 34,358.21 | $ 790,120.93 | $ 1,209,079.07 |
| 25 | $ 4,534.05 | $ 150,919.42 | $ 34,487.05 | $ 824,607.98 | $ 1,174,592.02 |
| 26 | $ 4,404.72 | $ 155,324.14 | $ 34,616.38 | $ 859,224.35 | $ 1,139,975.65 |
| 27 | $ 4,274.91 | $ 159,599.05 | $ 34,746.19 | $ 893,970.54 | $ 1,105,229.46 |
| 28 | $ 4,144.61 | $ 163,743.66 | $ 34,876.49 | $ 928,847.03 | $ 1,070,352.97 |
| 29 | $ 4,013.82 | $ 167,757.48 | $ 35,007.27 | $ 963,854.30 | $ 1,035,345.70 |
| 30 | $ 3,882.55 | $ 171,640.03 | $ 35,138.55 | $ 998,992.85 | $ 1,000,207.15 |
| 31 | $ 3,750.78 | $ 175,390.81 | $ 35,270.32 | $ 1,034,263.17 | $ 964,936.83 |
| 32 | $ 3,618.51 | $ 179,009.32 | $ 35,402.58 | $ 1,069,665.75 | $ 929,534.25 |
| 33 | $ 3,485.75 | $ 182,495.07 | $ 35,535.34 | $ 1,105,201.09 | $ 893,998.91 |
| 34 | $ 3,352.50 | $ 185,847.57 | $ 35,668.60 | $ 1,140,869.69 | $ 858,330.31 |
| 35 | $ 3,218.74 | $ 189,066.31 | $ 35,802.36 | $ 1,176,672.05 | $ 822,527.95 |
| 36 | $ 3,084.48 | $ 192,150.79 | $ 35,936.62 | $ 1,212,608.66 | $ 786,591.34 |
| 37 | $ 2,949.72 | $ 195,100.50 | $ 36,071.38 | $ 1,248,680.04 | $ 750,519.96 |
| 38 | $ 2,814.45 | $ 197,914.95 | $ 36,206.65 | $ 1,284,886.69 | $ 714,313.31 |
| 39 | $ 2,678.67 | $ 200,593.63 | $ 36,342.42 | $ 1,321,229.11 | $ 677,970.89 |
| 40 | $ 2,542.39 | $ 203,136.02 | $ 36,478.71 | $ 1,357,707.82 | $ 641,492.18 |
| 41 | $ 2,405.60 | $ 205,541.62 | $ 36,615.50 | $ 1,394,323.32 | $ 604,876.68 |
| 42 | $ 2,268.29 | $ 207,809.90 | $ 36,752.81 | $ 1,431,076.12 | $ 568,123.88 |
| 43 |           |              |             |              | $ 531,233.24 |

| | | | | | |
|---|---|---|---|---|---|
| | $2,130.46 | $209,940.37 | $36,890.63 | $1,467,966.76 | |
| 44 | $1,992.12 | $211,932.49 | $37,028.97 | $1,504,995.73 | $494,204.27 |
| 45 | $1,853.27 | $213,785.76 | $37,167.83 | $1,542,163.56 | $457,036.44 |
| 46 | $1,713.89 | $215,499.65 | $37,307.21 | $1,579,470.77 | $419,729.23 |
| 47 | $1,573.98 | $217,073.63 | $37,447.11 | $1,616,917.88 | $382,282.12 |
| 48 | $1,433.56 | $218,507.19 | $37,587.54 | $1,654,505.41 | $344,694.59 |
| 49 | $1,292.60 | $219,799.79 | $37,728.49 | $1,692,233.91 | $306,966.09 |
| 50 | $1,151.12 | $220,950.92 | $37,869.97 | $1,730,103.88 | $269,096.12 |
| 51 | $1,009.11 | $221,960.03 | $38,011.99 | $1,768,115.86 | $231,084.14 |
| 52 | $866.57 | $222,826.59 | $38,154.53 | $1,806,270.39 | $192,929.61 |
| 53 | $723.49 | $223,550.08 | $38,297.61 | $1,844,568.00 | $154,632.00 |
| 54 | $579.87 | $224,129.95 | $38,441.23 | $1,883,009.23 | $116,190.77 |
| 55 | $435.72 | $224,565.66 | $38,585.38 | $1,921,594.61 | $77,605.39 |
| 56 | $291.02 | $224,856.68 | $38,730.08 | $1,960,324.69 | $38,875.31 |
| 57 | $145.78 | $225,002.47 | $38,875.31 | $1,999,200.00 | $0.00 |

## Exhibit B

## Form of Membership Interest Pledge Agreement

# MEMBERSHIP INTEREST PLEDGE AND SECURITY AGREEMENT

THIS MEMBERSHIP INTEREST PLEDGE AND SECURITY AGREEMENT ("***Pledge Agreement***") is made as of the 10th day of February, 2017 by and among **VIVOS ACQUISITIONS, LLC**, a Virginia limited liability company ("***Pledgor***"); and **LAURA BANKEROFF** ("***Bankeroff***") and **JOANN KOUTSIOUKIS** ("***Koutsioukis***", and collectively with Bankeroff referred to as the "***Pledgeess***"); and **HEALTH CARE RESOURCE NETWORK, LLC**, a Nevada limited liability company (the "***Company***"). Pledgor, Pledgeess, and Company are collectively referred to herein as the "***Parties***".

## WITNESSETH:

WHEREAS, Pledgeess are the owner of one hundred percent (100%) of the membership interests of the Company (the "***Membership Interests***");

WHEREAS, Pledgeess have agreed to sell the Membership Interests to Pledgor, pursuant to that certain Membership Interest Purchase Agreement of even date (the "***Purchase Agreement***"), for a purchase price of Eight million Five Hundred Eighty Thousand and 00/100 Dollars $8,580,000.00, with the sum of Four Million, Eighty Thousand and 00/100 Dollars ($4,080,000.00), to be deferred and paid pursuant to the Seller Notes, as such term is defined in the Purchase Agreement (with the payment and other obligations under the Seller Notes, collectively, the "***Obligations***");

WHEREAS, the parties have agreed that the obligation to pay the purchase price for the Membership Interests to Pledgeess will be secured by a pledge of the Membership Interests; and

WHEREAS, the Pledgor desires to pledge the Membership Interests purchased to Pledgeess as security for payment of the Seller Notes and full satisfaction of the Obligations.

NOW, THEREFORE, in consideration of the premises which are hereby acknowledged, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Pledged Membership Interests.** As security for the timely payment of the Seller Notes and prompt and proper satisfaction of the Obligations to Pledgeess, the Pledgor irrevocably pledges to Pledgeess the Membership Interests (the "***Pledged Interests***") and grants Pledgeess a lien thereon and security interest therein.

2. **Possession of Pledged Membership Interests.** To perfect said lien and security interest, Pledgeess are hereby given possession of the Certificated Pledged Interests until the Obligations are fully satisfied. If as of the date hereof, certificated membership interests have not yet been issued in the name of the Pledgor, then all right, title and interest in and to the Pledged Interests remains irrevocably assigned to Pledgeess, which Pledged Interests will be restricted membership interests and when certificates for such Pledged Interests are issued they will be immediately delivered to Pledgeess.

3. **Pledgor as Pledgees' Agent.** Pledgor shall act as Pledgees' agent and accept in trust for Pledgees, on behalf of Pledgees, any written or oral notices received with respect to the Pledged Interests, as well as any rights, certificates, dividends, distributions of any sort, and any right, or interest which Pledgors may receive or become entitled to receive in connection with the Pledged Interests. All notices will be immediately provided to Pledgees. If requested, Pledgor shall promptly deliver the above to Pledgees, endorsed if necessary. Pledgor shall also immediately deliver to Pledgees, whenever requested by Pledgees, blank Assignments Separate From Certificate duly executed by the Pledgor. Pledgor further acknowledges that it has executed a blank Assignment Separate From Certificate assigning the Membership Interests to Pledgees which are being held in escrow by Gavett Datt & Barish, P.C. (or such substitute escrow agent as reasonably selected by Pledgees) and hereby irrevocably authorizes such escrow agent to deliver such blank Assignments Separate From Certificate to Pledgees upon the occurrence of an Event of Default and further authorizes the Secretary and/or Manager of the Company to transfer the Membership Interests to Pledgees. Pledgees and Pledgor agree to indemnify and hold harmless such escrow agent in connection with the performance of its duties, including prompt reimbursement of any attorney's fees and costs incurred because of such actions. Until an Event of Default has occurred, Pledgor will retain all voting and other limited liability company rights and privileges to which it may be entitled to as holder of the Pledged Interests.

4. **Registration of Pledged Interests.** Pledgees may, at any time and at its option, cause or require that Pledgor cause any part or all of the Pledged Interests to become registered in the name of Pledgees, and Pledgor will promptly comply with said registration. If such registration is effectuated prior to an Event of Default (as defined below), the Pledgor shall retain (until an Event of Default) all voting and other limited liability company rights and privileges. Upon the occurrence of an Event of Default, whether the Pledged Interests have been registered in the name of the Pledgees or their nominees, the Pledgees or their nominee shall have voting rights and all other limited liability company rights and all conversion, exchange, subscription or other rights, privileges, or options pertaining to, the Pledged Interests as if it were the absolute owner thereof, including, without limitation, the rights to exchange any or all of the Pledged Interests upon a merger, consolidation, reorganization or other readjustment of the Company.

Unless an Event of Default has occurred, Pledgees will not receive for their own use cash distributions on the Pledged Interests paid out of earned surplus. Upon an Event of Default, Pledgees may apply and retain any such cash distributions as additional security or apply them toward satisfaction of the Obligations.

5. **Remedies Upon Occurrence of Event of Default.** Upon the occurrence of a default under the Note or on any of the Collateral Documents which is not cured within any applicable cure period or if the Pledgor defaults hereunder which is not cured within five (5) days of delivery of notice of such default to the Pledgor ("*Event of Default*"), then in addition to the rights and remedies of Pledgees under the Seller Notes, Pledgees may, without demand of performance or notice of any kind to the Pledgor, either (i), sell or dispose of and deliver Pledged Interests or interest therein in a public or private sale, for cash or for credit, without assumption of credit risk or (ii) retain and become the full owner of the Pledged Interests with all rights and privileges thereto and without the requirement of any notice to the Pledgor. The

Pledgor irrevocably appoints Pledgees its attorney-in-fact to execute any instrument necessary to transfer title to the Membership Interests to Pledgees upon the occurrence of an Event of Default. The Pledgor further provides that the Pledgees may utilize any Assignment or Bill of Sale that the Pledgees may have been provided to transfer title to the Pledged Interests to Pledgees or Pledgees' successors or assigns.  The Pledgees or any purchaser has the right to retain all or part of the Pledged Interests, free of any rights of redemption in the Pledgor.

6. **Pledgor's Right of Redemption**.  Pledgor hereby expressly waives and releases any right of redemption or equity of redemption of the Pledged Interests.

7. **Remedies/Sale.**  Pledgees, upon an Event of Default, may retain the Pledged Interests for their own use and become again a member of the Company with the full rights and powers thereof, or at their own discretion and without any requirement to do so, may dispose or sell the Pledged Interests, with the proceeds from sale applied as follows:  (i) to costs and expenses incurred in connection with the safekeeping of the Pledged Interests, including attorneys fees; (ii) to satisfy the Obligations;  (iii)  to pay any other amounts required by law; and (iv)  to the Pledgor, if surplus proceeds remain.

8. **Representations and Warranties of the Pledgor.**  Pledgor hereby represents, warrants and covenants that:

(a)    It has the requisite power, and authority to enter into this Pledge Agreement, and carry out transactions contemplated therein;

(b)    It is the legal and beneficial owner of the Pledged Interests;

(c)    The Pledged Interests have been duly and validly issued;

(d)    The Pledged Interests are free of any pledge, lien, mortgage, hypothecation, charge, encumbrance, or security interest except as granted herein;

(e)    The execution and delivery of this Pledge Agreement will not result in any violation of any provision of the Company's or the Pledgor's respective Articles of Organization, Operating Agreements or constitute a default under the terms of any agreement or other instrument, governmental rule or regulation;

(f)    Delivery of the Pledged Interests to the Pledgees or their nominee creates a valid first lien upon and perfected security interest in the Pledged Interests, and the proceeds thereof; and

(g)    Pledgor will, at its own expense fully and vigorously defend Pledgees' rights, title and interest in and to the Pledged Interests against claims of any person, firm, corporation or other entity.  Pledgor recognizes that Pledgees may elect to sell the Pledged Interests at a private sale which may

result in the sale of the Pledged Interests at prices which are less favorable than in a public sale and accept the results of any such sale so long as done in a commercially reasonable manner.

**9.** **Disposition of Pledged Interests by Pledgor.** Except only for the Pledge to Pledgees created by this Pledge Agreement, Pledgor covenants that, until the Obligations are satisfied in full, Pledgor will not sell, assign, hypothecate, convey or otherwise dispose of any Pledged Interests or interest therein, or create a lien, pledge or any encumbrance whatsoever upon the Pledged Interests or its proceeds. Pledgees may require that the certificate evidencing the Membership Interests be marked as "restricted membership interests", subject to the terms and conditions of this Pledge Agreement.

**10.** **Issuance of Additional Membership Interests.** Pledgor shall not consent to or approve of the issuance of additional membership interests by the Company; or any securities convertible voluntarily, or exchangeable for any membership interests; or any warrants, options, rights or other commitments entitling any person to purchase or otherwise acquire any such membership interests.

**11.** **Notices Received by Pledgees.** Pledgees will promptly deliver to Pledgor a copy or original if appropriate of any written or oral notices in connection with the Pledged Interests which Pledgees or its nominee receives.

**12.** **Further Documentation.** The parties to this Pledge agreement agree to promptly execute such further documentation and/or to undertake such further acts or actions which may be necessary, in the reasonable opinion of any party, to effectuate the terms and provisions of this Pledge Agreement.

**13.** **Release of Pledged Interests.** Upon the satisfaction in full of all Obligations and the payment of any additional costs and expenses of the Pledgees as provided herein, this Pledge Agreement shall terminate and the Pledgees shall deliver to the Pledgor at the Pledgor's expense the Pledged Interests which remain in Pledgees' possession and which shall not have otherwise been sold or disposed of pursuant to this Pledge Agreement. Pledgees agree that they will release any individual Pledgor from the terms hereof and deliver the membership certificate to the Pledgor representing Pledgor's Membership Interest upon payment in full of the Note to Pledgees by Pledgor.

**14.** **Notice.** Any notice required or permitted by this Pledge Agreement shall be effective if given in accordance with the notice provision set forth in the Purchase Agreement.

**15.** **Miscellaneous.**

(a) This Pledge Agreement shall be binding upon the parties hereto and shall inure to the benefit of and be enforceable by their respective personal representatives, heirs, successors or assigns of the parties hereto.

(b)     The section numbers and headings appearing in the Pledge Agreement are inserted only as a matter of convenience and do not define, limit, construe or describe the scope or intent of such sections of this Pledge Agreement or any way effect this Pledge Agreement.

(c)     This Pledge Agreement shall be construed and enforced in accordance with the laws of the State of Maryland.

(d)     This Pledge Agreement may be executed in one or more counterparts each of which shall be deemed to be an original but all of which shall together constitute one and the same agreement.  The parties intend for this Pledge Agreement to be executed under seal.  Any change or modification hereto will only be effective if in writing and signed by the parties hereto.

(e)     The rights and remedies provided herein and in the Seller Notes and in all other agreements, instruments and documents delivered pursuant to or in connection with the Seller Notes are cumulative and are in addition to and not exclusive of any rights or remedies provided by law including but without limitation, the rights and remedies of the Pledgees under the Uniform Commercial Code.

(f)     The provisions of this Pledge Agreement are severable and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction then such invalidity or unenforceability shall effect only such clause or provision or part thereof in such jurisdiction and shall not in any manner effect such clause or provision in any other jurisdiction or any other clause or provision in this Pledge Agreement in any jurisdiction.

(g)     The parties hereto, agree to be bound by the terms of Note and the Collateral Agreements and agree that a default under the terms of the Note or of any one or more of the Collateral Agreements shall constitute a cross default and the rights and remedies provided therein, herein or by law may be fully exercised by the parties hereto.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK,
SIGNATURES APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first hereinabove written.

**<u>Pledgor</u>:**

VIVOS ACQUISITIONS, LLC, a Virginia limited liability company


By:_____
Silvija Valleru, Vice President


**<u>Pledgees</u>:**


_____
Laura Bankeroff


_____
Joann Koutsioukis


**<u>Company</u>:**

HEALTH CARE RESOURCE NETWORK, LLC, a Nevada limited liability company


By:_____
Silvija Valleru, Manager

# EXHIBIT C

## FORM OF EMPLOYMENT AGREEMENT

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "**Agreement**") made and entered into this 10th day of February, 2017 (the "**Effective Date**"), by and between LAURA BANKEROFF (the "**Employee**"), an adult individual, and **HEALTH CARE RESOURCE NETWORK, LLC**, a Nevada limited liability company (the "**Employer**").

WITNESSETH:

WHEREAS, Employer is in the business of providing staffing solutions to businesses, specializing in medical professional and support staff for government and military treatment facilities (the "**Business**"); and

WHEREAS, Employer agrees to employ Employee in the Business on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, and such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employer and Employee, intending to be legally bound, agree as follows:

1.    **Employment.**  The Employer agrees to employ Employee and Employee agrees to be employed by the Employer on the terms and conditions set forth in this Agreement. Employee shall devote her full time and effort to Employer and shall not directly or indirectly render services to any other person or entity or engage in other outside business activity without the prior written consent of the Employer.

2.    **Capacity.**  Employee shall be employed in the capacity set forth on Schedule A, attached hereto and in such capacity shall perform the duties and functions described on Schedule A, together with such other services and duties in connection with the business, affairs and operations of the Employer as may be reasonably assigned or delegated to  Employee from time to time by or under the authority of the Employer's President or other supervisory officer, provided such duties are typically performed by individuals holding such position indicated on Schedule A hereto throughout the industry.

3.    **Compensation and Benefits.**  The Employer shall pay the Employee an annual salary of two hundred sixty thousand dollars ($260,000.00).  Employee shall also receive those benefits listed on Schedule A attached hereto. Such benefits shall be subject to change in accordance with changes in Employer's policies.  Employer shall, on an annual basis, evaluate Employee's performance and make adjustments to Employee's rate of compensation, such adjustments at Employer's sole discretion.  Employee shall also be eligible for a monthly bonus as outlined on Schedule B attached hereto.

4.    **Term; Renewal.**  The term of Employee's employment with Employer shall be for a period of three (3) years commencing February 10, 2017.  Upon the expiration of the initial three (3) year term, the term shall automatically renew for two (2) successive one (1) year terms.

Notwithstanding the forgoing, the term shall not renew for either or both of the one (1) year renewal terms if: (i) Employee serves Employer with a written notice of intent not to renew employment term within ninety (90) days of the expiration of the prior term; or (ii) if Employer terminates Employee for Cause as defined herein. Notwithstanding the foregoing, Employer may terminate Employee's employment and this Agreement immediately for cause shown. "Cause" shall mean (i) Employee is no longer in substantial compliance with or substantially performing her duties of employment; (ii) Employee commits any act of theft, embezzlement, fraud, deceit, dishonesty or other criminal act that adversely impacts Employer or Employer's reputation, or (iii) Employee is in material breach of any other material provision of this Agreement.

5. **Restrictive Covenants.**

(a) <u>Non-Disclosure.</u> Employee recognizes and acknowledges that she will, during the term of this Agreement, have access to certain Confidential Information of Employer, as defined herein. Employee agrees that she will not use or disclose any such Confidential Information to any party without express written authorization of the Employer. The term "**Confidential Information**" means any and all confidential, proprietary or trade secret information, whether disclosed, directly or indirectly, verbally, in writing or by any other means in tangible, intangible form, electronic or online, including that which is conceived or developed by the Employee, applicable to or in any way related to: (i) the present or future business of the Employer; (ii) the research and development of the Employer; or (iii) the business of any client or vendor of the Employer.

(b) <u>Non-Competition.</u> Employee agrees that for a period of two (2) years after the termination of her employment, regardless if such termination is voluntary or involuntary, she will not engage in any business or perform any service, or have any interest in any enterprise in direct or indirect competition with Employer which does business within fifty (50) miles of the office of Employer where Employee performed her duties for Employer, nor will Employee engage in or have any interest in any client or customer of Employer.

(c) <u>Non-Solicitation.</u> During the period of employment, or during the period of non-competition, Employee shall not, directly or indirectly, solicit or service in any way, any client or customer, or prospective client or customer, who has been solicited or serviced by Employer prior to the termination of the Employee. Employee further agrees not to solicit or entice or endeavor to solicit or entice away from Employer any person who was a director, officer, employee, contractor or consultant of Employer, either on her own account or for any person, firm, corporation or other organization, whether or not such person would commit any breach of his contract of employment by reason of leaving the service of Employer.

(d) <u>Injunctive Relief.</u> Employee acknowledges that her compliance with the restrictive covenants in this Section 5 is necessary to protect the goodwill and other proprietary interests of Employer. Employee acknowledges that a breach of the restrictive covenants as more fully set forth in this Section 5 may result in serious and

irreparable damage to the Business for which there will be no adequate remedy at law and she agrees that in the event of any such breach of the aforesaid restrictive covenants, Employer and its successors and assigns shall be entitled to preliminary and permanent injunctive relief and to such other and further relief as may be available at law or in equity.

(e) <u>Period of Relief.</u> If Employee violates the agreements set forth in this Section 5 and Employer brings legal action for injunctive or other relief, Employer shall have the benefit of the full period of the restrictive covenant. Accordingly, the restrictive covenants shall be deemed to have the duration of two (2) years, computed from the date the relief is granted but reduced by the time period after termination that Employee was not in violation of this covenant.

(f) <u>Alternative Employment.</u> Employee acknowledges that her experience and capabilities are such that Employee can obtain suitable employment otherwise than in violation of this restrictive covenant, and that, accordingly, in the event of the termination of Employee's employment for any reason and at any time, the enforcement of this restrictive covenant will not prevent Employee from earning a livelihood or otherwise cause Employee undue hardship.

6. **Intellectual Property.** Employee agrees that Employer owns and shall continue to own all copyrights, trademarks, patents, websites, domain names, internet addresses, phone numbers, ideas, formulae, programs, systems, improvements, devices, processes, business concepts, discoveries and inventions related to the Business, or used or useable by Employer, that were conceived, made, developed, acquired or reduced to practice during the term of this Agreement (hereinafter referred to as "**Intellectual Property**"), whether or not the Intellectual Property is suitable for trademark, patent or copyright. Employee hereby transfers and assigns to Employer all right, title and interest in and to said Intellectual Property, including any and all domestic and foreign patent rights or copyrights therein and any renewals thereof. On request of Employer, Employee shall (without any additional compensation) from time to time during the term of this Agreement, subject however to the terms and provisions of Section 5 above, execute such further instruments (including, without limitation, trademark assignments, copyright registrations, applications for letters patent and assignments of either) and do all such other acts and things as may be deemed necessary or desirable by Employer to protect and/or enforce its rights in respect of any Intellectual Property. All expenses of filing or prosecuting any copyright or any patent application shall be borne by Employer, but Employee shall reasonably cooperate in filing and/or prosecuting any such applications, at no cost to Employee, and subject to the terms of Section 5 above.

7. **Entire Agreement.** This Agreement, and all schedules and attachments hereto, contains the entire agreement of the Parties with respect to the subject matter hereof and shall not be modified or changed in any respect except in writing duly signed by the Parties.

8. **Governing Law; Jurisdiction.** This Agreement shall be governed by, interpreted, construed, and enforced in accordance with the laws of the State of Maryland. Any action or proceeding to enforce this Agreement shall under the exclusive jurisdiction and venue of the courts of Montgomery County, Maryland, and any Party that must institute such action or

proceeding to enforce this Agreement shall be entitled to costs of enforcement, including attorney fees and litigation costs.

9. **Interpretation of Provisions.** Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10. **Headings.** Headings in this Agreement are solely for purposes of identification and shall not in any manner alter or vary the interpretation or construction of this Agreement.

11. **Successors and Assigns.** All the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their heirs, personal representatives, executors, transferees, successors and assigns.

12. **Counterparts.** This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURES APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement on the date first above written.

EMPLOYEE:

_____
Laura Bankeroff

EMPLOYER:

HEALTH CARE RESOURCE
NETWORK, LLC


_____
Silvija Valleru, Manager

**<u>SCHEDULE A</u>**

**JOB DESCRIPTION**

**<u>Position/Title</u>:**
Chief Executive Officer (CEO)/President

**<u>Duties and Hours</u>:**
Employee will undertake a variety of management and client responsibilities including without limitation: business development and sales, client project management, account management, employee management and growth, executive-level decision making for Employer success, and marketing.  Employee will work full time, defined as at least 40 hours per week.

**<u>Benefits*</u>:**
Health Insurance – wholly paid by employer
Dental Insurance – wholly paid by employer
Vision Insurance – wholly paid by employer
Twenty-five (25) Days Paid Time Off (PTO) plus 3 sick/bereavement days
Participation in Employer's SIMPLE-IRA retirement plan
Participation in Employer's Bonus Plan
Ten (10) Holidays:

| New Year's Day | Martin Luther King, Jr. Day |
|---|---|
| George Washington's Birthday | Memorial day |
| Independence Day | Labor Day |
| Columbus Day | Veteran's Day |
| Thanksgiving Day | Christmas Day |

If any of the above holidays falls on a weekend, then Employer shall assign a different day in which Employee shall be off work.  Ex. - July 4th is on a Saturday, Employer may decide between the preceding Friday or the following Monday as the holiday for employment purposes.
Home-office benefits as determined by Employer

* Benefits shall be subject to periodic review and change in order to conform with changes in Employer's policies

**<u>SCHEDULE B</u>**

**MONTHLY BONUS PLAN**

Employer shall be eligible for a monthly bonus in accordance with the below chart. Said bonus shall be paid on the first regular pay-day following confirmation of the bonus amount by Employee and her supervisor. For purposes of the chart below, Net Income shall be as determined by the monthly Income Statement after application of all operating expenses, including without limitation allocation of taxes, interest, and long-term debt.

| **<u>Employer's Monthly Net Income</u>** | **<u>Employee's Bonus</u>** |
|---|---|
| Less than $150,000 | 1% of Net Income (for applicable month) |
| Between $150,000 and $200,000 | 2.5% of Net Income (for applicable month) |
| More than $200,000 | 3% of Net Income (for applicable month) |

**EXHIBIT D**

**FORM OF EARNOUT AGREEMENT**

# EARNOUT AGREEMENT

This is an **EARNOUT AGREEMENT**, dated February 10, 2017 (the "*Agreement*") by and among **HEALTH CARE RESOURCE NETWORK, LLC** ("*Company*"); **VIVOS ACQUISITIONS, LLC** ("*Buyer*"); and **LAURA BANKEROFF** ("*Seller*") Company, Buyer and Seller are collectively referred to herein as the "*Parties*".

## WITNESSETH:

WHEREAS, Company, Seller and Buyer are parties to that certain Membership Interest Purchase Agreement dated as of the same date hereof (the "*Purchase Agreement*") which provides for Buyer to purchase all of the membership interest of Company;

WHEREAS, the Purchase Agreement provides that Company will enter into this Agreement with Seller to provide for earnout payments to Seller in consideration for her continued consulting services with Company; and

WHEREAS, the Parties now desire to enter this Agreement to set forth the terms and conditions for the earnout contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and of the respective representations and warranties set forth in this Agreement, and of the covenants and agreements contained herein, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE 1

### Definitions

**1.1    Definitions.**

"**Adjusted EBITDA**"—EBITDA, adjusted as described in the last sentence of this definition and by excluding the effects of any of the following to the extent otherwise included in consolidated earnings from operations:

(a)    gains, losses or profits realized by the Company from the sale of assets other than in the ordinary course of business and any "extraordinary items" of gain or loss (as determined in accordance with GAAP); and

(b)    any management fees, general overhead expenses, or other intercompany charges, of whatever kind or nature, charged by Buyer to Company, except that Buyer may charge interest on any loans or advances made by Buyer or its Affiliates to Company in connection with their business operations.

"**Affiliate**"—with respect to any entity, an entity that directly or indirectly controls or is controlled by, or is under common control with, as the case may be, the relevant entity.

"**Annual Earnout Payment**"—as defined in <u>Section 2(a)(i)</u>.

"**Buyer**"—as defined in the preamble.

"**Company**"—as defined in the preamble.

"**Computation Notice**"—as defined in <u>Section 3(a)</u>.

"**EBITDA**"—consolidated earnings from operations of Company, as determined in accordance with GAAP as consistently applied by Company, before consolidated interest, taxes, depreciation, and amortization of the Company, in each case, as determined in accordance with GAAP as consistently applied by the Company.

"**Earnout Period**"—for Year 1, the fiscal year ending December 31, 2017; for Year 2, , the fiscal year ending December 31, 2018; for Year 3, the fiscal year ending December 31, 2019; Year 4, the fiscal year ending December 31, 2020; Year 5, the fiscal year ending December 31, 2021.

"**Income Statement**"—as defined in <u>Section 3(a)</u>.

"**Independent Accountants**"—a recognized national or regional independent accounting firm mutually acceptable to Buyer and Seller, which has not and does not represent and has no affiliation with  Seller or Buyer.  If Buyer and Seller cannot agree on a firm within 15 days from any event that requires selection of such a firm, then Buyer and Seller shall each select an accountant who is a certified public accountant and the two accountants so selected shall within 15 days thereafter mutually agree on a recognized national or regional independent accounting firm.

"**Objection Notice**"—as defined in <u>Section 3(c)</u>.

"**Seller**"—as defined in the preamble.

## ARTICLE 2

### Earnout Payment

**2.1**     <u>**Earnout Payment**</u>.

(a)     <u>Annual Earnout Payments</u>.  Company shall pay Seller forty percent (40%) of any increase of the Company's Adjusted EBITA as compared to the prior year's Adjusted EBITA (the "***Annual Earnout Payments***") for each of the Company's fiscal years during the Earnout Period as set forth in Section 1.1  above.

(b)     The Annual Earnout Payment, if achieved, will be paid by the Company within 30 days after the final determination of Adjusted EBITDA for each Earnout Period, but in no event later than March 15 of the year following such Earnout Period.

(c)     Seller shall not be entitled to any interest on the Annual Earnout Payment under this Agreement.

(d)     Upon notice to Seller specifying in reasonable detail the basis therefor, Company may set off any amount to which it claims to be entitled from Seller, including any amounts that may be owed under Article 7 of the Purchase Agreement, subject to Seller's right to such written notice and opportunity to cure as set forth in Article 7 of the Purchase Agreement or otherwise, against amounts otherwise payable under this Agreement.    Neither the exercise of, nor the failure to exercise, such right of setoff will constitute an election of remedies or limit Company in any manner in the enforcement of any other remedies that may be available to it.

## ARTICLE 3

### Procedure

**3.1**     **Procedure.**

(a)     Promptly following the end of each Earnout Period, Company shall prepare (i) a consolidated income statement of the Company for the Earnout Period, which shall be prepared in accordance with GAAP as consistently applied by the Company (the "***Income Statement***"), and (ii) a computation of EBITDA and Adjusted EBITDA, showing separately each of the adjustments made to EBITDA to arrive at Adjusted EBITDA (the "***Computation Notice***"). Company shall deliver the Income Statement and the Computation Notice to Seller within 75 days following the end of the Earnout Period.

(b)     Upon execution of such access letters as may be reasonably required by Company, Seller shall be given reasonable access during reasonable business hours to (and copies of) all Company's books, records, and other documents, including work papers, worksheets, notes, and schedules used in preparation of the Income Statement and its computation of EBITDA and Adjusted EBITDA in the Computation Notice for the purpose of reviewing the Income Statement and the Computation Notice, in each case, other than work papers that Company considers proprietary, such as internal control documentation, engagement planning, time control and audit sign off, and quality control work papers.

(c)     If, within 30 days following delivery of the Income Statement and the Computation Notice to Seller, Seller has not given Buyer and Company notice of an objection as to any amounts set forth on the Income Statement or the computation of EBITDA or Adjusted EBITDA in the Computation Notice (which notice shall state in reasonable detail the basis of Seller's objection) (the "***Objection Notice***"), the Adjusted EBITDA as computed by Company will be final, binding, and conclusive on the Parties.

(d)     If Seller timely gives Buyer and Company an Objection Notice, and if Seller and Buyer fail to resolve the issues raised in the Objection Notice within 30 days after giving the Objection Notice, Seller, Buyer and Company shall submit the issues remaining in dispute for resolution to Independent Accountants.

(e)     The Parties shall negotiate in good faith in order to seek agreement on the procedures to be followed by the Independent Accountants, including procedures with regard to

the presentation of evidence.  If the Parties are unable to agree upon procedures within 10 days of the submission to the Independent Accountants, the Independent Accountants shall establish such procedures giving due regard to the intention of the Parties to resolve disputes as promptly, efficiently, and inexpensively as possible, which procedures may, but need not, be those proposed by either Buyer or Seller.  The Independent Accountants shall be directed to resolve only those issues in dispute and render a written report on their resolution of disputed issues with respect to the Income Statement and the Computation Notice as promptly as practicable, but no later than 60 days after the date on which the Independent Accountants are engaged.  The determination of Adjusted EBITDA by the Independent Accountants will be based solely on written submissions of Buyer and Company, on the one hand, and Seller, on the other hand, and will not involve independent review.  Any determination by the Independent Accountants will not be outside the range established by the amounts in (i) the Income Statement and the computation of EBITDA and Adjusted EBITDA in the Computation Notice proposed by Buyer and Company, and (ii) Seller's proposed adjustments thereto.  Such determination will be final, binding, and conclusive on the Parties.

(f)    If the computation of Adjusted EBITDA is submitted to the Independent Accountants for resolution:

(i)    The Parties shall execute any agreement reasonably required by the Independent Accountants to accept their engagement pursuant to this <u>Section 3</u>;

(ii)    The Parties shall promptly furnish or cause to be furnished to the Independent Accountants such work papers and other documents and information relating to the disputed issues as the Independent Accountants may request and are available to that Party or its accountants or other representatives, and shall be afforded the opportunity to present to the Independent Accountants, with a copy to the other Party, any other written material relating to the disputed issues;

(iii)    the determination by the Independent Accountants, as set forth in a report to be delivered by the Independent Accountants to the Parties, will include all the changes in the Income Statement and the computation of EBITDA and Adjusted EBITDA in the Computation Notice required as a result of the determination made by the Independent Accountants; and

(iv)    Seller and Buyer shall each pay one-half (1/2) the fees and costs of the Independent Accountants.

# ARTICLE 4

## Miscellaneous

**4.1    Entire Agreement.**  This Agreement, together with the other agreements among the Parties executed and delivered concurrently herewith, supersedes all prior agreements, whether written or oral, between the Parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter.

**4.2    Modification.**   This Agreement may only be amended, supplemented, or otherwise modified by a writing executed by the Parties.

**4.3    Assignments and Successors.**  No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior consent of the other Parties.  Any purported assignment of rights or delegation of obligations in violation of this <u>Section 4.3</u> will be void.  Subject to the foregoing, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the heirs, executors, administrators, personal representatives, legal representatives, successors, and permitted assigns of the Parties.

**4.4    Governing Law.**  All matters relating to or arising out of this Agreement and the rights of the Parties (whether sounding in contract, tort or otherwise) will be governed by and construed and interpreted under the laws of the State of Maryland without regard to conflicts of laws principles that would require the application of any other law.

**4.5    Remedies Cumulative.**   The rights and remedies of the Parties are cumulative and not alternative.

**4.6    Dispute Resolution.**   This Agreement shall be governed by the same dispute resolution clauses as set forth in the Purchase Agreement.

**4.7    No Waiver.**   Neither any failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.   To the maximum extent permitted by applicable legal requirements, (i) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be waived by a Party, in whole or in part, unless made in a writing signed by such Party; (ii) a waiver given by a Party will only be applicable to the specific instance for which it is given; and (iii) no notice to or demand on a Party will (A) waive or otherwise affect any obligation of that Party or (B) affect the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

**4.8    Notices.**   All notices and other communications required or permitted by this Agreement shall be given in accordance with Article 8 of the Purchase Agreement.

**4.9    Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**4.10    Time of the Essence.**   With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**4.11    Counterparts; Electronic Signatures.**   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy and all of which, when taken together, will be deemed to constitute one and the same agreement, and will be

effective when counterparts have been signed by each of the Parties and delivered to the other Parties. A manual signature on this Agreement, which image is transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement for all purposes.

4.12. **Waiver Of Right To Jury Trial**. Each party hereto expressly waives their respective right to a trial by jury on all issues of law and/or fact arising out of the interpretation or enforcement of this agreement, and any other disputes between the parties collateral to this agreement.


**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**SIGNATURES APPEAR ON THE FOLLOWING PAGE(S)**

IN WITNESS WHEREOF, the Company has duly executed this Agreement as of the date first hereinabove written.

<u>**COMPANY**</u>:

**Health Care Resource Network, LLC**

By:_____
      Silvija Valleru, Manager

IN WITNESS WHEREOF, the Buyer has duly executed this Agreement as of the date first hereinabove written.

**BUYER**:

**Vivos Acquisitions, LLC**

By:    _____
        Silvija Valleru, Vice President

IN WITNESS WHEREOF, the Seller has duly executed this Agreement as of the date first hereinabove written.

**<u>Seller</u>:**

_____
Laura Bankeroff

CLOSING CERTIFICATE AND
NOTICE OF FUNDING

February 16, 2017

This Closing Certificate is delivered in connection with that certain Membership Interest Purchase Agreement dated February 10, 2017 (the "*Agreement*"; capitalized terms not otherwise define herein shall have the same respective meanings as are ascribed to them in the Agreement), by and among **VIVOS ACQUISITIONS, LLC**, a Virginia limited liability company ("*Buyer*"); and **LAURA BANKEROFF** ("*Bankeroff*") and **JOANN KOUTSIOUKIS** ("*Koutsioukis*", and collectively with Bankeroff referred to as the "*Sellers*"); and **HEALTH CARE RESOURCE NETWORK, LLC**, a Nevada limited liability company (the "*Company*").

1.      This certificate shall serve as acknowledgment and consent that all parties hereto, including Buyer, Sellers and the Company, have agreed that the final closing date for execution of the Agreement and related documents is as listed in such Agreement and such related documents, to wit February 10, 2017, and that the funding date shall be the date first listed above.

2.      The parties expressly acknowledge and agree that the payment of the purchase price, as provided in the Agreement, has changed by decreasing the amount paid at closing from $4,500,000 to $4,300,000, by increasing the Bankeroff Note from $2,080,800.00 to $2,182,800.00, and by increasing the Koutsioukis Note from $1,999,200.00 to $2,097,200.00. The parties further acknowledge and agree that these changes were made to the respective documents with the signature pages already executed, therefore the changed pages were replaced keeping the same previously executed signature pages. The effected pages are page 2 of the Agreement, page 1 of the Bankeroff Note, and page 1 of the Koutsioukis Note.

3.      The parties acknowledge the payment of an additional amount, being the payoff balance of the SunTrust line of credit ($582,942.71) paid at closing, to be paid by Buyer to Sellers in the form of Supplemental Seller Notes, as reviewed and agreed by the parties, with the Bankeroff Supplemental Note in the amount of $297,300.78 and the Koutsioukis Supplemental Note in the amount of $285,641.92.

4.      The parties agree that all documents executed and delivered pursuant to the Agreement and the transactions contemplated therein are considered final, effective, and shall be operative as of the date listed above, notwithstanding the date or dates any of the applicable documents have been executed or signed by the parties, either individually or collectively.

5.      The representations and warranties made in the Agreement, as applicable to the respective parties, and as may be provided in any schedule, exhibit, list, certificate or document delivered pursuant thereto, are true on and as of the date hereof with the same force and effect as though made on and as of the date hereof, except as affected by transactions contemplated under the Agreement.

6.      The respective parties have performed or caused to be performed all obligations and agreements and complied or caused to be complied with all covenants and conditions

**EXHIBIT 2**

contained in the Agreement, as applicable to the such parties, to be performed or complied with on or prior to the date hereof.

7.     Based on the foregoing acknowledgements and representations, the undersigned hereby authorizes the funding of this transactions, as contemplated pursuant to the Agreement, pursuant to the Settlement Statement delivered with this Closing Certificate and separately executed by the Buyer and Seller.

[signatures to follow]

IN WITNESS WHEREOF, the undersigned have set their hands as of the date first above-written.

**BUYER:**

VIVOS ACQUISITIONS, LLC, a Virginia
limited liability company

By:_____
          Silvija Valleru, Vice President

**SELLERS:**

_____
Laura Bankeroff

_____
Joann Koutsioukis

**COMPANY:**

HEALTH CARE RESOURCE NETWORK,
LLC, a Nevada limited liability company

By:_____
          Laura Bankeroff, President

# PROMISSORY NOTE

DATE:                                    February 16, 2017

PRINCIPAL AMOUNT:         $2,182,800.00

INTEREST RATE:               4.5%

MATURITY DATE:              January 1, 2022

HOLDER NAME/ADDRESS:    Laura Bankeroff
                                          10817 Red Barn Lane
                                          Potomac, MD  20854

FOR VALUE RECEIVED, and the sum of one dollar cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, **Vivos Acquisitions, LLC**, a Virginia limited liability company ("*Maker*"), promises to pay to the order of Laura Bankeroff, her heirs, executors, personal representatives, successors and assigns ("*Holder*"), the principal sum of Two Million One Hundred Eighty Two Thousand Eight Hundred and 00/100 Dollars ($2,182,800.00), together with interest from the date hereof on the unpaid balance at the rate of 4.5% per annum ("*Interest Rate*"). Maker shall pay principal and interest in fifty seven (57) monthly installments as follows:  Fifty six (56) monthly installments in the amount of  Forty Two Thousand, Five Hundred Sixty Three and 48/100 Dollars ($42,563.48) each, commencing on the first day of the third calendar month following the Closing Date (May 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of January 1, 2022, if not sooner paid as provided herein.  Payments shall be made pursuant to the amortization schedule attached hereto as <u>Exhibit A</u>, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note.  All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the Maker, Holder, Joann Koutsioukis and Health Care Resource Network, LLC (the "*Purchase Agreement*").  Terms used in this Note not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

Maker, without notice or demand of any kind, shall be in default (each, an "*Event of Default*") hereunder if any of the following events occurs:

        (a)  The institution of bankruptcy, reorganization, insolvency or liquidation proceedings by or against Maker where such proceeding is consented to by Maker, or remains undismissed for sixty (60) days after notice thereof; or

        (b)  Insolvency or bankruptcy of Maker, or the making by Maker of an assignment for the benefit of creditors, or the consent of Maker to the appointment of a trustee or

1

**EXHIBIT 3**

a receiver or other officer of the court or other tribunal on or for Maker in an insolvency or bankruptcy case or proceeding;

      (c)    Maker fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

      (d)    Maker shall be in default or breach of any of the terms and provisions of the Purchase Agreement between Maker and Holder of even date herewith.

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. Maker covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

Maker may, at its election, prepay without penalty all unpaid principal hereof.  Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to Maker's right of setoff as provided under the Purchase Agreement.

Any provision of this Note which may be unenforceable or invalid under any applicable law shall be ineffective to the extent of such unenforceability or invalidity only, without affecting the enforceability or validity of any other provision hereof.

In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

Maker hereby expressly waives the benefit of any homestead exemption as to this debt and waives demand, protest, notice of presentment, notice of protest, and notice of non-payment and dishonor of this Note.

Maker agrees that this Note is provided not in payment of, but as additional security for and evidence of obligations due to the Holder under the Purchase Agreement and this note is not accepted in lieu of Holder's other legal rights. Maker expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and Maker, whether suit is brought by Holder and Maker, shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE(S) APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the Maker has caused this Note to be executed on the day and year first above mentioned.

VIVOS ACQUISITIONS, LLC, a Virginia
limited liability company

By: _V. Si Li_ _____
         Silvija Valleru, Vice President

STATE OF _Virginia_ _____
COUNTY OF _Fairfax_ _____ : to-wit:

The forgoing instrument was acknowledged before me this _1st_ day of _February_ , 20__, by Silvija Valleru, Vice President of Vivos Acquisitions, LLC, a Virginia limited liability company, on behalf of the limited liability company.

_____
                       Notary Public

My Commission Expires: _6/30/2019_ _____

PATRICIA M GAMBINO
NOTARY PUBLIC
REG. #7122728
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JUNE 30, 2019

Signature Page                 Bankeroff Promissory Note

**<u>EXHIBIT A</u>**
**AMORTIZATION SCHEDULE**



## Mortgage calculator with amortization schedule

| Principal | $ 2,182,800 | | Amortization | 57 | months | **Help** |
| Interest Rate | 4.5 % | | Payment | Monthly | | **Info** |

Calculate Payment

Or Input Payment $ 42,563.48 and Calculate Principal

The above is for illustrative purposes only. Canadian Rates are compounded semi-annually

---

**Amortization:** 57 Months (4.75 Years)

**57 Periodic Payments of** $ 42,563.48

**Mortgage Cost (Total Interests):** $ 243,318.34

---

## Amortization Schedule for Monthly Payments

| Month | Principal Balance | Capital Paid | Total Capital | Interests Paid | Total Interests |
|---|---|---|---|---|---|
| 1 | $ 2,182,800.00 | $ 34,453.68 | $ 34,453.68 | $ 8,109.80 | $ 8,109.80 |
| 2 | $ 2,148,346.32 | $ 34,581.69 | $ 69,035.37 | $ 7,981.79 | $ 16,091.59 |
| 3 | $ 2,113,764.63 | $ 34,710.17 | $ 103,745.54 | $ 7,853.31 | $ 23,944.90 |
| 4 | $ 2,079,054.46 | $ 34,839.13 | $ 138,584.66 | $ 7,724.35 | $ 31,669.26 |
| 5 | $ 2,044,215.34 | $ 34,968.57 | $ 173,553.23 | $ 7,594.91 | $ 39,264.17 |
| 6 | $ 2,009,246.77 | $ 35,098.49 | $ 208,651.72 | $ 7,464.99 | $ 46,729.16 |
| 7 | $ 1,974,148.28 | $ 35,228.89 | $ 243,880.60 | $ 7,334.59 | $ 54,063.75 |
| 8 | $ 1,938,919.40 | $ 35,359.77 | $ 279,240.38 | $ 7,203.71 | $ 61,267.46 |
| 9 | $ 1,903,559.62 | $ 35,491.15 | $ 314,731.52 | $ 7,072.33 | $ 68,339.79 |
| 10 | $ 1,868,068.48 | $ 35,623.01 | $ 350,354.53 | $ 6,940.47 | $ 75,280.26 |
| 11 | $ 1,832,445.47 | $ 35,755.36 | $ 386,109.89 | $ 6,808.12 | $ 82,088.38 |
| 12 | $ 1,796,690.11 | $ 35,888.20 | $ 421,998.09 | $ 6,675.28 | $ 88,763.66 |
| Year 1 | | | | | |
| 13 | $ 1,760,801.91 | $ 36,021.54 | $ 458,019.63 | $ 6,541.94 | $ 95,305.60 |
| 14 | $ 1,724,780.37 | $ 36,155.37 | $ 494,175.00 | $ 6,408.11 | $ 101,713.71 |
| 15 | $ 1,688,625.00 | $ 36,289.70 | $ 530,464.70 | $ 6,273.78 | $ 107,987.50 |
| 16 | $ 1,652,335.30 | $ 36,424.53 | $ 566,889.23 | $ 6,138.95 | $ 114,126.45 |
| 17 | $ 1,615,910.77 | $ 36,559.85 | $ 603,449.08 | $ 6,003.62 | $ 120,130.07 |
| 18 | $ 1,579,350.92 | $ 36,695.69 | $ 640,144.77 | $ 5,867.79 | $ 125,997.87 |
| 19 | $ 1,542,655.23 | $ 36,832.02 | $ 676,976.79 | $ 5,731.46 | $ 131,729.32 |

| 20 | $ 1,505,823.21 | $ 36,968.87 | $ 713,945.65 | $ 5,594.61 | $ 137,323.94 |
| 21 | $ 1,468,854.35 | $ 37,106.22 | $ 751,051.87 | $ 5,457.26 | $ 142,781.20 |
| 22 | $ 1,431,748.13 | $ 37,244.08 | $ 788,295.95 | $ 5,319.40 | $ 148,100.60 |
| 23 | $ 1,394,504.05 | $ 37,382.45 | $ 825,678.40 | $ 5,181.03 | $ 153,281.63 |
| 24 | $ 1,357,121.60 | $ 37,521.34 | $ 863,199.74 | $ 5,042.14 | $ 158,323.77 |
| Year 2 | | | | | |
| 25 | $ 1,319,600.26 | $ 37,660.74 | $ 900,860.48 | $ 4,902.74 | $ 163,226.51 |
| 26 | $ 1,281,939.52 | $ 37,800.66 | $ 938,661.15 | $ 4,762.81 | $ 167,989.32 |
| 27 | $ 1,244,138.85 | $ 37,941.11 | $ 976,602.25 | $ 4,622.37 | $ 172,611.70 |
| 28 | $ 1,206,197.75 | $ 38,082.07 | $ 1,014,684.32 | $ 4,481.41 | $ 177,093.11 |
| 29 | $ 1,168,115.68 | $ 38,223.56 | $ 1,052,907.88 | $ 4,339.92 | $ 181,433.03 |
| 30 | $ 1,129,892.12 | $ 38,365.57 | $ 1,091,273.45 | $ 4,197.91 | $ 185,630.94 |
| 31 | $ 1,091,526.55 | $ 38,508.11 | $ 1,129,781.56 | $ 4,055.37 | $ 189,686.31 |
| 32 | $ 1,053,018.44 | $ 38,651.18 | $ 1,168,432.74 | $ 3,912.30 | $ 193,598.61 |
| 33 | $ 1,014,367.26 | $ 38,794.78 | $ 1,207,227.52 | $ 3,768.70 | $ 197,367.31 |
| 34 | $ 975,572.48 | $ 38,938.92 | $ 1,246,166.43 | $ 3,624.56 | $ 200,991.87 |
| 35 | $ 936,633.57 | $ 39,083.59 | $ 1,285,250.02 | $ 3,479.89 | $ 204,471.77 |
| 36 | $ 897,549.98 | $ 39,228.79 | $ 1,324,478.82 | $ 3,334.69 | $ 207,806.45 |
| Year 3 | | | | | |
| 37 | $ 858,321.18 | $ 39,374.54 | $ 1,363,853.36 | $ 3,188.94 | $ 210,995.39 |
| 38 | $ 818,946.64 | $ 39,520.83 | $ 1,403,374.19 | $ 3,042.65 | $ 214,038.04 |
| 39 | $ 779,425.81 | $ 39,667.66 | $ 1,443,041.85 | $ 2,895.82 | $ 216,933.85 |
| 40 | $ 739,758.15 | $ 39,815.04 | $ 1,482,856.89 | $ 2,748.44 | $ 219,682.29 |
| 41 | $ 699,943.11 | $ 39,962.97 | $ 1,522,819.86 | $ 2,600.51 | $ 222,282.80 |
| 42 | $ 659,980.14 | $ 40,111.44 | $ 1,562,931.30 | $ 2,452.04 | $ 224,734.84 |
| 43 | $ 619,868.70 | $ 40,260.47 | $ 1,603,191.77 | $ 2,303.01 | $ 227,037.85 |
| 44 | $ 579,608.23 | $ 40,410.05 | $ 1,643,601.82 | $ 2,153.43 | $ 229,191.28 |
| 45 | $ 539,198.18 | $ 40,560.19 | $ 1,684,162.01 | $ 2,003.29 | $ 231,194.57 |
| 46 | $ 498,637.99 | $ 40,710.88 | $ 1,724,872.89 | $ 1,852.60 | $ 233,047.17 |
| 47 | $ 457,927.11 | $ 40,862.13 | $ 1,765,735.02 | $ 1,701.35 | $ 234,748.52 |
| 48 | $ 417,064.98 | $ 41,013.95 | $ 1,806,748.97 | $ 1,549.53 | $ 236,298.05 |
| Year 4 | | | | | |
| 49 | $ 376,051.03 | $ 41,166.33 | $ 1,847,915.30 | $ 1,397.15 | $ 237,695.20 |
| 50 | $ 334,884.70 | $ 41,319.28 | $ 1,889,234.58 | $ 1,244.20 | $ 238,939.40 |
| 51 | $ 293,565.42 | $ 41,472.79 | $ 1,930,707.37 | $ 1,090.69 | $ 240,030.09 |
| 52 | $ 252,092.63 | $ 41,626.87 | $ 1,972,334.24 | $ 936.60 | $ 240,966.70 |
| 53 | $ 210,465.76 | $ 41,781.53 | $ 2,014,115.78 | $ 781.95 | $ 241,748.64 |
| 54 | $ 168,684.22 | $ 41,936.76 | $ 2,056,052.54 | $ 626.72 | $ 242,375.36 |
| 55 | $ 126,747.46 | $ 42,092.57 | $ 2,098,145.11 | $ 470.91 | $ 242,846.27 |

| 56 | $ 84,654.89 | $ 42,248.96 | $ 2,140,394.07 | $ 314.52 | $ 243,160.79 |
| 57 | $ 42,405.93 | $ 42,405.93 | $ 2,182,800.00 | $ 157.55 | $ 243,318.34 |

# PROMISSORY NOTE

| | |
|---|---|
| DATE: | February 16, 2017 |
| PRINCIPAL AMOUNT: | $2,097,200.00 |
| INTEREST RATE: | 4.5% |
| MATURITY DATE: | January 1, 2022 |
| HOLDER NAME/ADDRESS: | Joann Koutsioukis<br>10817 Red Barn Lane<br>Potomac, MD  20854 |

FOR VALUE RECEIVED, and the sum of one dollar cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, **Vivos Acquisitions, LLC**, a Virginia limited liability company ("***Maker***"), promises to pay to the order of Joann Koutsioukis, her heirs, executors, personal representatives, successors and assigns ("***Holder***"), the principal sum of Two Million Ninety Seven Thousand, Two Hundred and 00/100 Dollars ($2,097,200.00) together with interest from the date hereof on the unpaid balance at the rate of 4.5%  per annum ("***Interest Rate***"). Maker shall pay principal and interest in fifty seven (57) monthly installments as follows:  Fifty six (56) monthly installments in the amount of  Forty Thousand Eight Hundred Ninety Four and 32/100 Dollars ($40,894.32) each, commencing on the first day of the third calendar month following the Closing Date (May 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of January 1, 2022, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as <u>Exhibit A</u>, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note.  All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the Maker, Holder, Laura Bankeroff and Health Care Resource Network, LLC (the "***Purchase Agreement***").  Terms used in this Note not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

Maker, without notice or demand of any kind, shall be in default (each, an "***Event of Default***") hereunder if any of the following events occurs:

        (a)     The institution of bankruptcy, reorganization, insolvency or liquidation proceedings by or against Maker where such proceeding is consented to by Maker, or remains undismissed for sixty (60) days after notice thereof; or

        (b)     Insolvency or bankruptcy of Maker, or the making by Maker of an assignment for the benefit of creditors, or the consent of Maker to the appointment of a trustee or

**EXHIBIT 4**

a receiver or other officer of the court or other tribunal on or for Maker in an insolvency or bankruptcy case or proceeding;

(c)    Maker fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

(d)    Maker shall be in default or breach of any of the terms and provisions of the Purchase Agreement between Maker and Holder of even date herewith.

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. Maker covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

Maker may, at its election, prepay without penalty all unpaid principal hereof.  Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to Maker's right of setoff as provided under the Purchase Agreement.

Any provision of this Note which may be unenforceable or invalid under any applicable law shall be ineffective to the extent of such unenforceability or invalidity only, without affecting the enforceability or validity of any other provision hereof.

In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

Maker hereby expressly waives the benefit of any homestead exemption as to this debt and waives demand, protest, notice of presentment, notice of protest, and notice of non-payment and dishonor of this Note.

Maker agrees that this Note is provided not in payment of, but as additional security for and evidence of obligations due to the Holder under the Purchase Agreement and this note is not accepted in lieu of Holder's other legal rights. Maker expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and Maker, whether suit is brought by Holder and Maker, shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE(S) APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the Maker has caused this Note to be executed on the day and year first above mentioned.

VIVOS ACQUISITIONS, LLC, a Virginia
limited liability company

By: _V. Si Li_ _____
Silvija Valleru, Vice President

STATE OF _Virginia_ _____
COUNTY OF _Fairfax_ _____ : to-wit:

The forgoing instrument was acknowledged before me this _7th_ day of _Febr_ _____,
20_17_, by Silvija Valleru, Vice President of Vivos Acquisitions, LLC, a Virginia limited liability company, on behalf of the limited liability company.

_____
Notary Public

My Commission Expires: _6/30/2019_ _____

PATRICIA M GAMBINO
NOTARY PUBLIC
REG. #7122728
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JUNE 30, 2019

Signature Page                    Koutsioukis Promissory Note

**<u>EXHIBIT A</u>**
**AMORTIZATION SCHEDULE**



**Amortization:** 57 Months (4.75 Years)

**57 Periodic Payments of** $ 40,894.32

**Mortgage Cost (Total Interests):** $ 233,776.44

| | Amortization Schedule for Monthly Payments | | | | |
|---|---|---|---|---|---|
| Month | Principal Balance | Capital Paid | Total Capital | Interests Paid | Total Interests |
| 1 | $ 2,097,200.00 | $ 33,102.56 | $ 33,102.56 | $ 7,791.77 | $ 7,791.77 |
| 2 | $ 2,064,097.44 | $ 33,225.54 | $ 66,328.10 | $ 7,668.78 | $ 15,460.55 |
| 3 | $ 2,030,871.90 | $ 33,348.99 | $ 99,677.08 | $ 7,545.34 | $ 23,005.89 |
| 4 | $ 1,997,522.92 | $ 33,472.89 | $ 133,149.97 | $ 7,421.44 | $ 30,427.32 |
| 5 | $ 1,964,050.03 | $ 33,597.25 | $ 166,747.22 | $ 7,297.07 | $ 37,724.40 |
| 6 | $ 1,930,452.78 | $ 33,722.07 | $ 200,469.29 | $ 7,172.25 | $ 44,896.65 |
| 7 | $ 1,896,730.71 | $ 33,847.36 | $ 234,316.66 | $ 7,046.96 | $ 51,943.61 |
| 8 | $ 1,862,883.34 | $ 33,973.12 | $ 268,289.77 | $ 6,921.21 | $ 58,864.81 |
| 9 | $ 1,828,910.23 | $ 34,099.34 | $ 302,389.11 | $ 6,794.99 | $ 65,659.80 |
| 10 | $ 1,794,810.89 | $ 34,226.03 | $ 336,615.14 | $ 6,668.30 | $ 72,328.10 |
| 11 | $ 1,760,584.86 | $ 34,353.19 | $ 370,968.33 | $ 6,541.14 | $ 78,869.23 |
| 12 | $ 1,726,231.67 | $ 34,480.82 | $ 405,449.15 | $ 6,413.50 | $ 85,282.73 |
| Year 1 | | | | | |
| 13 | $ 1,691,750.85 | $ 34,608.93 | $ 440,058.08 | $ 6,285.40 | $ 91,568.13 |
| 14 | $ 1,657,141.92 | $ 34,737.51 | $ 474,795.59 | $ 6,156.81 | $ 97,724.94 |
| 15 | $ 1,622,404.41 | $ 34,866.57 | $ 509,662.16 | $ 6,027.75 | $ 103,752.69 |
| 16 | $ 1,587,537.84 | $ 34,996.11 | $ 544,658.28 | $ 5,898.21 | $ 109,650.90 |
| 17 | $ 1,552,541.72 | $ 35,126.13 | $ 579,784.41 | $ 5,768.19 | $ 115,419.09 |
| 18 | $ 1,517,415.59 | $ 35,256.64 | $ 615,041.05 | $ 5,637.68 | $ 121,056.77 |
| 19 | $ 1,482,158.95 | $ 35,387.63 | $ 650,428.68 | $ 5,506.69 | $ 126,563.47 |

| | | | | | |
|---|---|---|---|---|---|
| 20 | $ 1,446,771.32 | $ 35,519.11 | $ 685,947.78 | $ 5,375.22 | $ 131,938.69 |
| 21 | $ 1,411,252.22 | $ 35,651.07 | $ 721,598.86 | $ 5,243.25 | $ 137,181.94 |
| 22 | $ 1,375,601.14 | $ 35,783.53 | $ 757,382.38 | $ 5,110.80 | $ 142,292.74 |
| 23 | $ 1,339,817.62 | $ 35,916.47 | $ 793,298.85 | $ 4,977.85 | $ 147,270.59 |
| 24 | $ 1,303,901.15 | $ 36,049.91 | $ 829,348.77 | $ 4,844.41 | $ 152,115.00 |
| Year 2 | | | | | |
| 25 | $ 1,267,851.23 | $ 36,183.85 | $ 865,532.62 | $ 4,710.47 | $ 156,825.47 |
| 26 | $ 1,231,667.38 | $ 36,318.29 | $ 901,850.90 | $ 4,576.04 | $ 161,401.51 |
| 27 | $ 1,195,349.10 | $ 36,453.22 | $ 938,304.12 | $ 4,441.10 | $ 165,842.61 |
| 28 | $ 1,158,895.88 | $ 36,588.66 | $ 974,892.78 | $ 4,305.67 | $ 170,148.28 |
| 29 | $ 1,122,307.22 | $ 36,724.59 | $ 1,011,617.37 | $ 4,169.73 | $ 174,318.01 |
| 30 | $ 1,085,582.63 | $ 36,861.04 | $ 1,048,478.41 | $ 4,033.29 | $ 178,351.30 |
| 31 | $ 1,048,721.59 | $ 36,997.99 | $ 1,085,476.40 | $ 3,896.34 | $ 182,247.63 |
| 32 | $ 1,011,723.60 | $ 37,135.45 | $ 1,122,611.85 | $ 3,758.88 | $ 186,006.51 |
| 33 | $ 974,588.15 | $ 37,273.42 | $ 1,159,885.26 | $ 3,620.91 | $ 189,627.42 |
| 34 | $ 937,314.74 | $ 37,411.90 | $ 1,197,297.16 | $ 3,482.42 | $ 193,109.84 |
| 35 | $ 899,902.84 | $ 37,550.90 | $ 1,234,848.06 | $ 3,343.43 | $ 196,453.27 |
| 36 | $ 862,351.94 | $ 37,690.41 | $ 1,272,538.47 | $ 3,203.91 | $ 199,657.18 |
| Year 3 | | | | | |
| 37 | $ 824,661.53 | $ 37,830.44 | $ 1,310,368.91 | $ 3,063.88 | $ 202,721.06 |
| 38 | $ 786,831.09 | $ 37,970.99 | $ 1,348,339.91 | $ 2,923.33 | $ 205,644.39 |
| 39 | $ 748,860.09 | $ 38,112.07 | $ 1,386,451.98 | $ 2,782.25 | $ 208,426.64 |
| 40 | $ 710,748.02 | $ 38,253.67 | $ 1,424,705.64 | $ 2,640.66 | $ 211,067.30 |
| 41 | $ 672,494.36 | $ 38,395.79 | $ 1,463,101.44 | $ 2,498.53 | $ 213,565.83 |
| 42 | $ 634,098.56 | $ 38,538.44 | $ 1,501,639.88 | $ 2,355.88 | $ 215,921.71 |
| 43 | $ 595,560.12 | $ 38,681.63 | $ 1,540,321.51 | $ 2,212.70 | $ 218,134.41 |
| 44 | $ 556,878.49 | $ 38,825.34 | $ 1,579,146.85 | $ 2,068.98 | $ 220,203.39 |
| 45 | $ 518,053.15 | $ 38,969.59 | $ 1,618,116.44 | $ 1,924.73 | $ 222,128.12 |
| 46 | $ 479,083.56 | $ 39,114.38 | $ 1,657,230.81 | $ 1,779.95 | $ 223,908.07 |
| 47 | $ 439,969.19 | $ 39,259.70 | $ 1,696,490.51 | $ 1,634.63 | $ 225,542.70 |
| 48 | $ 400,709.49 | $ 39,405.56 | $ 1,735,896.07 | $ 1,488.76 | $ 227,031.46 |
| Year 4 | | | | | |
| 49 | $ 361,303.93 | $ 39,551.96 | $ 1,775,448.04 | $ 1,342.36 | $ 228,373.82 |
| 50 | $ 321,751.96 | $ 39,698.91 | $ 1,815,146.95 | $ 1,195.41 | $ 229,569.23 |
| 51 | $ 282,053.05 | $ 39,846.41 | $ 1,854,993.35 | $ 1,047.92 | $ 230,617.15 |
| 52 | $ 242,206.65 | $ 39,994.45 | $ 1,894,987.80 | $ 899.88 | $ 231,517.02 |
| 53 | $ 202,212.20 | $ 40,143.04 | $ 1,935,130.84 | $ 751.28 | $ 232,268.31 |
| 54 | $ 162,069.16 | $ 40,292.18 | $ 1,975,423.03 | $ 602.14 | $ 232,870.44 |
| 55 | $ 121,776.97 | $ 40,441.88 | $ 2,015,864.91 | $ 452.44 | $ 233,322.88 |

| 56 | $ 81,335.09 | $ 40,592.14 | $ 2,056,457.05 | $ 302.19 | $ 233,625.07 |
| 57 | $ 40,742.95 | $ 40,742.95 | $ 2,097,200.00 | $ 151.37 | $ 233,776.44 |

# MEMBERSHIP INTEREST PLEDGE AND SECURITY AGREEMENT

THIS MEMBERSHIP INTEREST PLEDGE AND SECURITY AGREEMENT ("***Pledge Agreement***") is made as of the 10th day of February, 2017 by and among **VIVOS ACQUISITIONS, LLC**, a Virginia limited liability company ("***Pledgor***"); and **LAURA BANKEROFF** ("***Bankeroff***") and **JOANN KOUTSIOUKIS** ("***Koutsioukis***", and collectively with Bankeroff referred to as the "***Pledgeess***"); and **HEALTH CARE RESOURCE NETWORK, LLC**, a Nevada limited liability company (the "***Company***"). Pledgor, Pledgeess, and Company are collectively referred to herein as the "***Parties***".

## WITNESSETH:

WHEREAS, Pledgees are the owner of one hundred percent (100%) of the membership interests of the Company (the "***Membership Interests***");

WHEREAS, Pledgees have agreed to sell the Membership Interests to Pledgor, pursuant to that certain Membership Interest Purchase Agreement of even date (the "***Purchase Agreement***"), for a purchase price of Eight million Five Hundred Eighty Thousand and 00/100 Dollars $8,580,000.00, with the sum of Four Million, Eighty Thousand and 00/100 Dollars ($4,080,000.00), to be deferred and paid pursuant to the Seller Notes, as such term is defined in the Purchase Agreement (with the payment and other obligations under the Seller Notes, collectively, the "***Obligations***");

WHEREAS, the parties have agreed that the obligation to pay the purchase price for the Membership Interests to Pledgees will be secured by a pledge of the Membership Interests; and

WHEREAS, the Pledgor desires to pledge the Membership Interests purchased to Pledgees as security for payment of the Seller Notes and full satisfaction of the Obligations.

NOW, THEREFORE, in consideration of the premises which are hereby acknowledged, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**1.** **Pledged Membership Interests.** As security for the timely payment of the Seller Notes and prompt and proper satisfaction of the Obligations to Pledgees, the Pledgor irrevocably pledges to Pledgees the Membership Interests (the "***Pledged Interests***") and grants Pledgees a lien thereon and security interest therein.

**2.** **Possession of Pledged Membership Interests.** To perfect said lien and security interest, Pledgees are hereby given possession of the Certificated Pledged Interests until the Obligations are fully satisfied. If as of the date hereof, certificated membership interests have not yet been issued in the name of the Pledgor, then all right, title and interest in and to the Pledged Interests remains irrevocably assigned to Pledgees, which Pledged Interests will be restricted membership interests and when certificates for such Pledged Interests are issued they will be immediately delivered to Pledgees.

**3.** **Pledgor as Pledgees' Agent.** Pledgor shall act as Pledgees' agent and accept in

**EXHIBIT 5**

trust for Pledgees, on behalf of Pledgees, any written or oral notices received with respect to the Pledged Interests, as well as any rights, certificates, dividends, distributions of any sort, and any right, or interest which Pledgors may receive or become entitled to receive in connection with the Pledged Interests. All notices will be immediately provided to Pledgees. If requested, Pledgor shall promptly deliver the above to Pledgees, endorsed if necessary. Pledgor shall also immediately deliver to Pledgees, whenever requested by Pledgees, blank Assignments Separate From Certificate duly executed by the Pledgor. Pledgor further acknowledges that it has executed a blank Assignment Separate From Certificate assigning the Membership Interests to Pledgees which are being held in escrow by Gavett Datt & Barish, P.C. (or such substitute escrow agent as reasonably selected by Pledgees) and hereby irrevocably authorizes such escrow agent to deliver such blank Assignments Separate From Certificate to Pledgees upon the occurrence of an Event of Default and further authorizes the Secretary and/or Manager of the Company to transfer the Membership Interests to Pledgees. Pledgees and Pledgor agree to indemnify and hold harmless such escrow agent in connection with the performance of its duties, including prompt reimbursement of any attorney's fees and costs incurred because of such actions. Until an Event of Default has occurred, Pledgor will retain all voting and other limited liability company rights and privileges to which it may be entitled to as holder of the Pledged Interests.

4.  **Registration of Pledged Interests.** Pledgees may, at any time and at its option, cause or require that Pledgor cause any part or all of the Pledged Interests to become registered in the name of Pledgees, and Pledgor will promptly comply with said registration. If such registration is effectuated prior to an Event of Default (as defined below), the Pledgor shall retain (until an Event of Default) all voting and other limited liability company rights and privileges. Upon the occurrence of an Event of Default, whether the Pledged Interests have been registered in the name of the Pledgees or their nominees, the Pledgees or their nominee shall have voting rights and all other limited liability company rights and all conversion, exchange, subscription or other rights, privileges, or options pertaining to, the Pledged Interests as if it were the absolute owner thereof, including, without limitation, the rights to exchange any or all of the Pledged Interests upon a merger, consolidation, reorganization or other readjustment of the Company.

Unless an Event of Default has occurred, Pledgees will not receive for their own use cash distributions on the Pledged Interests paid out of earned surplus. Upon an Event of Default, Pledgees may apply and retain any such cash distributions as additional security or apply them toward satisfaction of the Obligations.

5.  **Remedies Upon Occurrence of Event of Default.** Upon the occurrence of a default under the Note or on any of the Collateral Documents which is not cured within any applicable cure period or if the Pledgor defaults hereunder which is not cured within five (5) days of delivery of notice of such default to the Pledgor ("***Event of Default***"), then in addition to the rights and remedies of Pledgees under the Seller Notes, Pledgees may, without demand of performance or notice of any kind to the Pledgor, either (i), sell or dispose of and deliver Pledged Interests or interest therein in a public or private sale, for cash or for credit, without assumption of credit risk or (ii) retain and become the full owner of the Pledged Interests with all rights and privileges thereto and without the requirement of any notice to the Pledgor. The Pledgor irrevocably appoints Pledgees its attorney-in-fact to execute any instrument necessary to

transfer title to the Membership Interests to Pledgees upon the occurrence of an Event of Default. The Pledgor further provides that the Pledgees may utilize any Assignment or Bill of Sale that the Pledgees may have been provided to transfer title to the Pledged Interests to Pledgees or Pledgees' successors or assigns. The Pledgees or any purchaser has the right to retain all or part of the Pledged Interests, free of any rights of redemption in the Pledgor.

6.    **Pledgor's Right of Redemption**.  Pledgor hereby expressly waives and releases any right of redemption or equity of redemption of the Pledged Interests.

7.    **Remedies/Sale.**  Pledgees, upon an Event of Default, may retain the Pledged Interests for their own use and become again a member of the Company with the full rights and powers thereof, or at their own discretion and without any requirement to do so, may dispose or sell the Pledged Interests, with the proceeds from sale applied as follows:  (i) to costs and expenses incurred in connection with the safekeeping of the Pledged Interests, including attorneys fees; (ii) to satisfy the Obligations;  (iii)  to pay any other amounts required by law; and (iv)  to the Pledgor, if surplus proceeds remain.

8.    **Representations and Warranties of the Pledgor.**  Pledgor hereby represents, warrants and covenants that:

(a)    It has the requisite power, and authority to enter into this Pledge Agreement, and carry out transactions contemplated therein;

(b)    It is the legal and beneficial owner of the Pledged Interests;

(c)    The Pledged Interests have been duly and validly issued;

(d)    The Pledged Interests are free of any pledge, lien, mortgage, hypothecation, charge, encumbrance, or security interest except as granted herein;

(e)    The execution and delivery of this Pledge Agreement will not result in any violation of any provision of the Company's or the Pledgor's respective Articles of Organization, Operating Agreements or constitute a default under the terms of any agreement or other instrument, governmental rule or regulation;

(f)    Delivery of the Pledged Interests to the Pledgees or their nominee creates a valid first lien upon and perfected security interest in the Pledged Interests, and the proceeds thereof; and

(g)    Pledgor will, at its own expense fully and vigorously defend Pledgees' rights, title and interest in and to the Pledged Interests against claims of any person, firm, corporation or other entity.  Pledgor recognizes that Pledgees may elect to sell the Pledged Interests at a private sale which may result in the sale of the Pledged Interests at prices which are less favorable than

in a public sale and accept the results of any such sale so long as done in a commercially reasonable manner.

**9.** **Disposition of Pledged Interests by Pledgor.** Except only for the Pledge to Pledgees created by this Pledge Agreement, Pledgor covenants that, until the Obligations are satisfied in full, Pledgor will not sell, assign, hypothecate, convey or otherwise dispose of any Pledged Interests or interest therein, or create a lien, pledge or any encumbrance whatsoever upon the Pledged Interests or its proceeds. Pledgees may require that the certificate evidencing the Membership Interests be marked as "restricted membership interests", subject to the terms and conditions of this Pledge Agreement.

**10.** **Issuance of Additional Membership Interests.** Pledgor shall not consent to or approve of the issuance of additional membership interests by the Company; or any securities convertible voluntarily, or exchangeable for any membership interests; or any warrants, options, rights or other commitments entitling any person to purchase or otherwise acquire any such membership interests.

**11.** **Notices Received by Pledgees.** Pledgees will promptly deliver to Pledgor a copy or original if appropriate of any written or oral notices in connection with the Pledged Interests which Pledgees or its nominee receives.

**12.** **Further Documentation.** The parties to this Pledge agreement agree to promptly execute such further documentation and/or to undertake such further acts or actions which may be necessary, in the reasonable opinion of any party, to effectuate the terms and provisions of this Pledge Agreement.

**13.** **Release of Pledged Interests.** Upon the satisfaction in full of all Obligations and the payment of any additional costs and expenses of the Pledgees as provided herein, this Pledge Agreement shall terminate and the Pledgees shall deliver to the Pledgor at the Pledgor's expense the Pledged Interests which remain in Pledgees' possession and which shall not have otherwise been sold or disposed of pursuant to this Pledge Agreement. Pledgees agree that they will release any individual Pledgor from the terms hereof and deliver the membership certificate to the Pledgor representing Pledgor's Membership Interest upon payment in full of the Note to Pledgees by Pledgor.

**14.** **Notice.** Any notice required or permitted by this Pledge Agreement shall be effective if given in accordance with the notice provision set forth in the Purchase Agreement.

**15.** **Miscellaneous.**

(a) This Pledge Agreement shall be binding upon the parties hereto and shall inure to the benefit of and be enforceable by their respective personal representatives, heirs, successors or assigns of the parties hereto.

(b) The section numbers and headings appearing in the Pledge Agreement

are inserted only as a matter of convenience and do not define, limit, construe or describe the scope or intent of such sections of this Pledge Agreement or any way effect this Pledge Agreement.

(c)     This Pledge Agreement shall be construed and enforced in accordance with the laws of the State of Maryland.

(d)     This Pledge Agreement may be executed in one or more counterparts each of which shall be deemed to be an original but all of which shall together constitute one and the same agreement.  The parties intend for this Pledge Agreement to be executed under seal.  Any change or modification hereto will only be effective if in writing and signed by the parties hereto.

(e)     The rights and remedies provided herein and in the Seller Notes and in all other agreements, instruments and documents delivered pursuant to or in connection with the Seller Notes are cumulative and are in addition to and not exclusive of any rights or remedies provided by law including but without limitation, the rights and remedies of the Pledgees under the Uniform Commercial Code.

(f)     The provisions of this Pledge Agreement are severable and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction then such invalidity or unenforceability shall effect only such clause or provision or part thereof in such jurisdiction and shall not in any manner effect such clause or provision in any other jurisdiction or any other clause or provision in this Pledge Agreement in any jurisdiction.

(g)     The parties hereto, agree to be bound by the terms of Note and the Collateral Agreements and agree that a default under the terms of the Note or of any one or more of the Collateral Agreements shall constitute a cross default and the rights and remedies provided therein, herein or by law may be fully exercised by the parties hereto.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK,
SIGNATURES APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first hereinabove written.

**Pledgor:**

VIVOS ACQUISITIONS, LLC, a Virginia limited liability company

By: _____

Silvija Valleru, Vice President

**Pledgees:**

_____

Laura Bankeroff

_____

Joann Koutsioukis

**Company:**

HEALTH CARE RESOURCE NETWORK, LLC, a Nevada limited liability company

By: _____

Silvija Valleru, Manager

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first hereinabove written.

**Pledgor:**

VIVOS ACQUISITIONS, LLC, a Virginia limited liability company

By:_____
Silvija Valleru, Vice President

**Pledgees:**

_____
Laura Bankeroff

_____
Joann Koutsioukis

**Company:**

HEALTH CARE RESOURCE NETWORK, LLC, a Nevada limited liability company

By:_____
Silvija Valleru, Manager

# FIRST AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This FIRST AMENDED AND RESTATED EMPLOYMENT AGREEMENT (the "**Agreement**") made and entered into this 26 day of April_____, 2017 (the "**Effective Date**"), by and between LAURA BANKEROFF (the "**Employee**"), an adult individual, and **HEALTH CARE RESOURCE NETWORK, LLC**, a Nevada limited liability company (the "**Employer**").

## WITNESSETH:

WHEREAS, Employer is in the business of providing staffing solutions to businesses, specializing in medical professional and support staff for government and military treatment facilities (the "**Business**"); and

WHEREAS, Employer agrees to employ Employee in the Business on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, and such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employer and Employee, intending to be legally bound, agree as follows:

1. **Employment.** The Employer agrees to employ Employee and Employee agrees to be employed by the Employer on the terms and conditions set forth in this Agreement. Employee shall devote her full time and effort to Employer and shall not directly or indirectly render services to any other person or entity or engage in other outside business activity without the prior written consent of the Employer.

2. **Capacity.** Employee shall be employed in the capacity set forth on Schedule A, attached hereto and in such capacity shall perform the duties and functions described on Schedule A, together with such other services and duties in connection with the business, affairs and operations of the Employer as may be reasonably assigned or delegated to Employee from time to time by or under the authority of the Employer's President or other supervisory officer, provided such duties are typically performed by individuals holding such position indicated on Schedule A hereto throughout the industry. It is agreed and understood between the Parties that Employee shall not be considered an officer, director or manager of the Employer at any time during her employment unless agreed to in writing by both parties. Except in the case of fraud or breach of this Agreement by Employee, the Employer shall defend, indemnify and hold Employee harmless (including the payment of attorney fees and other costs of litigation) for any liabilities incurred by the Employee arising out of the performance of her duties with Employer.

3. **Compensation and Benefits.** The Employer shall pay the Employee an annual salary of two hundred sixty thousand dollars ($260,000.00). Employee shall also receive those benefits listed on Schedule A attached hereto. Such benefits shall be subject to change in accordance with changes in Employer's policies. Employer shall, on an annual basis, evaluate

1

**EXHIBIT 5B**

Employee's performance and make adjustments to Employee's rate of compensation, such adjustments at Employer's sole discretion. Employee shall also be eligible for a monthly bonus as outlined on Schedule B attached hereto.

4.   **Term; Renewal.**   The term of Employee's employment with Employer shall be for a period of three (3) years commencing _____Feb 10_____, 20_17 Upon the expiration of the initial three (3) year term, the term shall automatically renew for two (2) successive one (1) year terms.  Notwithstanding the forgoing, the term shall not renew for either or both of the one (1) year renewal terms if: (i) Employee serves Employer with a written notice of intent not to renew employment term within ninety (90) days of the expiration of the prior term; or (ii) if Employer terminates Employee for Cause as defined herein.  Notwithstanding the foregoing, Employer may terminate Employee's employment and this Agreement immediately for cause shown. "Cause" shall mean (i) Employee is no longer in substantial compliance with or substantially performing her duties of employment; (ii) Employee commits any act of theft, embezzlement, fraud, deceit, dishonesty or other criminal act that adversely impacts Employer or Employer's reputation, or (iii) Employee is in material breach of any other material provision of this Agreement.

5.   **Restrictive Covenants.**

(a)   Non-Disclosure.   Employee recognizes and acknowledges that she will, during the term of this Agreement, have access to certain Confidential Information of Employer, as defined herein.  Employee agrees that she will not use or disclose any such Confidential Information to any party without express written authorization of the Employer.   The term **"Confidential Information"** means any and all confidential, proprietary or trade secret information, whether disclosed, directly or indirectly, verbally, in writing or by any other means in tangible, intangible form, electronic or online, including that which is conceived or developed by the Employee, applicable to or in any way related to: (i) the present or future business of the Employer; (ii) the research and development of the Employer; or (iii) the business of any client or vendor of the Employer.

(b)   Non-Competition.   Employee agrees that for a period of two (2) years after the termination of her employment, regardless if such termination is voluntary or involuntary, she will not engage in any business or perform any service, or have any interest in any enterprise in direct or indirect competition with Employer which does business within fifty (50) miles of the office of Employer where Employee performed her duties for Employer, nor will Employee engage in or have any interest in any client or customer of Employer.

(c)   Non-Solicitation.   During the period of employment, or during the period of non-competition, Employee shall not, directly or indirectly, solicit or service in any way, any client or customer, or prospective client or customer, who has been solicited or serviced by Employer prior to the termination of the Employee.  Employee further agrees not to solicit or entice or endeavor to solicit or entice away from Employer any person who was a director, officer, employee, contractor or consultant of Employer, either on her own account or for any person, firm, corporation or other organization, whether or not

2

UAB

such person would commit any breach of his contract of employment by reason of leaving the service of Employer.

(d) <u>Injunctive Relief.</u> Employee acknowledges that her compliance with the restrictive covenants in this Section 5 is necessary to protect the goodwill and other proprietary interests of Employer. Employee acknowledges that a breach of the restrictive covenants as more fully set forth in this Section 5 may result in serious and irreparable damage to the Business for which there will be no adequate remedy at law and she agrees that in the event of any such breach of the aforesaid restrictive covenants, Employer and its successors and assigns shall be entitled to preliminary and permanent injunctive relief and to such other and further relief as may be available at law or in equity.

(e) <u>Period of Relief.</u> If Employee violates the agreements set forth in this Section 5 and Employer brings legal action for injunctive or other relief, Employer shall have the benefit of the full period of the restrictive covenant. Accordingly, the restrictive covenants shall be deemed to have the duration of two (2) years, computed from the date the relief is granted but reduced by the time period after termination that Employee was not in violation of this covenant.

(f) <u>Alternative Employment.</u> Employee acknowledges that her experience and capabilities are such that Employee can obtain suitable employment otherwise than in violation of this restrictive covenant, and that, accordingly, in the event of the termination of Employee's employment for any reason and at any time, the enforcement of this restrictive covenant will not prevent Employee from earning a livelihood or otherwise cause Employee undue hardship.

6. **Intellectual Property.** Employee agrees that Employer owns and shall continue to own all copyrights, trademarks, patents, websites, domain names, internet addresses, phone numbers, ideas, formulae, programs, systems, improvements, devices, processes, business concepts, discoveries and inventions related to the Business, or used or useable by Employer, that were conceived, made, developed, acquired or reduced to practice during the term of this Agreement (hereinafter referred to as "**Intellectual Property**"), whether or not the Intellectual Property is suitable for trademark, patent or copyright. Employee hereby transfers and assigns to Employer all right, title and interest in and to said Intellectual Property, including any and all domestic and foreign patent rights or copyrights therein and any renewals thereof. On request of Employer, Employee shall (without any additional compensation) from time to time during the term of this Agreement, subject however to the terms and provisions of Section 5 above, execute such further instruments (including, without limitation, trademark assignments, copyright registrations, applications for letters patent and assignments of either) and do all such other acts and things as may be deemed necessary or desirable by Employer to protect and/or enforce its rights in respect of any Intellectual Property. All expenses of filing or prosecuting any copyright or any patent application shall be borne by Employer, but Employee shall reasonably cooperate in filing and/or prosecuting any such applications, at no cost to Employee, and subject to the terms of Section 5 above.



3

7. **Entire Agreement.** This Agreement, and all schedules and attachments hereto, contains the entire agreement of the Parties with respect to the subject matter hereof and shall not be modified or changed in any respect except in writing duly signed by the Parties.

8. **Governing Law; Jurisdiction.** This Agreement shall be governed by, interpreted, construed, and enforced in accordance with the laws of the State of Maryland. Any action or proceeding to enforce this Agreement shall under the exclusive jurisdiction and venue of the courts of Montgomery County, Maryland, and any Party that must institute such action or proceeding to enforce this Agreement shall be entitled to costs of enforcement, including attorney fees and litigation costs.

9. **Interpretation of Provisions.** Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10. **Headings.** Headings in this Agreement are solely for purposes of identification and shall not in any manner alter or vary the interpretation or construction of this Agreement.

11. **Successors and Assigns.** All the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their heirs, personal representatives, executors, transferees, successors and assigns.

12. **Counterparts.** This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURES APPEAR ON THE FOLLOWING PAGE(S)]



IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement on the date first above written.

EMPLOYEE:

Laura Bankeroff

EMPLOYER:

HEALTH CARE RESOURCE NETWORK, LLC

Silvija Valleru, Manager

**SCHEDULE A**

**JOB DESCRIPTION**

**Position/Title:**
Administrator

**Duties and Hours:**
Employee will undertake a variety of management and client responsibilities including without limitation: business development and sales, client project management, account management, employee management and growth, executive-level decision making for Employer success, and marketing. Employee will work full time, defined as at least 40 hours per week.

**Benefits\*:**
Health Insurance – wholly paid by employer
Dental Insurance – wholly paid by employer
Vision Insurance – wholly paid by employer
Twenty-five (25) Days Paid Time Off (PTO) plus 3 sick/bereavement days
Participation in Employer's SIMPLE-IRA retirement plan
Participation in Employer's Bonus Plan
Ten (10) Holidays:

| New Year's Day | Martin Luther King, Jr. Day |
| --- | --- |
| George Washington's Birthday | Memorial day |
| Independence Day | Labor Day |
| Columbus Day | Veteran's Day |
| Thanksgiving Day | Christmas Day |

If any of the above holidays falls on a weekend, then Employer shall assign a different day in which Employee shall be off work. Ex. - July 4th is on a Saturday, Employer may decide between the preceding Friday or the following Monday as the holiday for employment purposes.
Home-office benefits as determined by Employer

\* Benefits shall be subject to periodic review and change in order to conform with changes in Employer's policies



6

## SCHEDULE B

## MONTHLY BONUS PLAN

Employee shall be eligible for a monthly bonus in accordance with the below chart. Said bonus shall be paid on the first regular pay-day following confirmation of the bonus amount by Employee and her supervisor. For purposes of the chart below, Net Income shall be as determined by the monthly Income Statement after application of all operating expenses, including without limitation allocation of taxes, interest, and long-term debt.

| Employer's Monthly Net Income | Employee's Bonus |
|---|---|
| Less than $150,000 | 1% of Net Income (for applicable month) |
| Between $150,000 and $200,000 | 2.5% of Net Income (for applicable month) |
| More than $200,000 | 3% of Net Income (for applicable month) |



# PROMISSORY NOTE

| | |
|---|---|
| DATE: | February 16, 2017 |
| PRINCIPAL AMOUNT: | $297,300.78 |
| INTEREST RATE: | 4.5% |
| MATURITY DATE: | December 1, 2021 |
| HOLDER NAME/ADDRESS: | Laura Bankeroff |
| | 10817 Red Barn Lane |
| | Potomac, MD 20854 |

FOR VALUE RECEIVED, and the sum of one dollar cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, **Vivos Acquisitions, LLC**, a Virginia limited liability company ("**Maker**"), promises to pay to the order of Laura Bankeroff, her heirs, executors, personal representatives, successors and assigns ("**Holder**"), the principal sum of $297,300.78, together with interest from the date hereof on the unpaid balance at the rate of 4.5% per annum ("**Interest Rate**"). Maker shall pay principal and interest in fifty seven (57) monthly installments as follows: Fifty six (56) monthly installments in the amount of $5,797.22 each, commencing on the first day of the second calendar month following the Closing Date (April 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of December 1, 2021, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as Exhibit A, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note. All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the Maker, Holder, Joann Koutsioukis and Health Care Resource Network, LLC (the "**Purchase Agreement**"). Terms used in this Note not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

Maker, without notice or demand of any kind, shall be in default (each, an "**Event of Default**") hereunder if any of the following events occurs:

        (a)      The institution of bankruptcy, reorganization, insolvency or liquidation proceedings by or against Maker where such proceeding is consented to by Maker, or remains undismissed for sixty (60) days after notice thereof; or

        (b)      Insolvency or bankruptcy of Maker, or the making by Maker of an assignment for the benefit of creditors, or the consent of Maker to the appointment of a trustee or a receiver or other officer of the court or other tribunal on or for Maker in an insolvency or bankruptcy case or proceeding;

**EXHIBIT 6**

(c)     Maker fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

(d)     Maker shall be in default or breach of any of the terms and provisions of the Purchase Agreement between Maker and Holder of even date herewith.

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. Maker covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

Maker may, at its election, prepay without penalty all unpaid principal hereof.  Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to Maker's right of setoff as provided under the Purchase Agreement.

Any provision of this Note which may be unenforceable or invalid under any applicable law shall be ineffective to the extent of such unenforceability or invalidity only, without affecting the enforceability or validity of any other provision hereof.

In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

Maker hereby expressly waives the benefit of any homestead exemption as to this debt and waives demand, protest, notice of presentment, notice of protest, and notice of non-payment and dishonor of this Note.

Maker agrees that this Note is provided not in payment of, but as additional security for and evidence of obligations due to the Holder under the Purchase Agreement and this note is not accepted in lieu of Holder's other legal rights. Maker expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and Maker, whether suit is brought by Holder and Maker, shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE(S) APPEAR ON THE FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the Maker has caused this Note to be executed on the day and year first above mentioned.

VIVOS ACQUISITIONS, LLC, a Virginia
limited liability company

By: _____
Silvija Valleru, Vice President

**<u>EXHIBIT A</u>**
**AMORTIZATION SCHEDULE**

## Mortgage calculator
## with amortization schedule

Principal $ 297,301          Amortization 57   months   **Help**

Interest Rate 4.5 %          Payment Monthly ▾        **Info**

Calculate Payment

Or Input Payment $ 5,797.22   and   Calculate Principal

The above is for illustrative purposes only. Canadian Rates are compounded semi-annually

**Amortization:** 57 Months (4.75 Years)

**57 Periodic Payments of** $ 5,797.22

**Mortgage Cost (Total Interests):** $ 33,140.36

## Amortization Schedule
## for Monthly Payments

| Month | Principal Balance | Capital Paid | Total Capital | Interests Paid | Total Interests |
|---|---|---|---|---|---|
| 1 | $ 297,301.00 | $ 4,692.65 | $ 4,692.65 | $ 1,104.57 | $ 1,104.57 |
| 2 | $ 292,608.35 | $ 4,710.08 | $ 9,402.73 | $ 1,087.13 | $ 2,191.70 |
| 3 | $ 287,898.27 | $ 4,727.58 | $ 14,130.31 | $ 1,069.63 | $ 3,261.34 |
| 4 | $ 283,170.69 | $ 4,745.15 | $ 18,875.46 | $ 1,052.07 | $ 4,313.41 |
| 5 | $ 278,425.54 | $ 4,762.78 | $ 23,638.24 | $ 1,034.44 | $ 5,347.85 |
| 6 | $ 273,662.76 | $ 4,780.47 | $ 28,418.71 | $ 1,016.74 | $ 6,364.59 |
| 7 | $ 268,882.29 | $ 4,798.23 | $ 33,216.94 | $ 998.98 | $ 7,363.57 |
| 8 | $ 264,084.06 | $ 4,816.06 | $ 38,033.01 | $ 981.16 | $ 8,344.73 |
| 9 | $ 259,267.99 | $ 4,833.95 | $ 42,866.96 | $ 963.26 | $ 9,307.99 |
| 10 | $ 254,434.04 | $ 4,851.91 | $ 47,718.87 | $ 945.30 | $ 10,253.30 |
| 11 | $ 249,582.13 | $ 4,869.94 | $ 52,588.81 | $ 927.28 | $ 11,180.57 |
| 12 | $ 244,712.19 | $ 4,888.03 | $ 57,476.84 | $ 909.18 | $ 12,089.76 |
| Year 1 | | | | | |
| 13 | $ 239,824.16 | $ 4,906.19 | $ 62,383.04 | $ 891.02 | $ 12,980.78 |
| 14 | $ 234,917.96 | $ 4,924.42 | $ 67,307.46 | $ 872.80 | $ 13,853.58 |
| 15 | $ 229,993.54 | $ 4,942.72 | $ 72,250.18 | $ 854.50 | $ 14,708.08 |
| 16 | $ 225,050.82 | $ 4,961.08 | $ 77,211.26 | $ 836.14 | $ 15,544.21 |
| 17 | $ 220,089.74 | $ 4,979.51 | $ 82,190.77 | $ 817.70 | $ 16,361.92 |
| 18 | $ 215,110.23 | $ 4,998.01 | $ 87,188.78 | $ 799.20 | $ 17,161.12 |
| 19 | $ 210,112.22 | $ 5,016.58 | $ 92,205.37 | $ 780.63 | $ 17,941.75 |

| | | | | | |
|---|---|---|---|---|---|
| 20 | $ 205,095.63 | $ 5,035.22 | $ 97,240.59 | $ 762.00 | $ 18,703.75 |
| 21 | $ 200,060.41 | $ 5,053.93 | $ 102,294.52 | $ 743.29 | $ 19,447.04 |
| 22 | $ 195,006.48 | $ 5,072.71 | $ 107,367.22 | $ 724.51 | $ 20,171.55 |
| 23 | $ 189,933.78 | $ 5,091.55 | $ 112,458.77 | $ 705.66 | $ 20,877.21 |
| 24 | $ 184,842.23 | $ 5,110.47 | $ 117,569.24 | $ 686.75 | $ 21,563.96 |
| Year 2 | | | | | |
| 25 | $ 179,731.76 | $ 5,129.46 | $ 122,698.70 | $ 667.76 | $ 22,231.72 |
| 26 | $ 174,602.30 | $ 5,148.51 | $ 127,847.21 | $ 648.70 | $ 22,880.43 |
| 27 | $ 169,453.79 | $ 5,167.64 | $ 133,014.86 | $ 629.57 | $ 23,510.00 |
| 28 | $ 164,286.14 | $ 5,186.84 | $ 138,201.70 | $ 610.38 | $ 24,120.38 |
| 29 | $ 159,099.30 | $ 5,206.11 | $ 143,407.81 | $ 591.10 | $ 24,711.48 |
| 30 | $ 153,893.19 | $ 5,225.45 | $ 148,633.26 | $ 571.76 | $ 25,283.24 |
| 31 | $ 148,667.74 | $ 5,244.87 | $ 153,878.13 | $ 552.35 | $ 25,835.59 |
| 32 | $ 143,422.87 | $ 5,264.36 | $ 159,142.49 | $ 532.86 | $ 26,368.45 |
| 33 | $ 138,158.51 | $ 5,283.91 | $ 164,426.40 | $ 513.30 | $ 26,881.76 |
| 34 | $ 132,874.60 | $ 5,303.55 | $ 169,729.95 | $ 493.67 | $ 27,375.43 |
| 35 | $ 127,571.05 | $ 5,323.25 | $ 175,053.20 | $ 473.97 | $ 27,849.40 |
| 36 | $ 122,247.80 | $ 5,343.03 | $ 180,396.22 | $ 454.19 | $ 28,303.59 |
| Year 3 | | | | | |
| 37 | $ 116,904.78 | $ 5,362.88 | $ 185,759.10 | $ 434.34 | $ 28,737.92 |
| 38 | $ 111,541.90 | $ 5,382.80 | $ 191,141.90 | $ 414.41 | $ 29,152.34 |
| 39 | $ 106,159.10 | $ 5,402.80 | $ 196,544.71 | $ 394.41 | $ 29,546.75 |
| 40 | $ 100,756.29 | $ 5,422.88 | $ 201,967.58 | $ 374.34 | $ 29,921.09 |
| 41 | $ 95,333.42 | $ 5,443.02 | $ 207,410.60 | $ 354.19 | $ 30,275.29 |
| 42 | $ 89,890.40 | $ 5,463.25 | $ 212,873.85 | $ 333.97 | $ 30,609.26 |
| 43 | $ 84,427.15 | $ 5,483.54 | $ 218,357.39 | $ 313.67 | $ 30,922.93 |
| 44 | $ 78,943.61 | $ 5,503.92 | $ 223,861.31 | $ 293.30 | $ 31,216.23 |
| 45 | $ 73,439.69 | $ 5,524.36 | $ 229,385.67 | $ 272.85 | $ 31,489.09 |
| 46 | $ 67,915.33 | $ 5,544.89 | $ 234,930.56 | $ 252.33 | $ 31,741.41 |
| 47 | $ 62,370.44 | $ 5,565.49 | $ 240,496.05 | $ 231.73 | $ 31,973.14 |
| 48 | $ 56,804.95 | $ 5,586.17 | $ 246,082.22 | $ 211.05 | $ 32,184.19 |
| Year 4 | | | | | |
| 49 | $ 51,218.78 | $ 5,606.92 | $ 251,689.15 | $ 190.29 | $ 32,374.48 |
| 50 | $ 45,611.85 | $ 5,627.75 | $ 257,316.90 | $ 169.46 | $ 32,543.95 |
| 51 | $ 39,984.10 | $ 5,648.66 | $ 262,965.56 | $ 148.55 | $ 32,692.50 |
| 52 | $ 34,335.44 | $ 5,669.65 | $ 268,635.21 | $ 127.57 | $ 32,820.07 |
| 53 | $ 28,665.79 | $ 5,690.71 | $ 274,325.93 | $ 106.50 | $ 32,926.57 |
| 54 | $ 22,975.07 | $ 5,711.86 | $ 280,037.78 | $ 85.36 | $ 33,011.93 |
| 55 | $ 17,263.22 | $ 5,733.08 | $ 285,770.86 | $ 64.14 | $ 33,076.07 |

| 56 | $ 11,530.14 | $ 5,754.38 | $ 291,525.24 | $ 42.84 | $ 33,118.90 |
| 57 | $ 5,775.76 | $ 5,775.76 | $ 297,301.00 | $ 21.46 | $ 33,140.36 |

# PROMISSORY NOTE

| | |
|---|---|
| DATE: | February 16, 2017 |
| PRINCIPAL AMOUNT: | $285,641.92 |
| INTEREST RATE: | 4.5% |
| MATURITY DATE: | December 1, 2021 |
| HOLDER NAME/ADDRESS: | Joann Koutsioukis |
| | 10817 Red Barn Lane |
| | Potomac, MD 20854 |

FOR VALUE RECEIVED, and the sum of one dollar cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, **Vivos Acquisitions, LLC**, a Virginia limited liability company ("***Maker***"), promises to pay to the order of Joann Koutsioukis, her heirs, executors, personal representatives, successors and assigns ("***Holder***"), the principal sum of $285,641.92, together with interest from the date hereof on the unpaid balance at the rate of 4.5% per annum ("***Interest Rate***"). Maker shall pay principal and interest in fifty seven (57) monthly installments as follows: Fifty six (56) monthly installments in the amount of $5,569.87 each, commencing on the first day of the second calendar month following the Closing Date (April 1, 2017), and continuing on the first day of each and every successive calendar month thereafter; and one (1) final installment in the amount of the entire outstanding principal balance due and all accrued and unpaid interest shall be due and payable in full on the first day of December 1, 2021, if not sooner paid as provided herein. Payments shall be made pursuant to the amortization schedule attached hereto as <u>Exhibit A</u>, and further subject to any adjustments made for pre-payment of principal in accordance with the terms of this Note. All payments due to Holder shall be delivered to Holder at the address provided above, or at such other place as may be designated from time to time by the Holder hereof.

This Note has been issued pursuant to the terms of a Membership Interest Purchase Agreement of even date herewith by and between the Maker, Holder, Laura Bankeroff and Health Care Resource Network, LLC (the "***Purchase Agreement***"). Terms used in this Note not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

Maker, without notice or demand of any kind, shall be in default (each, an "***Event of Default***") hereunder if any of the following events occurs:

       (a)      The institution of bankruptcy, reorganization, insolvency or liquidation proceedings by or against Maker where such proceeding is consented to by Maker, or remains undismissed for sixty (60) days after notice thereof; or

       (b)      Insolvency or bankruptcy of Maker, or the making by Maker of an assignment for the benefit of creditors, or the consent of Maker to the appointment of a trustee or a receiver or other officer of the court or other tribunal on or for Maker in an insolvency or bankruptcy case or proceeding;

**EXHIBIT 7**

(c)     Maker fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder.

(d)     Maker shall be in default or breach of any of the terms and provisions of the Purchase Agreement between Maker and Holder of even date herewith.

Upon an Event of Default, then, at the option of Holder, (i) the entire principal amount and accrued interest then unpaid may be accelerated and shall then become immediately due and payable. Holder, in his or her sole discretion, may charge a late payment fee equal to five percent (5%) of the sum due of any payment more than ten (10) days past due. Maker covenants and agrees to provide prompt written notice to Holder of any Event of Default described in clauses (a) or (b) above.

Maker may, at its election, prepay without penalty all unpaid principal hereof.  Upon such prepayment it shall also pay the interest accrued on the principal amount to the date of the prepayment.

This Note, and payment hereunder, shall be subject to Maker's right of setoff as provided under the Purchase Agreement.

Any provision of this Note which may be unenforceable or invalid under any applicable law shall be ineffective to the extent of such unenforceability or invalidity only, without affecting the enforceability or validity of any other provision hereof.

In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

Maker hereby expressly waives the benefit of any homestead exemption as to this debt and waives demand, protest, notice of presentment, notice of protest, and notice of non-payment and dishonor of this Note.

Maker agrees that this Note is provided not in payment of, but as additional security for and evidence of obligations due to the Holder under the Purchase Agreement and this note is not accepted in lieu of Holder's other legal rights. Maker expressly agrees to submit to personal jurisdiction in Virginia and agrees that the forum for any litigation pursuant to this Agreement or any other contract between Holder and Maker, whether suit is brought by Holder and Maker, shall be the County of Fairfax, Virginia. This Note shall be governed by and construed in accordance with the laws of Virginia.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE(S) APPEAR ON THE FOLLOWING PAGE(S)]

**EXHIBIT 7**

IN WITNESS WHEREOF, the Maker has caused this Note to be executed on the day and year first above mentioned.

VIVOS ACQUISITIONS, LLC, a Virginia
limited liability company

By: _____

Silvija Valleru, Vice President

**EXHIBIT 7**

**EXHIBIT A**
**AMORTIZATION SCHEDULE**

**EXHIBIT 7**

## Mortgage calculator
## with amortization schedule

| | | | | |
|---|---|---|---|---|
| Principal | $ 285,642 | Amortization | 57 months | **Help** |
| Interest Rate | 4.5 % | Payment | Monthly ⌄ | **Info** |

Calculate Payment

Or Input Payment $ 5,569.87 and Calculate Principal

The above is for illustrative purposes only. Canadian Rates are compounded semi-annually

**Amortization:** 57 Months (4.75 Years)

**57 Periodic Payments of** $ 5,569.87

**Mortgage Cost (Total Interests):** $ 31,840.73

## Amortization Schedule
## for Monthly Payments

| Month | Principal Balance | Capital Paid | Total Capital | Interests Paid | Total Interests |
|---|---|---|---|---|---|
| 1 | $ 285,642.00 | $ 4,508.62 | $ 4,508.62 | $ 1,061.25 | $ 1,061.25 |
| 2 | $ 281,133.38 | $ 4,525.37 | $ 9,033.99 | $ 1,044.50 | $ 2,105.75 |
| 3 | $ 276,608.01 | $ 4,542.19 | $ 13,576.18 | $ 1,027.69 | $ 3,133.44 |
| 4 | $ 272,065.82 | $ 4,559.06 | $ 18,135.24 | $ 1,010.81 | $ 4,144.25 |
| 5 | $ 267,506.76 | $ 4,576.00 | $ 22,711.24 | $ 993.87 | $ 5,138.12 |
| 6 | $ 262,930.76 | $ 4,593.00 | $ 27,304.24 | $ 976.87 | $ 6,115.00 |
| 7 | $ 258,337.76 | $ 4,610.07 | $ 31,914.30 | $ 959.81 | $ 7,074.80 |
| 8 | $ 253,727.70 | $ 4,627.19 | $ 36,541.50 | $ 942.68 | $ 8,017.48 |
| 9 | $ 249,100.50 | $ 4,644.38 | $ 41,185.88 | $ 925.49 | $ 8,942.97 |
| 10 | $ 244,456.12 | $ 4,661.64 | $ 45,847.52 | $ 908.23 | $ 9,851.20 |
| 11 | $ 239,794.48 | $ 4,678.96 | $ 50,526.48 | $ 890.91 | $ 10,742.12 |
| 12 | $ 235,115.52 | $ 4,696.34 | $ 55,222.82 | $ 873.53 | $ 11,615.64 |
| Year 1 | | | | | |
| 13 | $ 230,419.18 | $ 4,713.79 | $ 59,936.62 | $ 856.08 | $ 12,471.73 |
| 14 | $ 225,705.38 | $ 4,731.30 | $ 64,667.92 | $ 838.57 | $ 13,310.29 |
| 15 | $ 220,974.08 | $ 4,748.88 | $ 69,416.80 | $ 820.99 | $ 14,131.28 |
| 16 | $ 216,225.20 | $ 4,766.53 | $ 74,183.33 | $ 803.35 | $ 14,934.63 |
| 17 | $ 211,458.67 | $ 4,784.24 | $ 78,967.57 | $ 785.64 | $ 15,720.27 |
| 18 | $ 206,674.43 | $ 4,802.01 | $ 83,769.58 | $ 767.86 | $ 16,488.13 |
| 19 | $ 201,872.42 | $ 4,819.85 | $ 88,589.43 | $ 750.02 | $ 17,238.15 |

**EXHIBIT 7**

| 20 | $ 197,052.57 | $ 4,837.76 | $ 93,427.19 | $ 732.11 | $ 17,970.26 |
| 21 | $ 192,214.81 | $ 4,855.73 | $ 98,282.92 | $ 714.14 | $ 18,684.40 |
| 22 | $ 187,359.08 | $ 4,873.77 | $ 103,156.69 | $ 696.10 | $ 19,380.50 |
| 23 | $ 182,485.31 | $ 4,891.88 | $ 108,048.57 | $ 677.99 | $ 20,058.49 |
| 24 | $ 177,593.43 | $ 4,910.06 | $ 112,958.63 | $ 659.82 | $ 20,718.31 |
| Year 2 | | | | | |
| 25 | $ 172,683.37 | $ 4,928.30 | $ 117,886.93 | $ 641.57 | $ 21,359.88 |
| 26 | $ 167,755.07 | $ 4,946.61 | $ 122,833.54 | $ 623.26 | $ 21,983.14 |
| 27 | $ 162,808.46 | $ 4,964.99 | $ 127,798.53 | $ 604.89 | $ 22,588.03 |
| 28 | $ 157,843.47 | $ 4,983.43 | $ 132,781.96 | $ 586.44 | $ 23,174.47 |
| 29 | $ 152,860.04 | $ 5,001.95 | $ 137,783.91 | $ 567.92 | $ 23,742.39 |
| 30 | $ 147,858.09 | $ 5,020.53 | $ 142,804.44 | $ 549.34 | $ 24,291.73 |
| 31 | $ 142,837.56 | $ 5,039.19 | $ 147,843.62 | $ 530.69 | $ 24,822.42 |
| 32 | $ 137,798.38 | $ 5,057.91 | $ 152,901.53 | $ 511.97 | $ 25,334.38 |
| 33 | $ 132,740.47 | $ 5,076.70 | $ 157,978.23 | $ 493.17 | $ 25,827.56 |
| 34 | $ 127,663.77 | $ 5,095.56 | $ 163,073.79 | $ 474.31 | $ 26,301.87 |
| 35 | $ 122,568.21 | $ 5,114.49 | $ 168,188.28 | $ 455.38 | $ 26,757.25 |
| 36 | $ 117,453.72 | $ 5,133.49 | $ 173,321.78 | $ 436.38 | $ 27,193.63 |
| Year 3 | | | | | |
| 37 | $ 112,320.22 | $ 5,152.57 | $ 178,474.35 | $ 417.31 | $ 27,610.93 |
| 38 | $ 107,167.65 | $ 5,171.71 | $ 183,646.06 | $ 398.16 | $ 28,009.10 |
| 39 | $ 101,995.94 | $ 5,190.92 | $ 188,836.98 | $ 378.95 | $ 28,388.04 |
| 40 | $ 96,805.02 | $ 5,210.21 | $ 194,047.19 | $ 359.66 | $ 28,747.70 |
| 41 | $ 91,594.81 | $ 5,229.57 | $ 199,276.76 | $ 340.30 | $ 29,088.01 |
| 42 | $ 86,365.24 | $ 5,249.00 | $ 204,525.76 | $ 320.87 | $ 29,408.88 |
| 43 | $ 81,116.24 | $ 5,268.50 | $ 209,794.26 | $ 301.37 | $ 29,710.26 |
| 44 | $ 75,847.74 | $ 5,288.07 | $ 215,082.33 | $ 281.80 | $ 29,992.05 |
| 45 | $ 70,559.67 | $ 5,307.72 | $ 220,390.05 | $ 262.15 | $ 30,254.21 |
| 46 | $ 65,251.95 | $ 5,327.44 | $ 225,717.49 | $ 242.43 | $ 30,496.64 |
| 47 | $ 59,924.51 | $ 5,347.23 | $ 231,064.73 | $ 222.64 | $ 30,719.28 |
| 48 | $ 54,577.27 | $ 5,367.10 | $ 236,431.83 | $ 202.77 | $ 30,922.05 |
| Year 4 | | | | | |
| 49 | $ 49,210.17 | $ 5,387.04 | $ 241,818.87 | $ 182.83 | $ 31,104.88 |
| 50 | $ 43,823.13 | $ 5,407.06 | $ 247,225.92 | $ 162.82 | $ 31,267.70 |
| 51 | $ 38,416.08 | $ 5,427.14 | $ 252,653.07 | $ 142.73 | $ 31,410.42 |
| 52 | $ 32,988.93 | $ 5,447.31 | $ 258,100.37 | $ 122.56 | $ 31,532.99 |
| 53 | $ 27,541.63 | $ 5,467.55 | $ 263,567.92 | $ 102.33 | $ 31,635.32 |
| 54 | $ 22,074.08 | $ 5,487.86 | $ 269,055.78 | $ 82.01 | $ 31,717.33 |
| 55 | $ 16,586.22 | $ 5,508.25 | $ 274,564.03 | $ 61.62 | $ 31,778.95 |

**EXHIBIT 7**

| 56 | $ 11,077.97 | $ 5,528.71 | $ 280,092.74 | $ 41.16 | $ 31,820.11 |
| 57 | $ 5,549.26 | $ 5,549.26 | $ 285,642.00 | $ 20.62 | $ 31,840.73 |

**EXHIBIT 7**

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "**Agreement**") made and entered into this 10th day of February, 2017 (the "**Effective Date**"), by and between LAURA BANKEROFF (the "**Employee**"), an adult individual, and **HEALTH CARE RESOURCE NETWORK, LLC**, a Nevada limited liability company (the "**Employer**").

WITNESSETH:

WHEREAS, Employer is in the business of providing staffing solutions to businesses, specializing in medical professional and support staff for government and military treatment facilities (the "**Business**"); and

WHEREAS, Employer agrees to employ Employee in the Business on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, and such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employer and Employee, intending to be legally bound, agree as follows:

1.  **Employment.**  The Employer agrees to employ Employee and Employee agrees to be employed by the Employer on the terms and conditions set forth in this Agreement. Employee shall devote her full time and effort to Employer and shall not directly or indirectly render services to any other person or entity or engage in other outside business activity without the prior written consent of the Employer.

2.  **Capacity.**  Employee shall be employed in the capacity set forth on Schedule A, attached hereto and in such capacity shall perform the duties and functions described on Schedule A, together with such other services and duties in connection with the business, affairs and operations of the Employer as may be reasonably assigned or delegated to  Employee from time to time by or under the authority of the Employer's President or other supervisory officer, provided such duties are typically performed by individuals holding such position indicated on Schedule A hereto throughout the industry.

3.  **Compensation and Benefits.**  The Employer shall pay the Employee an annual salary of two hundred sixty thousand dollars ($260,000.00).  Employee shall also receive those benefits listed on Schedule A attached hereto. Such benefits shall be subject to change in accordance with changes in Employer's policies.  Employer shall, on an annual basis, evaluate Employee's performance and make adjustments to Employee's rate of compensation, such adjustments at Employer's sole discretion.  Employee shall also be eligible for a monthly bonus as outlined on Schedule B attached hereto.

4.  **Term; Renewal.**  The term of Employee's employment with Employer shall be for a period of three (3) years commencing February 10, 2017.  Upon the expiration of the initial three (3) year term, the term shall automatically renew for two (2) successive one (1) year terms.

1

**EXHIBIT 8**

Notwithstanding the forgoing, the term shall not renew for either or both of the one (1) year renewal terms if: (i) Employee serves Employer with a written notice of intent not to renew employment term within ninety (90) days of the expiration of the prior term; or (ii) if Employer terminates Employee for Cause as defined herein. Notwithstanding the foregoing, Employer may terminate Employee's employment and this Agreement immediately for cause shown. "Cause" shall mean (i) Employee is no longer in substantial compliance with or substantially performing her duties of employment; (ii) Employee commits any act of theft, embezzlement, fraud, deceit, dishonesty or other criminal act that adversely impacts Employer or Employer's reputation, or (iii) Employee is in material breach of any other material provision of this Agreement.

5. **Restrictive Covenants.**

(a)    Non-Disclosure.  Employee recognizes and acknowledges that she will, during the term of this Agreement, have access to certain Confidential Information of Employer, as defined herein.  Employee agrees that she will not use or disclose any such Confidential Information to any party without express written authorization of the Employer.    The term "**Confidential Information**" means any and all confidential, proprietary or trade secret information, whether disclosed, directly or indirectly, verbally, in writing or by any other means in tangible, intangible form, electronic or online, including that which is conceived or developed by the Employee, applicable to or in any way related to: (i) the present or future business of the Employer; (ii) the research and development of the Employer; or (iii) the business of any client or vendor of the Employer.

(b)    Non-Competition.  Employee agrees that for a period of two (2) years after the termination of her employment, regardless if such termination is voluntary or involuntary, she will not engage in any business or perform any service, or have any interest in any enterprise in direct or indirect competition with Employer which does business within fifty (50) miles of the office of Employer where Employee performed her duties for Employer, nor will Employee engage in or have any interest in any client or customer of Employer.

(c)    Non-Solicitation.  During the period of employment, or during the period of non-competition, Employee shall not, directly or indirectly, solicit or service in any way, any client or customer, or prospective client or customer, who has been solicited or serviced by Employer prior to the termination of the Employee.  Employee further agrees not to solicit or entice or endeavor to solicit or entice away from Employer any person who was a director, officer, employee, contractor or consultant of Employer, either on her own account or for any person, firm, corporation or other organization, whether or not such person would commit any breach of his contract of employment by reason of leaving the service of Employer.

(d)    Injunctive Relief.  Employee acknowledges that her compliance with the restrictive covenants in this Section 5 is necessary to protect the goodwill and other proprietary interests of Employer.  Employee acknowledges that a breach of the restrictive covenants as more fully set forth in this Section 5 may result in serious and

**EXHIBIT 8**

irreparable damage to the Business for which there will be no adequate remedy at law and she agrees that in the event of any such breach of the aforesaid restrictive covenants, Employer and its successors and assigns shall be entitled to preliminary and permanent injunctive relief and to such other and further relief as may be available at law or in equity.

(e)     Period of Relief.  If Employee violates the agreements set forth in this Section 5 and Employer brings legal action for injunctive or other relief, Employer shall have the benefit of the full period of the restrictive covenant.  Accordingly, the restrictive covenants shall be deemed to have the duration of two (2) years, computed from the date the relief is granted but reduced by the time period after termination that Employee was not in violation of this covenant.

(f)     Alternative Employment.  Employee acknowledges that her experience and capabilities are such that Employee can obtain suitable employment otherwise than in violation of this restrictive covenant, and that, accordingly, in the event of the termination of Employee's employment for any reason and at any time, the enforcement of this restrictive covenant will not prevent Employee from earning a livelihood or otherwise cause Employee undue hardship.

6.     **Intellectual Property.**  Employee agrees that Employer owns and shall continue to own all copyrights, trademarks, patents, websites, domain names, internet addresses, phone numbers, ideas, formulae, programs, systems, improvements, devices, processes, business concepts, discoveries and inventions related to the Business, or used or useable by Employer, that were conceived, made, developed, acquired or reduced to practice during the term of this Agreement (hereinafter referred to as "**Intellectual Property**"), whether or not the Intellectual Property is suitable for trademark, patent or copyright.  Employee hereby transfers and assigns to Employer all right, title and interest in and to said Intellectual Property, including any and all domestic and foreign patent rights or copyrights therein and any renewals thereof.  On request of Employer, Employee shall (without any additional compensation) from time to time during the term of this Agreement, subject however to the terms and provisions of Section 5 above, execute such further instruments (including, without limitation, trademark assignments, copyright registrations, applications for letters patent and assignments of either) and do all such other acts and things as may be deemed necessary or desirable by Employer to protect and/or enforce its rights in respect of any Intellectual Property.  All expenses of filing or prosecuting any copyright or any patent application shall be borne by Employer, but Employee shall reasonably cooperate in filing and/or prosecuting any such applications, at no cost to Employee, and subject to the terms of Section 5 above.

7.     **Entire Agreement.**  This Agreement, and all schedules and attachments hereto, contains the entire agreement of the Parties with respect to the subject matter hereof and shall not be modified or changed in any respect except in writing duly signed by the Parties.

8.     **Governing Law; Jurisdiction.**   This Agreement shall be governed by, interpreted, construed, and enforced in accordance with the laws of the State of Maryland.  Any action or proceeding to enforce this Agreement shall under the exclusive jurisdiction and venue of the courts of Montgomery County, Maryland, and any Party that must institute such action or

**EXHIBIT 8**

proceeding to enforce this Agreement shall be entitled to costs of enforcement, including attorney fees and litigation costs.

9. **Interpretation of Provisions**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10. **Headings**. Headings in this Agreement are solely for purposes of identification and shall not in any manner alter or vary the interpretation or construction of this Agreement.

11. **Successors and Assigns**. All the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their heirs, personal representatives, executors, transferees, successors and assigns.

12. **Counterparts**. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURES APPEAR ON THE FOLLOWING PAGE(S)]

**EXHIBIT 8**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement on the date first above written.

EMPLOYEE:

_Laura Bankeroff_

Laura Bankeroff

EMPLOYER:

HEALTH CARE RESOURCE
NETWORK, LLC

Silvija Valleru, Manager

**EXHIBIT 8**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement on the date first above written.

EMPLOYEE:

_____

Laura Bankeroff

EMPLOYER:

HEALTH CARE RESOURCE
NETWORK, LLC

_____

Silvija Valleru, Manager

5

**EXHIBIT 8**

**<u>SCHEDULE A</u>**

**JOB DESCRIPTION**

**<u>Position/Title</u>:**
Chief Executive Officer (CEO)/President

**<u>Duties and Hours</u>:**
Employee will undertake a variety of management and client responsibilities including without limitation: business development and sales, client project management, account management, employee management and growth, executive-level decision making for Employer success, and marketing.  Employee will work full time, defined as at least 40 hours per week.

**<u>Benefits*</u>:**
Health Insurance – wholly paid by employer
Dental Insurance – wholly paid by employer
Vision Insurance – wholly paid by employer
Twenty-five (25) Days Paid Time Off (PTO) plus 3 sick/bereavement days
Participation in Employer's SIMPLE-IRA retirement plan
Participation in Employer's Bonus Plan
Ten (10) Holidays:

| New Year's Day | Martin Luther King, Jr. Day |
|---|---|
| George Washington's Birthday | Memorial day |
| Independence Day | Labor Day |
| Columbus Day | Veteran's Day |
| Thanksgiving Day | Christmas Day |

If any of the above holidays falls on a weekend, then Employer shall assign a different day in which Employee shall be off work.  Ex. - July 4th is on a Saturday, Employer may decide between the preceding Friday or the following Monday as the holiday for employment purposes. Home-office benefits as determined by Employer

* Benefits shall be subject to periodic review and change in order to conform with changes in Employer's policies

6

**EXHIBIT 8**

## SCHEDULE B

## MONTHLY BONUS PLAN

Employer shall be eligible for a monthly bonus in accordance with the below chart.  Said bonus shall be paid on the first regular pay-day following confirmation of the bonus amount by Employee and her supervisor.  For purposes of the chart below, Net Income shall be as determined by the monthly Income Statement after application of all operating expenses, including without limitation allocation of taxes, interest, and long-term debt.

| **Employer's Monthly Net Income** | **Employee's Bonus** |
|---|---|
| Less than $150,000 | 1% of Net Income (for applicable month) |
| Between $150,000 and $200,000 | 2.5% of Net Income (for applicable month) |
| More than $200,000 | 3% of Net Income (for applicable month) |

**EXHIBIT 8**

Laura Bankeroff
Joann Koutsioukis
10817 Red Barn Lane
Potomac, MD 20854

August 1, 2018

**SENT BY FEDERAL EXPRESS AND**
**ELECTRONIC MAIL**
<u>silvivalleru@gmail.com</u>
<u>dokinav@yahoo.com</u>

Vivos Acquisitions, LLC
10529 Crestwood Drive., Suite 201
Manassas, VA 20109
Attn: Silvija Valleru

MPL Law Firm, LLP
137 East Philadelphia Street
York, PA 17401
Attn: Andrew J. Miller

RE:     **<u>DEFAULT NOTICE; VIVOS ACQUISITIONS, LLC</u>**

TO WHOM IT MAY CONCERN:

      You are hereby notified that Vivos Acquisitions, LLC ("Vivos") is in default of the following four (4) promissory notes payable to Laura Bankeroff and Joann Koutsioukis, all dated February 16, 2017. Payments of principal and interest were due and payable on or before August 1, 2018, and no payments were received. Under the terms of the promissory notes, Vivos has five (5) days to cure the defaults.

<u>Promissory Notes Payable to Laura Bankeroff</u>:

Principal Amount: $297,300.78
Interest Rate: 4.5%
Maturity Date: December 1, 2021

Principal Amount: $2,182,800.00
Interest Rate: 4.5%
Maturity Date: January 1, 2022

**EXHIBIT 9**

Promissory Notes Payable to Joann Koutsioukis:

Principal Amount: $285,641.92
Interest Rate:  4.5%
Maturity Date:  December 1, 2021


Principal Amount: $2,097,200.00
Interest Rate: 4.5%
Maturity Date: January 1, 2022


      In the event the defaults are not cured in five (5) days, then pursuant to the terms of the promissory notes, the entire unpaid principal balances due under the promissory notes shall be accelerated and be immediately due and payable, together with accrued interest.


      Yours Truly,

      *Laura Bankeroff*

      Laura Bankeroff and

      Joann Koutsioukis

**EXHIBIT 9**