IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| VIVOS ACQUISITIONS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:19-cv-1606 (RDA/WEF) |
| v. ) | |
| ) | |
| HEALTH CARE RESOURCE NETWORK, ) | |
| LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court for resolution following a four-day bench trial conducted from November 7, 2022 to November 10, 2022. At issue at the bench trial were the following claims and counterclaims remaining after summary judgment: Plaintiff Vivos Acquisitions, LLC's ("Vivos" or "Plaintiff") claim for breach of contract (Count II of the Amended Complaint); and Defendants Health Care Resource Network, LLC ("HCRN"), Laura Bankeroff, and Joann Koutsioukis' (collectively, "Defendants") counterclaims for fraud (Count I of the Amended Counterclaim); statutory conspiracy (Count II of the Amended Counterclaim); common law conspiracy (Count III of the Amended Counterclaim); and breach of contract (Count IV of the Amended Counterclaim). The parties also presented evidence on Plaintiff's breach of fiduciary duty claim against Bankeroff (Count VI of the Amended Complaint) after the Court, on its own motion, decided to reconsider its previous ruling dismissing that claim.[1]

---

[1] In its April 3, 2020 Memorandum Opinion and Order, this Court dismissed Plaintiff's breach of fiduciary duty claim against Bankeroff. Dkt. 24. In so doing, this Court reasoned that Maryland law, which governs the Employment Agreement at issue, does not recognize breach of fiduciary duty as an independent tort. *Id.* at 12-14. However, since this Court issued that Memorandum Opinion and Order, there has been a significant change in the law. Specifically, on July 14, 2020, the Court of Appeals of Maryland held that a breach of fiduciary duty may be

Based on all the evidence presented at trial, including the Court's assessment of the credibility of the witnesses and the weight to be given to each piece of evidence, together with the reasonable inferences drawn from that evidence, the Court enters judgment on Counts II and VI of the Amended Complaint in favor of Defendants and enters judgment on Counts I, II, III, and IV of the Amended Counterclaim in favor of Plaintiff.

In support of this verdict, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2]

## I. FINDINGS OF FACT

Suffice it to say that the circumstances of this matter are beyond convoluted and challenging. However, the factual circumstances of the case are largely undisputed. The significance and interpretation of these facts in light of the dealings between the parties control the disposition of the matter.

Vivos was formed on January 11, 2017 as a Virginia limited liability company with a principal place of business in Prince William County, Virginia. DX 1. Naveen Doki ("N. Doki") and Silvija Valleru ("Valleru") were its members. *Id.* HCRN is a Nevada limited liability company with a principal place of business in Montgomery County, Maryland. DX 3. Prior to February 10, 2017, Laura Bankeroff and Joann Koutsioukis owned 51 and 49 percent, respectively, of its Membership Interests. Trial Tr. 45:13-18.

---

actionable as an independent cause of action in certain circumstances. *Plank v. Cherneski*, 469 Md. 548, 559 (2020).

[2] Federal Rule of Civil Procedure 52(a) provides in pertinent part: "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

Prior to February 2017, Bankeroff and Koutsioukis solicited offers to sell HCRN. During that process, Suresh Venkat Doki ("S. Doki"), Vivos' director of mergers and acquisitions and N. Doki's brother, identified himself to them as "Suresh Venkat D." DX 9; Trial Tr. 561:22-562:2. On February 10, 2022, Bankeroff and Koutsioukis sold their Membership Interests to Vivos for $8,580,000.00 pursuant to a Membership Interest and Purchase Agreement. PX 1; DX 4; Trial Tr. 91:21-23. The record suggests that what started in this case as a traditional multi-million-dollar purchase of a viable enterprise turned into a multi-tiered leveraged buyout. Just prior to closing it was revealed that of the $8,580,000 purchase price, $4,280,000.00, was to be deferred and paid to Bankeroff and Koutsioukis pursuant to Promissory Notes of $2,182,800.00 and $2,097,200.00. PX 18; Trial Tr. 183:4-187:22. In addition, at closing, HCRN's existing line of credit balance of $582,942.71 was paid off and subsequently paid to Bankeroff and Koutsioukis in the form of Supplemental Promissory Notes.[3] DX 5. The Bankeroff Supplemental Promissory Note was in the amount of $297,300.78, and the Koutsioukis Supplemental Promissory Note was in the amount of $285,641.92. *Id.* In the documents finalized on the funding date, February 16, 2017, the Bankeroff Notes added up to $2,480,100.78 and the Koutsioukis Notes added up to $2,382,841.92. DX 11-14. After the sale, Bankeroff remained employed at HCRN. Bankeroff served as the company's Chief Executive Officer ("CEO") and President until April 26, 2017, when she became the company's Administrator. PX 8; Trial Tr. 473:24-25-474:1-20.

Vivos secured the Notes by pledging the Membership Interests in HCRN pursuant to a Membership Interest Pledge Agreement. PX 5; DX 15. Vivos, the "Pledgor," pledged its "Membership Interests purchased to [Bankeroff and Koutsioukis, the] Pledgees[,] as security for

---

[3] The Promissory Notes and the Supplemental Promissory Notes will be referred to collectively as "the Notes."

3

payment of the Seller Notes . . . ."  PX 5; DX 15.  Among other restrictions, the Membership Interest Pledge Agreement prohibited Vivos from "sell[ing], assign[ing], hypothecat[ing], convey[ing] or otherwise dispos[ing] of any Pledged Interests or interest therein, or create[ing] a lien, pledge or any encumbrance whatsoever upon the Pledged Interests or its proceeds."  PX 5; DX 15.  The Membership Interest Pledge Agreement also provided that "[t]he parties . . . shall pay their own costs, fees and expenses . . . , and no such costs, fees or expenses shall be paid by or transferred to the Company following Closing."  PX 5; DX 15.

Vivos funded the transaction with $3,452,627.00 borrowed from the factoring company Advance Business Capital, LLC d/b/a Triumph Business Capital ("Triumph").  PX 28, 55, 59, 99; Trial Tr. 184:17-20.  Vivos did so by using HCRN's accounts receivable as security for the money, plus $700,000.00 from a "Vivos Acquisitions Loan" and $183,873.00 from HCRN's own operating accounts at SunTrust Bank.  DX 6, 20; Trial Tr. 22:24, 186:4-6.  Vivos had borrowed $500,000.00 of the $700,000.00 "Vivos Acquisitions Loan" from Srinivasa R. Kalidindi, a friend of S. Doki's.  Trial Tr. 678:14-18.  Through Valleru, Vivos executed a Note dated February 10, 2017—the day of the closing of the HCRN transaction—and granted Kalidindi a 5.88% profits interest in HCRN.  DX 7-8; Trial Tr. 620:7-15.

Shortly afterwards, on February 20, 2017, Vivos sent HCRN an invoice for $171,600.00 for closing costs stemming from the HCRN transaction.  Trial Tr. 623:2-4.  Vivos sent this invoice in the name of Federal Systems LLC, and S. Doki told HCRN's CFO Erin Duffy that the invoice was for "his broker fee for the sale."  Trial Tr. 721:3-5.  S. Doki also wrote in an email: "We expect all fees to come out of the parent company.  As you very well know, we dont [sic] have funds at Lionshead or Vivos to cover for closing costs."  DX 10.

Again needing additional funds, on November 15, 2017, N. Doki and Valleru executed loan documents individually and on behalf of Vivos, HCRN, Vivos Holdings LLC, and Vivos' subsidiary Maslow Media Group, Inc. ("Maslow") with a division of Credit Cash New Jersey, LLC ("Credit Cash"). DX 25. Similar to the Kalidindi agreement, Vivos' guaranty "grant[ed] to [Credit Cash] . . . a continuing general lien and security interest in and to substantially all of [Vivos]'s assets, whether now existing or hereafter acquired or created, and wherever located . . . ." *Id.*

Additionally, the payments under the Supplemental Promissory Notes were to commence on or before April 1, 2017, while the payments under the original Promissory Notes were not to commence until May 1, 2017. PX 3-4, 6-7; DX 11-14. The final payment on the Supplemental Promissory Notes was due on or before January 1, 2022, and the final payment on the original Promissory Notes was due on or before December 1, 2021. PX 3-4, 6-7; DX 11-14. Each payment was to be made on the first day of the calendar month. PX 3-4, 6-7; DX 11-14.

The Notes contained the following language regarding potential default by Vivos: "[W]ithout notice or demand of any kind, [Vivos] shall be in default" for reasons that included:

> (b) Insolvency or bankruptcy of [Vivos], or the making by [Vivos] of an assignment for the benefit of creditors … or
>
> (c) [Vivos] fails to make payments when required hereunder and such failure continues uncured for more than five (5) days after written notice from Holder[, or]
>
> (d) [Vivos] shall be in default or breach of any of the terms and provisions of the Purchase Agreement between [Vivos] and Holder.

PX 3-4, 6-7; DX 11-14.

In the event of default, the Membership Interest and Purchase Agreement required Bankeroff and Koutsioukis to deliver written notice to the defaulting party personally, by first-

class mail, or by overnight delivery.  PX 1; DX 4.  And if the default remained uncured for five days, Bankeroff and Koutsioukis were permitted to

> either (i), sell or dispose of and deliver Pledged Interests or interest therein in a public or private sale, for cash or for credit, without assumption of credit risk or (ii) retain and become the full owner of the Pledged Interests with all rights and privileges thereto and without the requirement of any notice to the Pledgor.

PX 5; DX 15.

Vivos made its monthly payments on the Notes by depositing funds into HCRN's bank account, and, each time, Bankeroff and Koutsioukis would accept those payments.  PX 43-54.  However, by August of 2018, Bankeroff and Koutsioukis had decided that they would no longer permit Vivos to make payments with funds drawn from HCRN's own account.  PX 9.  On August 1, 2018, Bankeroff emailed a courtesy copy of a default notice to N. Doki and Valleru at 3:57 p.m. and deposited a notice of default in a Federal Express box at approximately 6:00 p.m.  Trial Tr. 233:19-23.  A couple of days later, on August 3, 2018, Vivos transferred $200,000.00 into HCRN's bank account.  Trial Tr. 230:24-25-231:1.  Rather than accepting those funds, Bankeroff sent an email to S. Doki asserting that she and Koutsioukis would no longer accept money from the HCRN bank account as payment under the Notes.  Trial Tr. 231:8-13.  Then, on August 7, 2018, Bankeroff and Koutsioukis executed the Assignment of Membership Interests, thus taking back the company.  DX 47.  On August 8, 2018, Vivos wired $94,824.89 into Bankeroff and Koutsioukis' joint SunTrust bank account.[4]  DX 49.  And on August 10, 2018, HCRN's counsel sent a notice of acceleration of the Notes to Vivos.  DX 50.

---

[4] The parties have represented that this payment is still held in an escrow account that defense counsel controls.  Trial Tr. 554: 6-13.

## II. CONCLUSIONS OF LAW

Based on the findings of fact set forth herein, the Court makes the following conclusions of law.

### A. Breach of Contract Claims[5]

#### 1. Plaintiff's Breach of Contract Claim (Count II of the Amended Complaint)

Plaintiff asserts that Defendants breached their contractual obligations when Bankeroff and Koutsioukis prematurely sent Plaintiff a notice of default on August 1, 2018 and subsequently terminated Plaintiff's ownership of the HCRN Membership Interests. Dkt. 116 at 25. Consequently, Plaintiff argues, the Court should declare Bankeroff and Koutsioukis' execution of the Assignment of Membership Interests to be "void." *Id.* at 32-33. In response, Defendants assert that any purported breach of contract on their part was excusable by Vivos' prior material breaches. Dkt. 114 at 23. Defendants specifically point to the following instances in which Vivos allegedly

---

[5] The Court has taken judicial notice that the Membership Interest Purchase Agreement was poorly written and is riddled with inconsistencies. Trial Tr. 144:4-11. The following are just some examples of this inartful draftsmanship: Section 4.1 of the agreement refers to the buyer, Vivos, as a Delaware limited liability company when, in fact, Vivos is a Virginia limited liability company. PX 1; DX 4. Section 2.1 of that same agreement incorrectly provides that the closing date was December 15, 2016, when in fact, the agreed-upon closing date was February 10, 2017. PX 1; DX 4. Section 5.3 of the agreement references a mandatory arbitration provision in Section 8.6 of the agreement, but Section 8.6 does not include any such mandatory arbitration provision. PX 1; DX 4. And perhaps most confusing of all, Section 8.5 of the agreement provides that Virginia law shall govern the agreement while Section 5.3 provides that the buyer "shall be permitted to seek equitable relief in the courts of Montgomery County, Maryland or the U.S. District Court for Maryland." PX 1; DX 4. It is important to note that trial counsel was not involved in the drafting or "facilitation" of any of the pre-closing documentation related to this case. Trial counsel, like the court was left to work its way through this jenga puzzle of legal documents, and like a jenga puzzle, each document created a progressively more unstable legal structure. Notwithstanding these examples of poor draftsmanship, the provisions relevant to the instant dispute are sufficiently clear and unambiguous for the Court to enforce the agreement. *See Doswell Ltd. P'ship v. Virginia Elec. & Power Co.*, 251 Va. 215, 222-23 (1996) ("Even though an agreement may have been drawn unartfully, the court must construe the language as written if its parts can be read together without conflict.").

breached its contractual obligations prior to August of 2018: (1) the Kalidindi "profits interest" agreement; (2) the Federal Systems "transaction fees" invoice, and (3) the Credit Cash agreement. *Id.* at 24-25.

Under Virginia law, a breach of contract claim requires "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 619 (2004). To determine whether Defendants breached their contractual obligations, the Court first examines the circumstances surrounding Bankeroff and Koutsioukis' issuance of a notice of default to Plaintiff. As explained in Section I, the Membership Interest Purchase Agreement provided that, in the event of a default, Bankeroff and Koutsioukis were to provide Vivos with written notice personally, by first-class mail, or by overnight delivery. PX 1; DX 4. However, on August 1, 2018 at around 6:00 p.m., when Bankeroff mailed Vivos a notice of default, Vivos had not yet defaulted on the Notes. *See* Trial Tr. 233:19-21. In fact, Vivos had until 11:59 p.m. on August 1, 2018 to make a payment under the Notes given that payment was due on the first day of every month. *See Ewing v. Ewing*, 21 Va. App. 34, 37 (1995) (defining a day as "a period of time consisting of twenty-four hours and including the solar day and the night"). Accordingly, the Court finds that, because Bankeroff and Koutsioukis failed to send Vivos a valid notice of default in August of 2018, their execution of the Assignment of Membership Interests constituted a breach of their obligations to Plaintiff.

Nevertheless, the Court finds that Plaintiff's breach of contract claim fails because Defendants have a valid defense of prior material breach. The Court also finds that, after August 2018, Bankeroff and Koutsioukis discovered several other factually legitimate and legally

cognizable grounds for declaring a default and reclaiming the Membership Interests that were not known to them at the time that they issued the August 1, 2018 notice of default.

As an initial matter, the Court recognizes that the defense of prior material breach is applicable, even where a party is unaware that a legal excuse for nonperformance existed at the time that she breached the contract. *See College Point Boat Corp. v. United States*, 267 U.S. 12, 16 (1925) (observing that a party may justify its termination of an agreement "by proving that there was, at the time, an adequate cause, although it did not become known to h[er] until later."); *Cars Unlimited II, Inc. v. National Motor Co.*, No. CIV A 206CV305, 2007 WL 2344990, at *7 (E.D. Va. Aug. 15, 2007) (holding that "regardless of its lack of knowledge, [the defendant] was permitted to suspend performance based on [the plaintiff's] prior material breach as it is a well-established precept of contract law that ignorance of a material breach does not preclude a party from thereafter relying on such breach as justification for its failure to perform").

The Court next turns to the issue of whether Plaintiff committed any material breaches prior to August 1, 2018. The Membership Interest Pledge and Security Agreement contains provisions that are relevant to this inquiry. Paragraph 9 of that Agreement provides, in pertinent part, that "[Vivos] will not sell, assign, hypothecate, convey or otherwise dispose of any Pledged Interests or interest therein, or create a lien, pledge or any encumbrance whatsoever upon the Pledged Interests or its proceeds." PX 5; DX 15. And paragraph 8.3 of that Agreement provides: "The parties hereto shall pay their own costs, fees and expenses incident to . . . this transaction, the negotiation, preparation and execution of this Agreement, . . . and no such costs, fees or expenses shall be paid by or transferred to the Company following Closing." PX 5; DX 15.

The Court finds that Plaintiff materially breached its contractual obligations to Defendants on three separate occasions prior to August of 2018. First, Plaintiff granted Kalidindi a profits

9

interest in HCRN in violation of paragraph 9 of the Membership Interest Pledge and Security Agreement.  *See* DX 7-8; Trial Tr. 620:7-15.  Second, Plaintiff violated paragraph 8.3 of the Agreement by invoicing HCRN for what S. Doki referred to as "his broker fee for the sale." Trial Tr. 721:5-7.  And third, Plaintiff granted Credit Cash a general lien and security interest in all of Vivos' assets, thus encumbering the HCRN Membership Interests in violation of paragraph 9 of the Agreement.  *See* DX 25.

Furthermore, each breach was material (and, in these instances, ruinous) to Defendant's interest.  "[A] breach qualifies as material when 'the evidence establishes that the breach was so central to the parties' agreement that it defeated an essential purpose of the contract.'"  *Cars Unlimited II, Inc.*, 2007 WL 2344990, at *5 (quoting *Horton v. Horton*, 254 Va. 111, 115 (1997)). The Court finds that Vivos violated central conditions of the Membership Interest Pledge and Security Agreement by pledging HCRN's assets and forcing HCRN to pay fees on both sides of the transaction.  Accordingly, Bankeroff and Koutsioukis were justified in executing the Assignment of Membership Interests in August of 2018.

For the foregoing reasons, the Court holds that Plaintiff has failed to prove Count II of the Amended Complaint and is therefore not entitled to ownership of the Membership Interests. Accordingly, Bankeroff and Koutsioukis will remain owners of HCRN's Membership Interests.

### 2. Defendants' Breach of Contract Counterclaim

Defendants' breach of contract counterclaim seeks the outstanding principal and interest that Plaintiff owes on the Notes, which Defendants assert became due and payable as a result of Plaintiff's default. Dkt. 114 at 33.  In response, Plaintiff claims that its obligations were completely satisfied when Defendants reclaimed the HCRN Membership Interests.  Dkt. 134 at 9.

The Membership Interest Pledge and Security Agreement provides, in pertinent part:

> Upon the occurrence of a default under the Note or on any of the Collateral Documents which is not cured within any applicable cure period or if the Pledgor defaults hereunder which is not cured within five (5) days of delivery of notice of such default to the Pledgor ("Event of Default"), then . . . Pledgees may, without demand of performance or notice of any kind to the Pledgor, either (i), sell or dispose of and deliver Pledged Interests or interest therein in a public or private sale, for cash or for credit, without assumption of credit risk or *(ii) retain and become the full owner of the Pledged Interests with all rights and privileges thereto* . . . .

PX 5 (emphasis added); DX 15 (emphasis added).

Here, the Court finds that, by reclaiming their Membership Interests in HCRN, Bankeroff and Koutsioukis have already received any relief that they may be entitled to under the Membership Interest Pledge and Security Agreement. Consequently, as a matter of equity, awarding Bankeroff and Koutsioukis the remaining money owed under the Notes would amount to an impermissible double recovery. *See Gen. Tel. Co. of the Nw., Inc. v. E.E.O.C*, 446 U.S. 318, 333 (1980) ("It . . . goes without saying that the courts can and should preclude double recovery by an individual."); *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, No. 2:13CV279, 2014 WL 12917974, at *1 (E.D. Va. Jan. 15, 2014) ("[S]hould Plaintiff ultimately prevail, only one form of recovery is proper."); *Am. Contractors Indem. Co. v. West*, No. 1:12-CV-01015 LO/IDD, 2014 WL 3378655, at *4 n.1 (E.D. Va. June 5, 2014), *report and recommendation adopted as modified*, No. 1:12-CV-01015, 2014 WL 3408082 (E.D. Va. July 10, 2014) ("It is well established that a party may not recover twice for one injury."). Accordingly, Bankeroff and Koutsioukis are entitled to neither the outstanding principal and interest on the Notes nor the funds that Vivos deposited into HCRN's bank account and Bankeroff and Koutsioukis' joint SunTrust bank account on August 3, 2018 and August 8, 2023, respectively.

B. Plaintiff's Breach of Fiduciary Duty Claim

Plaintiff argues that Bankeroff, as the CEO and President, and later, as an Administrator of HCRN, owed Vivos and its members a fiduciary duty during the relevant period. Dkt. 116 at 16. Plaintiff avers that Bankeroff breached her duty of confidentiality by sharing financial information about HCRN with Nick Tsahalis, an employee of Maslow. Trial Tr. 133:17-25. Plaintiff further accuses Bankeroff of breaching her duties of good faith and loyalty by conspiring with Koutsioukis to oust Vivos from HCRN after learning that HCRN would soon thereafter be awarded a lucrative government contract. Dkt. 116 at 16-17; Trial Tr. 11:6-10, 70:1-13. In response, Bankeroff maintains that she believed that all of her actions were in HCRN's best interest. Trial Tr. 70:11-15, 390:17-22.

To establish a claim for breach of fiduciary duty under Maryland law,[6] a plaintiff must prove "(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary."[7] *Plank v. Cherneski*, 469 Md. 548, 599 (2020) (quoting *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)). Here, the Court concludes that Plaintiff has not proven that Bankeroff breached her fiduciary duties to HCRN. The Court credits Bankeroff's testimony that she only disclosed HCRN's financial information when directed to do so by S. Doki and that such disclosures were necessary to fulfilling her duties.[8] *See* Trial Tr.

---

[6] This Court has already held in its April 3, 2020 Memorandum Opinion and Order that Maryland law governs Plaintiff's breach of fiduciary duty claim. Dkt. 24 at 13.

[7] Maryland law does not specify by statute the fiduciary duties of officers, thus "leaving the matter to be addressed in the operating agreement, or through judicial common-law development." *Plank*, 469 Md. at 571 n.7.

[8] The Membership Interest and Purchase Agreement permitted the sellers of HCRN—Bankeroff and Koutsioukis—to disclose confidential information when doing so was "necessary in the ordinary course of performing duties on behalf of the Company." PX 1; DX 4.

12

349:7-13, 350:1-6, 390:17-22.  The Court also finds that Bankeroff credibly testified that she and Koutsioukis refused to accept the money that Vivos wired into HCRN's bank account on August 3, 2018 because they feared that doing so would put HCRN at risk of bankruptcy, given the company's outstanding debts and payroll obligations.  *See* Trial Tr. 230:24-25, 231:1-18, 232:2-17.  Accordingly, Plaintiff's breach of fiduciary duty claim fails.

C. Defendants' Fraud Counterclaim

Defendants contend that the actions of Vivos, through its agent S. Doki and its members N. Doki and Valleru, constituted fraud. Defendants specifically accuse S. Doki of intentionally concealing his last name "Doki" to hide from Defendants (1) the fact that he, his businesses, and his wife had been the defendants in numerous lawsuits, including multiple default judgments; (2) a bankruptcy case involving an entity that S. Doki controlled, MCSGlobal Inc., during which the United States Trustee condemned "Mr. Doki's flagrant misrepresentations and willful breaches of contract"; and (3) millions of dollars in liens against S. Doki and his wife for unpaid federal, state, and local taxes and other debts. Dkt. 114 at 29-30. Bankeroff and Koutsioukis aver that, had they been aware of S. Doki's true identity and background, they would not have proceeded in selling HCRN. *Id.* at 31. They also accuse N. Doki and Valleru of playing smaller but still significant roles in the purported fraud scheme. *Id.* at 31. Bankeroff and Koutsioukis explain that both of those individuals knew of S. Doki's true identity—after all, N. Doki is S. Doki's brother and Valleru had participated in transactions with S. Doki for years. *Id.* As such, Bankeroff and Koutsioukis maintain that N. Doki and Valleru should have advised them of S. Doki's last name. *Id.* Plaintiff counters that S. Doki representing himself as "Suresh Venkat D." did not amount to actionable fraud. According to Plaintiff, Bankeroff and Koutsioukis were fully responsible for conducting their own due diligence, through their broker and attorneys, before deciding to sell their Membership Interests to N. Doki and Valleru.[9] Dkt. 116 at 35, 42-44. The Court agrees.[10]

In Virginia, to establish a claim for fraud in the concealment, the claimant must prove the following six elements: "(1) a false representation, (2) of a material fact, (3) made intentionally

---

[9] Plaintiff also contends that Virginia's source of duty rule bars Defendants' fraud counterclaim. Dkt. 116 at 45. Plaintiff explains that, under Virginia's source of duty rule, disappointments based on the breach of duties "assumed only by agreement, rather than a duty

14

and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Thompson v. Bacon*, 245 Va. 107, 111 (1993). Where the fraud is premised on an omitted statement or representation—*i.e.* the party makes a fraudulent concealment claim, as Defendants do here—the claimant must provide "an allegation . . . of a knowing and deliberate decision not to disclose a material fact." *Norris v. Mitchell*, 495 S.E.2d 809, 812 (Va. 1998).

In the instant case, it appears to the Court that S. Doki may very well have represented himself as "Suresh Venkat D." in hopes that Bankeroff and Koutsioukis would not inquire into his full last name and consequently remain unaware of the litany of lawsuits and liens filed against him.[11] But even assuming without deciding that S. Doki intentionally concealed his full name from Defendants, Defendants' fraud claim fails because they have not demonstrated that their reliance on S. Doki's representation about his identity was reasonable. The Fourth Circuit has articulated that, in the context of a fraud claim, the "touchstone of reasonableness is prudent investigation." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999). Here, Bankeroff and Koutsioukis are sophisticated parties who had employed Capital Business Advisors,

---

imposed by law, remain the sole province of the law of contracts." *Id.* (quoting *Filak v. George*, 267 Va. 612, 618 (2004)). However, this Court has already rejected Plaintiff's source of duty rule argument in its December 30, 2020 Memorandum Opinion and Order. Dkt. 66 at 19. In so doing, this Court held that any duty that Vivos may have had to disclose material facts to Bankeroff and Koutsioukis preceded the parties entering into an agreement and thus did not arise out of contract. *Id.*

[10] This determination is not in any way an endorsement of the, at best, duplicitous conduct of S. Doki.

[11] The Court gives significant weight to S. Doki's trial testimony that he typically identifies himself as Suresh Vanket Doki or Suresh V. Doki in his professional endeavors. *See* Trial Tr. 558:13-25 (S. Doki's trial testimony that he maintains a LinkedIn account under the name "Suresh Doki" and a website with the domain "SureshDoki.net."). Furthermore, the Court does not give much credence to S. Doki's trial testimony denying that he was trying to hide his long history of lawsuits, bankruptcies, and debts by referring to himself as "Suresh Vanket D." while negotiating with Bankeroff and Koutsioukis. *See* Trial Tr. 564:6-10.

15

a brokerage company, to conduct due diligence on their behalf. *See* Trial Tr. 187:12-13. The failure of Bankeroff and Koutsioukis' brokers to look into S. Doki's background,[12] purportedly because he was merely the broker for the potential buyers—not a potential buyer himself—does not undercut the Court's finding that a reasonable investigation would likely have uncovered S. Doki's full name and concerning history. *See* Trial Tr. 85:21-24, 287:15-16. While it is unfortunate that Bankeroff and Koutsioukis may have had the wrong impression with respect to the identity of S. Doki, the Court finds that Plaintiff's actions did not cross the line into fraud.

### D. Defendants' Conspiracy Counterclaims

Defendants next assert that, for the same reasons that Vivos is liable for fraud, the actions of S. Doki, N. Doki, and Valleru constituted statutory conspiracy, in violation of Virginia Code Section 18.2-499, and common law conspiracy. Dkt. 114 at 34. Because Defendants' conspiracy claims rely on the same allegations as their fraud claim, the conspiracy claims fail too.

### III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that final judgment is entered in favor of Defendants on Counts II and VI of the Amended Complaint and in favor of Plaintiff on Counts I, II, III, and IV of the Amended Counterclaim; and it is

FURTHER ORDERED that defense counsel return to Vivos the $200,000.00 that Vivos deposited into HCRN's bank account on August 3, 2018 and the $94,824.89 that Vivos deposited

---

[12] The issue of whether the brokerage firm breached any of its contractual obligations to Bankeroff and Koutsioukis is not before the Court, and so the Court does not reach this question.

into Bankeroff and Koutsioukis' joint SunTrust bank account on August 8, 2018.

The Clerk is directed to forward copies of these Findings of Fact and Conclusions of Law to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
January 5, 2023

                                        /s/
Rossie D. Alston, Jr.
United States District Judge